UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HOWARD HOUSTON,

                Plaintiff,

            v.

SEWARD & KISSEL LLP,

                Defendant.

**ECF CASE**

07 Civ. 6305 (HB)

<u>Oral Argument Requested</u>

## MEMORANDUM IN SUPPORT OF SEWARD & KISSEL LLP'S MOTION TO DISMISS THE COMPLAINT

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP

Gerard E. Harper
Julia Tarver Mason
Jacqueline P. Rubin
Jana C. Ramsey
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................ ii

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF THE CASE........................................................................ 2

ARGUMENT ................................................................................................. 8

I.    THE COURT SHOULD DISMISS PLAINTIFF'S CLAIMS AS
      PREEMPTED BY FEDERAL LAW............................................................8

      A.    The NSMIA Preempts The Regulation of "Covered Securities".................9

            1.    The Purpose And Intent Of The NSMIA ................................... 9

            2.    The Wood River Limited Partnership Interests Are Covered Securities
                  Under The NSMIA ................................................................ 11

      B.    The NSMIA Expressly Preempts Plaintiff's Claims ...............................11

      C.    The NSMIA Impliedly Preempts Plaintiff's Claims...............................14

      D.    The Savings Clause Of The NSMIA Does Not Apply To Plaintiff's
            Claims ...................................................................................... 17

II.   THE COURT SHOULD DISMISS PLAINTIFF'S CLAIMS BECAUSE ORS
      59.115 VIOLATES THE DORMANT COMMERCE CLAUSE......................17

      A.    ORS 59.115(3) Improperly Regulates Conduct Outside Its Borders.........18

      B.    ORS 59.115(3) Imposes An Improper Burden On Interstate Commerce.....21

III.  THE COURT SHOULD DISMISS PLAINTIFF'S THIRD CLAIM
      BECAUSE ORS 59.115(1)(a) DOES NOT REACH COVERED
      SECURITIES, AND ORS 59.055 EXEMPTS THESE SECURITIES FROM
      REGISTRATION ......................................................................................23

CONCLUSION............................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Am. Booksellers Found.* v. *Dean*, 342 F.3d 96 (2d Cir. 2003) ....................................18, 19, 21

*Am. Libraries Assoc.* v. *Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997).........................19, 21, 22

*BMW of North America, Inc.* v. *Gore*, 517 U.S. 559 (1996) .......................................19

*In re Bayou Hedge Funds Inv. Litig.*, 472 F. Supp. 2d 528 (S.D.N.Y. 2007).........................20

*Bd. of Governors, FRS* v. *Dimension Fin. Corp.*, 474 U.S. 361 (1986) ...................................12

*Brooks* v. *Howmedica, Inc.*, 273 F.3d 785 (8th Cir. 2001) ......................................................14

*Brown-Forman Distillers Corp.* v. *N.Y. State Liquor Auth.*, 476 U.S. 573 (1986) ................18

*Caldwell* v. *Sioux Falls Stock Yards Co.*, 242 U.S. 559 (1917) ...........................................19

*In re Cascade Int'l. Securities Litig.*, 840 F. Supp. 1558 (S.D. Fla. 1993)............................21

*Central Bank* v. *First Interstate Bank*, 511 U.S. 164 (1994) ...........................................15, 16, 23

*C.E.R. 1988, Inc.* v. *Aetna Cas. & Surety Co.*, 386 F.3d 263 (3d Cir. 1988) .........................16

*Cipollone* v. *Liggett Group, Inc.*, 505 U.S. 504 (1992) ................................................................9

*Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ...................................................14

*CSX Trans., Inc.* v. *Easterwood*, 507 U.S. 658 (1993) ............................................................11

*Edgar* v. *MITE Corp.*, 457 U.S. 624 (1983) .......................................................................18, 19, 22

*Friedman* v. *Hartmann*, 1994 WL 97104 (S.D.N.Y. Mar. 23, 1994)......................................20

*Hall* v. *Geiger-Jones Co.*, 242 U.S. 539 (1917) .......................................................................19

*Healy* v. *Beer Inst.*, 491 U.S. 324 (1989)................................................................................18

*Hines* v. *Davidowitz*, 312 U.S. 52 (1941) .............................................................................14

*Jones* v. *Rath Packing Co.*, 430 U.S. 519 (1977) .......................................................................9

*Kolbeck* v. *LIT America, Inc.*, 939 F. Supp. 240 (S.D.N.Y. 1996).........................................20

*Lander* v. *Hartford Life & Annuity Ins. Co.*, 251 F.3d 101 (2d Cir. 2001) ..........................24

*Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) ................................20

*Lorillard Tobacco Co.* v. *Reilly*, 533 U.S. 525 (2001) ................................11

*Maryland* v. *Louisiana*, 451 U.S. 725 (1981) ................................9

*Merrick* v. *N. W. Halsey & Co.*, 242 U.S. 568 (1917) ................................19

*Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Dabit*, 547 U.S. 71 (2006) ................16

*Myers* v. *Merrill Lynch & Co.*, 1999 WL 696082 (N.D. Cal. Aug. 23, 1999) ................13

*Pacific Gas & Elec. Co.* v. *State Energy Res. Conservation & Dev. Comm'n*,
461 U.S. 190 (1983) ................................14

*Perez* v. *Campbell*, 402 U.S. 637 (1971) ................................14

*Pincetich* v. *Jeanfreau*, 699 F. Supp. 1469 (D. Or. 1988) ................................23

*Pike* v. *Bruce Church, Inc.*, 397 U.S. 137 (1970) ................................21

*Riley* v. *Brazeau*, 612 F. Supp. 674 (D. Or. 1985) ................................23

*Rolex Employees Ret. Trust* v. *Mentor Graphics Corp.*, 1991 WL 45714
(D. Or. Mar. 26, 1991) ................................12

*Roth* v. *Jennings*, 489 F.3d 499 (2d Cir. 2007) ................................3

*Schlaifer Nance & Co., Inc.* v. *Estate of Warhol*,
927 F. Supp. 650 (S.D.N.Y. 1996) ................................21

*Schneidewind* v. *ANR Pipeline Co.*, 485 U.S. 293 (1988) ................................14

*In re Towers Fin. Corp. Noteholders Litig.*,
1995 WL 571888 (S.D.N.Y. Sept. 20 1995) ................................20

*United States* v. *Smith*, 299 U.S. 160 (1991) ................................17

*Wabash, St. L. & P. Ry. Co.* v. *Illinois*, 118 U.S. 557 (1886) ................................22

*Wood* v. *Gen'l Motors Corp.*, 856 F.2d 395 (1st Cir. 1988) ................................14

*Zuri-Invest AG* v. *Natwest Fin. Inc.*, 117 F. Supp. 2d 189 (S.D.N.Y. 2001) ................13

## STATE CASES

*Ainsley* v. *First Interstate Bank of Oregon*, 162 P.2d 125 (Or. App. 1997) ...........................19

*Anderson* v. *Carden*, 934 P.2d 562 (Or. App. 1997) ......................................12,15, 19

*Granewich* v. *Harding*, 985 P.2d 788 (Or. 1999) ................................................23

*Greenberg Traurig* v. *Moody*, 161 S.W.3d 56 (Tex. App. 2004) ............................21

*Nat'l Westminster Bank USA* v. *Weksel*, 124 A.D.2d 144 (1st Dep't 1987) .............21

*Prince* v. *Brydon*, 764 P.2d 1370 (1988) ..............................................................19

## U.S. CONSTITUTION

U.S. Const., art. VI, cl. 2 ....................................................................................8

U.S. Const., art. I § 8, cl. 3 ..............................................................................18

## FEDERAL STATUTES

15 U.S.C. § 77r .................................................................................... *passim*

15 U.S.C. § 77b(2) .......................................................................................3, 24

15 U.S.C. § 77d ...............................................................................................11

15 U.S.C. 77q ..................................................................................................23

15 U.S.C. 78j ...................................................................................................23

15 U.S.C. § 78t ................................................................................................16

## FEDERAL REGULATIONS

17 C.F.R. § 230.501(a)(5) ...............................................................................24

17 C.F.R. § 230.506 .........................................................................................11

## CONGRESSIONAL REPORTS

H.R. Rep. No. 104-864 (1996) (Conf. Rep.), *as reprinted in*
    1996 U.S.C.C.A.N. 3920 ...........................................................................10, 17

H.R. Rep. No. 104-622 (1996),*as reprinted in*
    1996 U.S.C.C.A.N. 3877 ...........................................................................9,10, 14

## STATE STATUTES

Ala. Code  § 8-6-19(c) (1975)....................................................................15

Ark. Code Ann. § 23-42-106(c) ..............................................................15

Cal. Corp. Code § 25504.2 ......................................................................15

Conn. Gen. Stat. Ann. § 36b-29 ..............................................................15

N.C. Gen. Stat. Ann. § 78A-56(c)(1) ......................................................15

S.C. Code Ann. 1976 § 35-1-509(g) ........................................................15

Texas Civ. Code Ann. § 581-33(F)(2) .....................................................15

ORS 59.035....................................................................................................24

ORS 59.055....................................................................................................24

ORS 59.115..........................................................................................*passim*

ORS 59.135..........................................................................................*passim*

ORS 59.137..........................................................................................*passim*

## OTHER

Fed. R. Civ. P. 12(b)(6)............................................................................3, 25

Page Keeton *et al.*, Prosser & Keeton on the Law of Torts
    § 46 at 323-24 (5th ed. 1984)) ...........................................................20

New York State Bar Assoc., The Lawyer's Code of Professional Responsibility
    DR 4-101(B) ......................................................................................21

## PRELIMINARY STATEMENT

Plaintiff's claims under Oregon's blue sky laws should be dismissed because federal law preempts Oregon's regulation of the securities at issue here, and the Commerce Clause's limitations on state regulation of interstate commerce render the statutes unconstitutional.

S&K was counsel to a hedge fund called Wood River Partners, L.P. The Fund's general partner, controlled by a man named John Whittier, over-concentrated the Fund's assets in one stock contrary to his representations to investors and failed to make required filings with the SEC. Whittier has since pleaded guilty to federal securities fraud, admitting in his allocution that he lied to S&K about the Fund's holdings. The Fund is in receivership. In search of a deep pocket to cover his risky investment losses, plaintiff -- a sophisticated investor -- sued S&K alleging violations of certain Oregon securities laws. Plaintiff, an Oregon resident, first sued S&K and John Whittier in state court in Idaho, Whittier's state of residence. On February 12, 2007, the Idaho court dismissed plaintiff's action against S&K for lack of personal jurisdiction.

Plaintiff now brings his claims under Oregon's blue sky laws to this Court. Specifically, plaintiff alleges that S&K committed fraud or participated in Whittier's fraud by drafting and editing the offering memorandum and marketing materials on which plaintiff relied. Plaintiff does not allege that S&K was his counsel, that S&K communicated with him in any way, that S&K solicited or sold him any securities, or that S&K provided any opinions or made any representations to him independent of the alleged statements of the Fund in its offering documents and other materials provided to him by the Fund.

Plaintiff's claims should be dismissed because federal law preempts state regulation of offering materials in relation to securities such as the ones at issue here. In 1996,

Congress enacted the National Securities Markets Improvement Act (the "NSMIA"), one of a series of federal securities statutes designed to promote efficiency and uniformity in the regulation of the national securities market. Under the NSMIA, Congress reserved to the federal government broad regulatory authority over securities offerings, including regulation of offering materials.

The Oregon securities laws on which plaintiff bases his claims also run afoul of the Commerce Clause because these statutes impermissibly regulate out of state conduct. Oregon's expansive liability regime seeks improperly to impose Oregon's regulations and legislation on conduct occurring in, and governed by the laws of, other states.

Finally, plaintiff's claim that the Wood River partnership interests were unregistered, and were therefore sold in violation of Oregon registration requirements, fails because the Oregon statutes expressly exempt these securities from registration.

## STATEMENT OF THE CASE

Plaintiff seeks to hold S&K responsible for the wrongdoing of three non-parties: Wood River Partners, L.P., Wood River Associates, L.L.C. (together, the "Fund"), and the Fund's principal, John Whittier.

**The Parties: Plaintiff**

Plaintiff, a resident of Oregon, allegedly invested in the Fund by (as required) signing a Subscription Agreement and a Limited Partnership Agreement (together, the "Operative Agreements"). (*See* Compl. ¶¶ 8, 13) The Operative Agreements are annexed as Exhibits B and C to the Declaration of Jana C. Ramsey ("Ramsey Decl.").

2

**The Parties:  Defendant**

Defendant S&K is a New York law firm with offices in New York City and Washington, D.C. (Compl. ¶ 6)

**The Fund**

The Fund was a so-called hedge fund. (*Id.* ¶ 1)  In very general terms, a hedge fund is an investment pool that is permitted to use aggressive strategies that are generally not used by mutual funds, including short selling, leverage, program trading, swaps, arbitrage and derivatives.  Hedge funds are exempt from many of the rules and regulations governing other mutual funds, which allows them to accomplish aggressive investing goals.  For this reason, hedge funds are not for everyone and investment is typically restricted to "'accredited investors' within the meaning of Regulation D," of the federal securities laws, which contains a very detailed definition of persons who qualify.  (Wood River Partners, L.P. Confidential Private Offering Memorandum (the "Offering Memorandum"), dated June 2004, at 19) (annexed as Ex. A to Ramsey Decl.)[1]  These accredited investors "either are sophisticated persons in connection with financial and business matters or are represented by such a person in connection with their investment" who are "able to bear the economic risk of the loss of their investment." (*Id.* at 18-19; *see also* 15 U.S.C. § 77b(a)(15)(ii))

Wood River Partners, L.P., a Delaware limited partnership with a principal office in San Francisco, California, first opened itself to investors in February 2003. (Ramsey Decl.

---

[1]    The Court may consider documents submitted by a defendant on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) without converting the motion to one for summary judgment where the documents are incorporated by reference, or are integral to the complaint and upon which plaintiff relied in bringing suit. *See, e.g.*, *Roth* v. *Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).  Here, plaintiff's complaint relies on the contents of the Wood River Offering Memorandum, Subscription Agreement, and Limited Partnership Agreement. (Compl. ¶¶ 3, 8-11, 16)

Ex. A at vii, 1)  The general partner of the Fund is Wood River Associates, L.L.C., a Delaware limited liability company.  (*Id.*)  The investment manager for the Fund is yet another entity, Wood River Capital Management, L.L.C., also a Delaware limited liability company. (*Id.*)  The principal and managing member of the general partner and the management company was John Hunting Whittier; he ran the Fund. (*Id.* at vii-viii)

**Offering Materials**

Sometime prior to February 2003, Whittier retained S&K to form the Wood River entities. S&K's name appears only four times in the Offering Memorandum -- each a boilerplate reference common in the thousands of such documents circulated in today's market -- and appears nowhere in the Operative Agreements.

The first mention of S&K in the Offering Memorandum is in the "Directory," where S&K is listed as "Counsel" to the Fund. (*Id.* at vi)  The next, under "General Comments," again identifies S&K as counsel only to the Fund, and offers prospective investors the opportunity to review legal opinions on two subjects that S&K would provide to the Fund. (*Id.* at 1)  The other two references to S&K are equally innocuous. The third recounts that S&K has advised the Fund that, as a partnership, the Fund would not be subject to federal income tax. (*Id.* at 14)  The final mention of S&K stresses that S&K's tax advice "is based on the investment program of the [Fund] as described in this Memorandum and the Partnership Agreement" and the current law, but cautions that the Internal Revenue Service may not ultimately sustain its positions. (*Id.* at 16-17)

Plaintiff does not contest the correctness of these legal opinions.  Nowhere does the Offering Memorandum suggest that S&K vouched for or would oversee the Fund's management, warranty the Fund's performance, or have anything to do with the Fund's

4

investments or with policing its regulatory compliance. Nothing in the document suggests that S&K bore any responsibility for anything other than the foregoing opinions.

**The SEC Proceeding**

In September 2005, the Securities and Exchange Commission began an investigation of the Fund. On October 13, 2005, the SEC filed an action in New York federal court, alleging that the Fund had acquired an extraordinary position in a California-based company called Endwave that it failed to disclose under the federal securities laws. (Complaint, *Securities and Exchange Commission* v. *Wood River Capital Management, LLC*, No. 05 Civ. 8713 (S.D.N.Y. 2005)) (annexed as Ex. D to Ramsey Decl.) When S&K first learned of the extent of the Fund's investment in Endwave from Whittier in late September 2005, it immediately resigned as counsel.

On August 9, 2007, Whittier settled with the SEC. (Consent of Defendant John Hunting Whittier, *Securities and Exchange Commission* v. *Wood River Capital Management, LLC*, No. 05 Civ. 8713 (S.D.N.Y. 2005)) (annexed as Ex. E to Ramsey Decl.) Under the terms of his consent to final judgment, Whittier neither admitted nor denied the allegations against him, but agreed to pay $6.3 million dollars in disgorgement, offset by any payments imposed by the court in the criminal case against him. *Id.*

**Whittier's Guilty Plea**

On February 1, 2007, a federal grand jury indicted Whittier on four felony counts of securities fraud. (Indictment, *United States* v. *Whittier*, 07 Crim. 087 (S.D.N.Y. 2007)) (annexed as Ex. F to Ramsey Decl.) Three counts involved Whittier's false statements concerning the Fund's investment in Endwave -- the fact that the investment exceeded the 10% limit on the Funds' assets as set forth in the Offering Memorandum, and the failure to make the

requisite SEC disclosures under sections 13(d) and 16(a).  (*Id.* ¶¶ 1-51)  The fourth involved his causing S&K to file a fraudulent SEC Form 13G about a company called MediaBay.  (*Id.* ¶¶ 52-54)

       According to the indictment, Whittier lied to S&K about the extent of the Fund's holdings in MediaBay.  (*Id.* ¶¶ 37-42)  Specifically, Whittier had caused the Fund to acquire more than 20% of that company's outstanding shares.  (*Id.* ¶¶ 39-40)  He consulted S&K about his filing obligations with the SEC and was told the consequences of owning 10% or more of a public company.  (*Id.* ¶¶ 37-38)  Upon learning these consequences, Whittier told the firm that he owned only 9.5% of MediaBay and instructed the firm to file the SEC Form disclosing ownership in that amount.  (*Id.* ¶¶ 41-42)  The indictment says that Whittier lied to S&K to avoid the disclosure and other obligations of owning 10% or more of a public company under Section 16(a).  (*Id.* ¶ 42)

       On May 30, 2007, Whittier pled guilty to securities fraud.  In his allocution, Whittier admitted that he had intentionally concealed the size of his position in Endwave. (Transcript, dated May 30, 2007, *United States* v. *Whittier*, 07 Crim. 087 (S.D.N.Y. 2007), at 14-15) (annexed as Ex. G to Ramsey Decl.)  Whittier also conceded that he lied to conceal the Fund's MediaBay holdings in order to avoid having to disclose that the Fund owned more than 10% of that company.  (*Id.* at 15)

**The Complaint**

       At some unspecified time in late 2004, plaintiff Houston received a "Confidential Wood River Partners, LP Summary" from "Wood River and its sales agents."  (Compl. ¶ 7)  In January 2005, he received a prospectus, partnership agreement and subscription agreement for the Fund.  (*Id.* ¶ 8)  Plaintiff alleges that, based on the information in the prospectus, he invested

6

$250,000 in Wood River in February 2005. (*Id.* ¶ 13) Plaintiff informed Whittier that "he would send additional monies so long as he was satisfied with the fund's operation and performance." (*Id.*) Apparently satisfied with Wood River's performance, plaintiff made additional investments of $250,000 to $500,000 on a monthly basis until September 2005. (*Id.*) Plaintiff's total investment in Wood River was $2,750,000. (*Id.*)

Plaintiff argues that the offering materials he received were misleading and misrepresented how the Fund would be managed. He claims that the materials identified American Express Tax and Business Services ("TBS") as the auditors for the Fund and stated that TBS would conduct yearly audits. (*Id.* ¶ 11) According to plaintiff, however, TBS had not been retained as the auditor and never performed any auditing services for the Fund (*Id.* ¶¶ 15(I), 16(E)) Plaintiff also maintains that the offering materials represented that the Fund's investments would be diversified and capped at a certain limit, that the Fund would be "flexible and nimble," that it would be managed responsibly and professionally, and that it was a low-risk investment. (*Id.* ¶¶ 9, 16) Instead of maintaining a diversified portfolio, however, Wood River acquired a massive stake in Endwave and failed to report its holdings. (*Id.* ¶ 15(B-F)) Plaintiff contends that in early 2005, the attorney for a former Wood River consultant notified S&K that Wood River's holdings in Endwave rose above 15% but that the Fund did not make the appropriate filings with the SEC and S&K did not disclose the underlying employment dispute between the former consultant and the Fund. (*Id.* ¶ 15(K))

Plaintiff also alleges that the offering materials should have disclosed certain information about Whittier's ostensible history of credit problems arising largely prior to the launch of the Fund, including that: (1) a lawsuit had been filed against Whittier for failure to pay for certain stock trades in 2002; (2) a suit had been filed for the non-payment of rent on Wood

River's San Francisco office in 2002; and (3) Whittier was or had been subject to tax liens in Idaho and California. (*Id.* ¶ 15(A))

With the Fund in receivership, plaintiff now seeks to hold S&K responsible for the actions of its former client. Plaintiff alleges that S&K "draft[ed], edit[ed] and/or review[ed] and approv[ed] the prospectus and marketing materials" that contained material misrepresentations and omissions; "assisted in and advised Wood River on various aspects of its operation"; and "allowed its prestigious name to be used in the Wood River prospectus." (Compl. ¶ 21)    Although plaintiff alleges that S&K had "actual knowledge" of the misrepresentations and omissions in the offering materials, (*id.*), the sole "fact" asserted in support of that claim is that the attorney for a disgruntled former employee purportedly alerted S&K about Wood River's Endwave holdings, (*id.* ¶ 15(K)).

The complaint asserts three causes of action against S&K under Oregon's blue sky laws. Count I alleges that S&K violated ORS 59.135 and ORS 59.115 by drafting, editing, reviewing and approving the prospectus and marketing materials that plaintiff purports to have relied on. Count II alleges that S&K violated ORS 59.137(1) by aiding in the unlawful sale of securities. Count III alleges that S&K participated or materially aided in the unlawful sale of unregistered securities in violation of ORS 59.055 and ORS 59.115(1)(a).

**ARGUMENT**

### I.    THE COURT SHOULD DISMISS PLAINTIFF'S CLAIMS AS PREEMPTED BY FEDERAL LAW

The Supremacy Clause of the Constitution provides that the law of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. It is well-established that "state law that conflicts with federal law is 'without effect.'" *Cipollone* v. *Liggett Group, Inc.*,

505 U.S. 504, 516 (1992) (quoting *Maryland* v. *Louisiana*, 451 U.S. 725, 746 (1981)). Congress's intent to supersede state law "may be 'explicitly stated in the statute's language, or implicitly contained in its structure and purpose.'" *Id.* (quoting *Jones* v. *Rath Packing Co.*, 430 U.S. 519, 525 (1977)).

In 1996, Congress enacted the NSMIA, amending Section 18 of the Securities Act of 1933 ("1933 Act"), in an effort to promote a national securities market unhampered by disparate state regulations and requirements. Pub. L. No. 104-290, 110 Stat. 3416 (codified in part in 15 U.S.C. § 77r). The NSMIA generally designates the federal government as the exclusive regulator of national securities offerings, broadly preempting state regulation and control over those offerings. *See* 15 U.S.C. §77r. Because plaintiff's claims require a ruling that Oregon's blue sky laws ORS 59.135, ORS 59.137, and ORS 59.115 regulate and control activities that are preempted by federal law, plaintiff's claims under these statutes must be dismissed.

**A.    The NSMIA Preempts The Regulation of "Covered Securities"**

1.    The Purpose And Intent Of The NSMIA

Congress enacted the NSMIA to "promote efficiency, competition, and capital formation in the capital markets," and to "further advance the development of national securities markets . . . by, as a general rule, *designating the Federal government as the exclusive regulator of national offerings of securities*." H.R. Rep. No. 104-622, at 16 (1996), *as reprinted in* 1996 U.S.C.C.A.N. at 3878, 3878 (emphasis added). The NSMIA reflects Congress's acknowledgment that the system of dual state and federal securities law governing securities offerings resulted in duplicative and unnecessary regulation that increased the costs of capital to

securities issuers "without providing commensurate protection to investors." *See* H.R. Rep. No. 104-864, at 39 (1996) (Conf. Rep.), *as reprinted in* 1996 U.S.C.C.A.N. 3920, 3920.

Under this new regulatory scheme, Congress contemplated that certain securities offerings are "inherently national in nature, and are therefore subject to only Federal Regulation," whereas "[s]maller, regional, and intrastate securities offerings remain subject to state regulation." H.R. Rep. No. 104-864, at 40, 1996 U.S.C.C.A.N. at 3921. Accordingly, Title I of the NSMIA amended Section 18 of the 1933 Act by adding express provisions that broadly preempt state regulation of offerings of "covered securities." 15 U.S.C. § 77r; *see also* H.R. Rep. 104-622, at 29-30, 1996 U.S.C.C.A.N. at 3892.

Section 18(b) sets forth four categories of securities that fall within the definition of "covered securities," including: (1) securities traded on a national securities exchange; (2) securities issued by a registered investment company; (3) securities that are offered or sold to "qualified purchasers"; and (4) securities issued with respect to a transaction that is exempt from registration under the 1933 Act. *Id.* §77r(b).

The NSMIA's provisions preclude state regulation of covered securities in three ways. First, the Act provides that no state law may require registration or qualification of covered securities. *Id.* § 77r(a)(1). Second, no state law or regulation may, with respect to any covered security, "directly or indirectly prohibit, limit, or impose any conditions upon the use of" any offering document, proxy statement, report to shareholders, or other disclosure document. 15 U.S.C. § 77r(a)(2). Third, the NSMIA forbids any state law that would "directly or indirectly prohibit, limit, or impose conditions" on the offer or sale of a covered security based on the merits of such offering. *Id.* § 77r(a)(3).

10

2.    The Wood River Limited Partnership Interests
      Are Covered Securities Under The NSMIA

The securities that plaintiff purchased -- the Wood River Limited Partnership Interests (the "Wood River Securities") -- are "covered securities" under Section 18(b) of the 1933 Act. Under Section 18(b)(4)(D), a security is a "covered security" if it is sold in a transaction that is exempt from registration pursuant to Commission rules issued under Section 4(2) of the 1933 Act. *Id.* § 77r(b)(4)(D). Section 4(2), in turn, exempts from registration requirements "transactions by an issuer not involving any public offering." *Id.* § 77d(2). Regulation D, issued pursuant to Section 4(2) of the 1933 Act, sets forth conditions under which offerings will be deemed exempt from registration. 17 C.F.R. § 230.506.

The Offering Memorandum specifies that the Wood River Securities were not registered under the 1933 Act, but rather would be offered to investors pursuant to Regulation D:

> THE INTERESTS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE ACT SINCE THEY WILL BE OFFERED ONLY TO A LIMITED NUMBER OF QUALIFIED INVESTORS. IT IS ANTICIPATED THAT THE OFFERING AND SALE WILL BE EXEMPT FROM REGISTRATION PURSUANT TO REGULATION D PROMULGATED UNDER THE ACT.

(Ramsey Decl. Ex. A, at ii) The Offering Memorandum also specifies that the Fund is open to investment only to "accredited investors within the meaning of Regulation D of the 1933 Act." (*Id.* at 19) Plaintiff does not allege that the securities were not issued pursuant to Regulation D.

**B.    The NSMIA Expressly Preempts Plaintiff's Claims**

In determining the preemptive force of a federal statute, the court's analysis "must in the first instance focus on the plain wording of the [statute], which necessarily contains the best evidence of Congress' pre-emptive intent." *CSX Transp., Inc.* v. *Easterwood*, 507 U.S. 658, 664 (1993); *see also Lorillard Tobacco Co.* v. *Reilly*, 533 U.S. 525, 542 (2001) ("Our analysis begins with the language of the statute."). Where the statutory language is clear and

unambiguous, "that is the end of the matter, for the court . . . must give effect to the unambiguously expressed intent of Congress." *Bd. of Governors* v. *Dimension Fin. Corp.*, 474 U.S. 361, 367 (1986) (citation and internal quotation marks omitted).

Plaintiff alleges that the Offering Memorandum contained misrepresentations and omissions in violation of ORS 59.135, which makes it unlawful "in connection with the purchase or sale of any security" for any person:

> (1) To employ any device, scheme or artifice to defraud;
>
> (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;
>
> (3) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person. . . .

Plaintiff also alleges violations of ORS 59.115 and ORS 59.137, statutes that provide private causes of action for any sale found unlawful under ORS 59.135.[2] Together, these three statutes impose liability on sellers and derivative liability on those who have peripheral involvement in the sale of securities.

Plaintiff's claims under ORS 59.135, ORS 59.137, and ORS 59.115 are predicated on the validity and sufficiency of the statements and disclosures made in an offering memorandum. Plaintiff claims that the Wood River Offering Memorandum did not adequately

---

[2]    Insofar as plaintiff purports to assert a cause of action directly under ORS 59.135, this claim must fail as section 59.135 of the Oregon code merely *defines* prohibited conduct; it does not provide a private right of action. Rather, the civil remedy for violation of the securities laws, including ORS 59.135, is provided in ORS 59.115. *See, e.g.*, *Anderson* v. *Carden*, 934 P.2d 562, 565 (Or. App. 1997); *Rolex Employees Ret. Trust* v. *Mentor Graphics Corp.*, 1991 WL 45714, at *3 (D. Or. Mar. 26, 1991). Plaintiff's claim under ORS 59.137 must also fail insofar as it is asserted as a substantive cause of action because it merely provides a right of action for a violation of the securities laws. ORS 59.135 is similar to ORS 59.115(3), except that the former imposes liability on purchasers as well as sellers, and secondary liability under ORS 59.137 is limited to those who materially aid in a violation, not merely participate.

disclose information about Whittier's prior credit problems, erroneously identified TBS as the auditor, stated that TBS would do audits when it did not, and stated that the Fund would be diversified when the Fund was not. (Compl. ¶¶ 9, 11, 15, 16) Each of these claims seeks to impose liability on S&K for information contained in, or left out of, the Offering Memorandum of S&K's client, Wood River, and each claim would, if successful, impermissibly impose conditions and limitations on the use of offering materials in violation of the preemption of this area by the NSMIA.

Congress specifically reserved to the federal government the right to regulate offering materials in connection with covered securities. The language in the NSMIA is precise that states cannot -- either directly or indirectly -- "prohibit, limit, or impose any conditions upon the use of . . . any offering document, . . . any proxy statement, report to shareholders, or other disclosure document relating to a covered security or the issuer thereof." 15 U.S.C. § 77r(a)(2). Applying Oregon's securities laws to hold S&K responsible for the adequacy of the disclosures and representations in an offering memorandum contravenes the express language of the statute and Congress's intent to limit the states' influence over regulating the contents of offering memoranda. *See Myers* v. *Merrill Lynch & Co.*, 1999 WL 696082, at *8-*10 (N.D. Cal. Aug. 23, 1999), *aff'd*, 249 F.3d 1087 (9th Cir. 2001).[3]

Such a limitation makes sense: requiring issuers of nationally offered securities to comply with disparate disclosure requirements in every state would undermine the effectiveness and efficiency of the national securities market. The regulation of offering materials for federal covered securities requires uniformity and consistency, and should not be subject to differing

---

[3]  In *Zuri-Invest AG* v. *Natwest Fin. Inc.*, 177 F. Supp. 2d 189, 194 (S.D.N.Y. 2001), Judge Scheindlin found that NSMIA does not expressly preempt state common law fraud claims.

rules by 50 states. *See* H.R. Rep. No. 104-622, at 34, *as reprinted in* 1996 U.S.C.C.A.N. at 3896-3897 ("The Committee intends to eliminate States' authority to require or otherwise impose conditions on the disclosure of any information for covered securities."); *see also Brooks v. Howmedica, Inc.*, 273 F.3d 785, 797 (8th Cir. 2001) (products liability action preempted by federal statute because Congress desired uniformity in products regulation); *Wood* v. *Gen'l Motors Corp.*, 856 F.2d 395, 402, 412 (1st Cir. 1988) (holding that state tort claim against vehicle manufacturer was preempted by the National Traffic and Motor Vehicle Safety Act because Congress recognized that motor vehicle safety standards had to be uniform to be effective and plaintiff's claim, if successful, would stand as an obstacle to that goal).

**C.      The NSMIA Impliedly Preempts Plaintiff's Claims**

To the extent that state law actually conflicts with federal law, state law may be preempted even in the absence of explicit preemption language. *Schneidewind* v. *ANR Pipeline Co.*, 485 U.S. 293, 299-300 (1988); *Pacific Gas & Elec. Co.* v. *State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983). The Supreme Court has found "implied" preemption where state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363, 373-74 (2000) (quoting *Hines* v. *Davidowitz*, 312 U.S. 52, 67 (1941)); *see also Perez* v. *Campbell*, 402 U.S. 637, 641 (1971).

ORS 59.135, ORS 59.137, and ORS 59.115 stand as obstacles to the NSMIA's objective of creating an efficient and effective national securities market, because under ORS 59.115(3), liability may be extended beyond sellers to persons who have not themselves

---

*Zuri-Invest* did not consider an action asserting claims under state securities law, as is the case here. Nor did it consider a claim against a secondary actor, as is the case here.

committed an unlawful act, *Anderson* v. *Carden*, 934 P.2d 562, 566 (Or. App. 1997), allowing plaintiffs to bring actions against secondary actors without even requiring allegations of scienter or independent culpability on the part of that secondary actor.[4]

Oregon's statutes creates uncertainty for secondary actors who are faced with non-uniform standards of conduct and broad and ill-defined secondary liability. By creating liability for service providers, without requiring proof of scienter or unlawful conduct by that provider, Oregon's blue sky laws effectively require that service providers investigate and police all clients that may possibly offer or sell securities in Oregon, out of fear that anything less may leave the service provider open to liability. This is precisely the type of uncertainty the Supreme Court warned against in *Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994).

In *Central Bank*, the Supreme Court determined that Section 10(b) of the Securities Exchange Act and Rule 10b-5 did not impose liability on aiders and abettors and suggested that were the statute otherwise, it would "exact[] costs that may disserve the goals of

---

[4]   Oregon's securities statute extends liability beyond the aiding and abetting causes of action permitted by other states. The overwhelming majority of states that recognize aider and abettor liability refuse to impose liability on service providers such as attorneys absent proof of scienter. *See, e.g.*, Ala. Code § 8-6-19(b)(c) (1975) (Alabama law imposing aiding and abetting liability only for those who control sellers, investment advisors, partners, officers, directors, their employees, dealers and agents); Ark. Code Ann. § 23-42-106(c) (same under Arkansas law); Cal. Corp. Code § 25504.2 (California law imposing liability on accountants, appraisers and other service providers with respect to written documents only to the extent that portions such documents have been expressly stated with such person's written consent to have been made on such person's authority); Conn. Gen. Stat. Ann. § 36b-29 (Connecticut law imposing liability on any person for aiding and abetting but only upon proof that such person knew, or in the exercise of reasonable case should have known, of the untruth or omission); N.C. Gen. Stat. Ann. § 78A-56(c)(1) (same defense under North Carolina law); S.C. Code Ann. 1976 § 35-1-509(g) (same defense under South Carolina law); Tex. Civ. Code Ann. § 581-33(F)(2) (Texas law imposing liability on those who materially aid securities fraud only upon proof of intent to deceive).

15

fair dealing and efficiency in the securities markets." *Id.* at 188.  The Court recognized that secondary liability could lead to a fear of excessive litigation by service professionals, making it more difficult for "newer and smaller companies" to obtain professional advice, *id.* at 189, as judicial decisions offered "little predictive value to those who provide services to participants in the securities business," *id.* at 188 (internal quotation marks and citation omitted).  The following year, Congress tacitly approved the Supreme Court's holding.  In enacting the Private Securities Litigation Reform Act of 1995, it expressly provided the SEC with authority to institute enforcement proceedings against those who "knowingly provide . . . substantial assistance to another person in violation of" the 1934 Act, while declining to provide an analogous private cause of action.  15 U.S.C. § 78t(e).

        The existence of divergent liability standards among the various states for service providers such as attorneys could have profoundly negative consequences on the availability to many companies of the sort of professional advice that they require to participate meaningfully in the national securities markets.  Attorneys fearing the prospect of liability may be deterred from assisting clients in placing their securities in certain states, undermining the congressional goal of reducing the costs and burdens of participating in the market.  As the Supreme Court stated recently in *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Dabit*, 547 U.S. 71, 78 (2006), "[t]he magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated."  State laws that interfere with the accomplishment of congressional objectives must be struck down.  *See, e.g., C.E.R. 1988, Inc.* v. *Aetna Cas. & Surety Co.*, 386 F.3d 263, 270-72 (3d Cir. 1988).

16

**D.    The Savings Clause Of The NSMIA Does Not Apply To Plaintiff's Claims**

The NSMIA preserves state authority over securities offerings only in two limited respects: (1) *"the securities commission . . . of any State"* retains jurisdiction "to *investigate and bring enforcement actions* with respect to fraud or deceit, or unlawful conduct by a broker or dealer, in connection with securities or securities transactions" under state law; and (2) states can require the filing of documents with the state securities commission "solely for notice purposes," and payment of a filing fee. 15 U.S.C. § 77r(c) (emphasis added).

The plain language of the savings clause makes clear that it operates only to preserve the continued exercise of the state's police powers to investigate and bring enforcement actions for fraud. This intent is reinforced by the Joint Conference Report of both houses, which explains that the NSMIA preserves the authority of the states to "continue to exercise their police power to prevent fraud and broker-dealer sales practice abuses, such as churning accounts or misleading customers." H.R. Conf. Rep. 104-864, at 40, 1996 U.S.C.C.A.N. at 3921.

The NSMIA preserves the ability of states' securities agencies to combat primary fraud. It does not similarly carve out a private right of action against anyone who assists a seller in preparing a securities offering. Absent evidence of a contrary congressional intent, where exceptions to a general rule are specified by statute, no other exceptions are to be implied or presumed. *See, e.g., United States* v. *Smith*, 499 U.S. 160, 167 (1991). The savings clause cannot be extended to apply more broadly than Congress specified.

## II.    THE COURT SHOULD DISMISS PLAINTIFF'S CLAIMS BECAUSE ORS 59.115 VIOLATES THE DORMANT COMMERCE CLAUSE

The power of a state to enact regulations for the benefit and protection of its citizens is circumscribed not only by the federal government's authority to preempt state

17

regulation, but also by Congress's power under the Commerce Clause to regulate interstate commerce. U.S. Const. art. 1 § 8, cl. 3. That power also encompasses a "dormant" limitation on the authority of states to enact laws that affect interstate commerce. *Healy* v. *Beer Inst.*, 491 U.S. 324, 326, n.1 (1989).

Regulations subject to dormant Commerce Clause analysis fall into two categories: (1) statutes that directly regulate or discriminate against interstate commerce; and (2) "evenhanded regulations" that impose only indirect effects or an incidental burden on interstate commerce. *See, e.g., Brown-Forman Distillers Corp.* v. *New York State Liquor Auth.*, 476 U.S. 573, 578-79 (1986). "Regulations that clearly discriminate against interstate commerce are virtually invalid *per se*, while those that incidentally burden interstate commerce will be struck down only if the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Am. Booksellers Found.* v. *Dean*, 342 F.3d 96, 102 (2d Cir. 2003) (internal citations and quotation marks omitted). ORS 59.115(3) is invalid under either test.

## A.    ORS 59.115(3) Improperly Regulates Conduct Outside Its Borders

"The Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Edgar* v. *MITE Corp.*, 457 U.S. 624, 642-43 (1982) (plurality opinion) (citing cases).[5]  Moreover, the Constitution has a "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres." *Healy*, 491 U.S. at 335-36.

---

[5]  Subsequent Supreme Court opinions have adopted the reasoning of *MITE Corp. See, e.g., Healy* v. *The Beer Inst.*, 491 U.S. 324 (1989).

Although states have "traditionally regulated intrastate securities transactions" and certain blue sky laws have been upheld against dormant Commerce Clause challenges, *MITE Corp.*, 457 U.S. at 641 (citing *Hall* v. *Geiger-Jones Co.*, 242 U.S. 539 (1917); *Caldwell* v. *Sioux Falls Stock Yards Co.*, 242 U.S. 559 (1917); *Merrick* v. *N. W. Halsey & Co.*, 242 U.S. 568 (1917)), once blue sky laws cease regulating purely intrastate activity, and instead impose a regulatory scheme on other states, they are no longer valid, *id.* at 642-43.

By imposing different standards of conduct on lawyers than are imposed by the lawyer's own home state, Oregon's laws improperly interfere with other states' laws and with their authority to regulate the conduct of lawyers practicing in their jurisdictions. *See BMW of North America, Inc.* v. *Gore*, 517 U.S. 559, 571-72 (1996) (holding that a state's power to regulate the interstate market is subordinate to the federal power over interstate market and "constrained by the need to respect the interests of other States") (citations omitted); *see also Am. Booksellers*, 342 F.3d at 104; *Am. Libraries Assoc.* v. *Pataki*, 969 F. Supp. 160, 176 (S.D.N.Y. 1997).

Under ORS 59.115, liability can be completely derivative of another's wrongful activity. This was stated explicitly in *Anderson* v. *Carden*:

> It bears noting that *the remedy against nonseller participants is not contingent on the nonsellers' violation of any law* . . . . [T]he liability of the nonseller participant under ORS 59.115(3) is predicated on the violation of the seller. The nonseller participant becomes liable under ORS 59.115(3) because it has 'participated or materially aided' in the sale, not because it has violated any law.

934 P.2d at 566 (emphasis added); *accord Ainsley* v. *First Interstate Bank of Oregon*, 939 P.2d 125, 137 (Or. App. 1997)). Furthermore, ORS 59.115(3) does not require that the secondary actor communicate with the alleged purchaser or, in fact, do anything more that provide routine services to clients. *See Prince* v. *Brydon*, 764 P.2d 1370, 1371 (1988).

Here, plaintiff alleges that S&K, a New York law firm, assisted the Fund in preparing its Offering Memorandum, and assisted and advised the Fund on certain unspecified aspects of the Fund's operation. (Compl. ¶¶ 1-3, 21)  In contrast to Oregon, New York requires far more than a lawyer's routine services in connection with a transaction to impose liability for fraud.  For aiding and abetting, New York law requires that the lawyer have actual knowledge of the fraud and provide "substantial assistance" to the  tortfeasor.  *See, e.g., Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006); *In re Bayou Hedge Funds Inv. Litig.*, 472 F. Supp. 2d 528, 532 (S.D.N.Y. 2007).  Merely representing a client who engages in a fraudulent activity does not create liability absent actual knowledge of the wrongdoing, and failing to disclose a client's fraud is only actionable if the lawyer has a fiduciary duty to speak. *In re Bayou*, 472 F. Supp. 2d at 533-34; *see also Kolbeck* v. *LIT America, Inc.*, 939 F. Supp. 240, 247 (S.D.N.Y. 1996) (quoting Page Keeton *et al.*, Prosser & Keeton on the Law of Torts § 46 at 323-24 (5th ed. 1984)).

That lawyers must have actual knowledge of false statements in an offering memorandum to incur liability for them is consistent with the fact that under New York law, statements in an offering memorandum are not those of a lawyer, but those of a client. *Friedman* v. *Hartmann*, 1994 WL 97104, at *6 (S.D.N.Y. Mar. 23, 1994).  Unless the lawyer makes a statement attributable to himself, and not the client, the lawyer is not liable for misrepresentations or omissions in offering memoranda. *Id.*

Unlike what the Oregon statute would require, lawyers also have no affirmative duty under New York law to investigate or police their clients, nor to ferret out their clients' possible violations of the law. *See In re Towers Fin. Corp. Noteholders Litig.*, 1995 WL 571888, at *17-*18 (S.D.N.Y. Sept. 20, 1995) ("[T]his Court does not believe that the current law

requires a law firm to direct its activities from representation to investigation of their clients."
(quoting *In re Cascade Int'l Secs. Litig.*, 840 F. Supp. 1558, 1564 (S.D. Fla. 1993)) (Report and
Recommendation adopted by 936 F. Supp. 926 (S.D.N.Y. 1996).

Nor do lawyers in New York have any duty to disclose information about their
clients to third parties, absent a fiduciary relationship. *E.g.*, *Schlaifer Nance & Co., Inc.* v.
*Estate of Warhol*, 927 F. Supp. 650, 661 (S.D.N.Y. 1996) (citing cases), *aff'd*, 119 F.3d 91 (2d
Cir. 1997); *In re Towers*, 1995 WL 571888, at *17-*18. In fact, such disclosure is not permitted
under New York professional ethics rules, except under certain narrowly tailored exceptions.
New York State Bar Assoc., The Lawyer's Code of Professional Responsibility DR 4-101(B);
*Greenberg Traurig* v. *Moody*, 161 S.W.3d 56, 79-80 (Tex. App. 2004) (construing New York
law); *Nat'l Westminster Bank USA* v. *Weksel*, 124 A.D.2d 144, 148-49 (1st Dep't 1987).

Here, Oregon's regulations impose far stricter standards of liability on S&K than
do those of New York. Where one state projects its legislation and regulation onto another state,
and directly regulates commerce therein, it is a violation of the Commerce Clause. *See, e.g., Am.
Booksellers*, 342 F.3d at 104; *Am. Libraries Assoc.*, 969 F. Supp. at 176. Because avoiding
liability under Oregon's rules would impose upon New York lawyer duties that are not imposed
or required -- and may even be forbidden -- under New York law, ORS 59.115(3) may not be
applied here consistent with the Constitution.

### B.    ORS 59.115(3) Imposes An Improper Burden On Interstate Commerce

Even if the Oregon statute were found not to directly regulate commerce, laws
that "regulate[] even-handedly to effectuate a legitimate local public interest" and only have an
"incidental" effect on interstate commerce may be struck down if "the burden imposed on such
commerce is clearly excessive in relation to the putative local benefit." *Pike* v. *Bruce Church,*

*Inc.*, 397 U.S. 137, 142 (1970). As the burden ORS 59.115(3) imposes on interstate commerce is excessive in comparison to any purported benefit to investors, it is an unconstitutional and invalid regulation.

*MITE Corp.* is illustrative of this principle: In *MITE Corp.*, the Court struck down an Illinois statute that, like the statute at issue here, had the effect of regulating across state lines. 457 U.S. 624. The statute required that bidders for target companies -- which, as defined by the statute, could include companies whose shareholders did not include a single Illinois resident -- register their takeover offers with the State. *Id.* at 626-27. The statute also permitted the Illinois Secretary of State to hold hearings on the takeover offer and reject the registration if it saw fit, thereby allowing Illinois to regulate takeovers occurring outside of its borders. *Id.* at 627. The Court explained that if Illinois could impose such regulations on takeover offers, there was nothing to stop other states from adopting similar regulations "and interstate commerce in securities transactions generated by tender offers would be thoroughly stifled." *Id.* at 641-42.

The same concern for interstate commerce is at issue here. Lawyers generally have no control over where offering memoranda are distributed. Lawyers typically do not solicit prospective investors, market the product, or conduct the actual sale of securities. The prospect of virtually unlimited liability in Oregon may discourage out of state lawyers from accepting clients who are conducting securities transactions that may conceivably include offers and sales in Oregon. As in *MITE*, the laws at issue here have a potential impact on the national securities market, and the ability to stifle private securities offerings.

"[C]ourts have long held that state regulation of those aspects of commerce that by their unique nature demand cohesive national treatment is offensive to the Commerce Clause." *Am. Libraries Assoc.*, 969 F. Supp. at 169 (citing *Wabash, St. L. & P. Ry. Co.* v.

*Illinois*, 118 U.S. 557 (1886)). As Congress has made clear, the national securities market is one of those unique areas that demands national treatment. In contrast, any benefit that Oregon investors would receive by operation of the statute is limited. Injured investors have ample recourse against those who are responsible for investment losses under other laws. The federal and Oregon state securities laws, and Oregon common law, provide causes of action against those who commit fraud in connection with securities transactions. *See, e.g.*, *Central Bank*, 511 U.S. at 191; *Pincetich* v. *Jeanfreau*, 699 F. Supp. 1469, 1474-75, 1477 (D. Or. 1988); Section 17(a) of the 1933 Act, 15 U.S.C. 77q(a); Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b); ORS 59.115(1). And Oregon common law recognizes a cause of action for aiding and abetting a tort. *See, e.g.*, *Granewich* v. *Harding*, 985 P.2d 788, 792-93 (Or. 1999).

## III. THE COURT SHOULD DISMISS PLAINTIFF'S THIRD CLAIM BECAUSE ORS 59.115(1)(a) DOES NOT REACH COVERED SECURITIES, AND ORS 59.055 EXEMPTS THESE SECURITIES FROM REGISTRATION

Plaintiff's claim that the Wood River Securities were unregistered and therefore sold in violation of ORS 59.115(1)(a) fails as a matter of law. ORS 59.115(1)(a), the mechanism through which a private plaintiff may assert a cause of action under ORS 59.055, *see Riley* v. *Brazeau*, 612 F. Supp. 674, 679 (D. Or. 1985), explicitly exempts covered securities from its reach. ORS 59.115 provides that "[a] person is liable . . . to a purchaser of a security if the person . . . [s]ells or successfully solicits the sale of a security, *other than a federal covered security*, in violation of" Oregon Law. ORS 59.115(1)(a) (emphasis added). Plaintiff cannot bring a private right of action under ORS 59.115(1)(a) relating to securities that are, like the ones at issue here, federally covered securities.

But even if the Wood River securities were not federally covered securities, they would be exempt from registration and notice requirements under ORS 59.055. Oregon

23

explicitly waives the requirement that securities offered or sold in the state must be registered for: (1) securities that fall into one of several categories enumerated in ORS 59.025 including, *inter alia*, securities traded on certain national exchanges; (2) securities sold in certain types of transactions exempted under ORS 59.035; and (3) federally covered securities where a notice has been filed and certain fees paid. ORS 59.055(2)(3). These exemptions are broad because the NSMIA provides that no state law may require the registration or qualification of covered securities. 15 U.S.C. § 77r(a)(1); *Lander* v. *Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 109 (2d Cir. 2001).

Here, the Wood River Securities are exempt from registration under two provisions of ORS 59.035. ORS 59.035(5) exempts from registration "[a]ny transaction by an offeror with an accredited investor as defined in section 2(15)(i) or (ii) of the Securities Act" as long as there is no public advertising or general solicitation in connection with the transaction. ORS 59.035(5). As discussed above, *supra* p. 2, Wood River investors were required to sign a Subscription Agreement stating that they have a net worth in excess of $1,000,000, a threshold that brings the investors -- including plaintiff -- within the definition of "accredited investor."[6] (Ramsey Decl. Ex. B, at 1) As plaintiff alleges no facts showing advertising or solicitation of the public in connection with the interests," the transaction is exempted from registration. ORS 59.035(5).

---

[6]    Section 2(a)(15)(ii) provides that the term "accredited investor" means "any person who, on the basis of such factors as financial sophistication, net worth, knowledge, and experience in financial matters, or amount of assets under management qualifies as an accredited investor under rules and regulations which the Commission shall prescribe."    15 U.S.C. § 77b(a)(15)(ii).    Regulation D, in turn, defines "accredited investor" to include "[a]ny natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000." 17 C.F.R. § 230.501(a)(5).

24

ORS 59.035 also exempts any transaction that "result[s] in not more than 10 purchasers within [Oregon] of securities of the issuer during any 12 consecutive months," provided that no commission or other remuneration is paid in connection with the sale, and no public advertising or general solicitation of the transaction is used. ORS 59.035(12)(a). Plaintiff does not allege that Wood River sold its securities to more than ten Oregon residents, does not allege remuneration was paid, and does not allege public advertising or solicitation.[7]

## CONCLUSION

For the foregoing reasons, the complaint should be dismissed with prejudice pursuant to Fed. R. Civ. P. 12(b)(6).

Dated: New York, New York
          August 31, 2007

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By: _____
      Gerard E. Harper
      Julia Tarver Mason
      Jacqueline P. Rubin
      Jana C. Ramsey

1285 Avenue of the Americas
New York, New York 10019-6064
Tel: 212-373-3000
Fax: 212-757-3990

---

[7]   The statute provides that "[r]epeat transactions" with the same purchaser "do not increase the number of purchasers" for purposes of the purchaser limit. ORS 59.035(12)(b). Further, "[n]o limitations are placed on the number of offers under this exemption." *Id.*

25