# EXHIBIT A

Copy No. _____

**CONFIDENTIAL PRIVATE OFFERING MEMORANDUM**

**LIMITED PARTNERSHIP INTERESTS**

**OF**

**WOOD RIVER PARTNERS, L.P.**

(a Delaware limited partnership)

**June 2004**

THIS MEMORANDUM IS SUBMITTED TO YOU ON A CONFIDENTIAL BASIS SOLELY IN CONNECTION WITH YOUR CONSIDERATION OF AN INVESTMENT IN LIMITED PARTNERSHIP INTERESTS IN WOOD RIVER PARTNERS, L.P., A DELAWARE LIMITED PARTNERSHIP (THE "PARTNERSHIP"). DUE TO THE CONFIDENTIAL NATURE OF THIS MEMORANDUM, ITS USE FOR ANY OTHER PURPOSE MIGHT INVOLVE SERIOUS LEGAL CONSEQUENCES. CONSEQUENTLY, THIS MEMORANDUM MAY NOT BE REPRODUCED IN WHOLE OR IN PART, AND MAY NOT BE DELIVERED TO ANY PERSON (OTHER THAN YOUR FINANCIAL ADVISOR) WITHOUT PRIOR WRITTEN CONSENT OF THE GENERAL PARTNER.

Memorandum Copy Number:_____

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PARTNERSHIP AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.  THE INTERESTS HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY, NOR HAVE THEY BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING.  FURTHERMORE THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THESE OFFERING MATERIALS.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.  INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF AN INVESTMENT IN THE PARTNERSHIP FOR AN INDEFINITE PERIOD OF TIME.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH AN OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE INTERESTS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE ACT SINCE THEY WILL BE OFFERED ONLY TO A LIMITED NUMBER OF QUALIFIED INVESTORS. IT IS ANTICIPATED THAT THE OFFERING AND SALE OF SUCH INTERESTS WILL BE EXEMPT FROM REGISTRATION PURSUANT TO REGULATION D PROMULGATED UNDER THE ACT.  THERE ARE SUBSTANTIAL RESTRICTIONS ON THE TRANSFERABILITY OF THE LIMITED PARTNERSHIP INTERESTS.

NO REPRESENTATIONS OR WARRANTIES OF ANY KIND ARE INTENDED OR SHOULD BE INFERRED WITH RESPECT TO THE ECONOMIC RETURN OR THE TAX CONSEQUENCES FROM AN INVESTMENT IN THE PARTNERSHIP.  NO ASSURANCE CAN BE GIVEN THAT EXISTING LAWS WILL NOT BE CHANGED OR INTERPRETED ADVERSELY.  PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THIS MEMORANDUM AS LEGAL OR TAX ADVICE.  EACH INVESTOR SHOULD CONSULT HIS OWN COUNSEL AND ACCOUNTANT FOR ADVICE CONCERNING THE VARIOUS LEGAL, TAX AND ECONOMIC CONSIDERATIONS RELATING TO HIS INVESTMENT.

AN INVESTOR (AND EACH EMPLOYEE, REPRESENTATIVE, OR OTHER AGENT OF THE INVESTOR) MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATION OF ANY KIND, THE TAX TREATMENT AND TAX STRUCTURE OF AN INVESTMENT IN THE PARTNERSHIP AND ALL MATERIALS OF ANY KIND (INCLUDING OPINIONS OR OTHER TAX ANALYSES) THAT ARE PROVIDED TO THE INVESTOR RELATING TO SUCH TAX TREATMENT AND TAX STRUCTURE.

NO PERSON OTHER THAN THE GENERAL PARTNER HAS BEEN AUTHORIZED TO MAKE REPRESENTATIONS, OR GIVE ANY INFORMATION, WITH RESPECT TO THESE LIMITED PARTNERSHIP INTERESTS, EXCEPT THE INFORMATION CONTAINED HEREIN, AND ANY INFORMATION OR REPRESENTATION NOT CONTAINED HEREIN OR OTHERWISE SUPPLIED BY THE GENERAL PARTNER IN WRITING MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE PARTNERSHIP OR ANY OF ITS PARTNERS. ANY FURTHER DISTRIBUTION OR REPRODUCTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, IS PROHIBITED.

A PROSPECTIVE INVESTOR SHOULD NOT SUBSCRIBE FOR LIMITED PARTNERSHIP INTERESTS UNLESS SATISFIED THAT HE AND HIS INVESTMENT REPRESENTATIVE HAVE ASKED FOR AND RECEIVED ALL INFORMATION WHICH WOULD ENABLE HIM OR BOTH OF THEM TO EVALUATE THE MERITS AND RISKS OF THE PROPOSED INVESTMENT.

THE PARTNERSHIP SHALL MAKE AVAILABLE TO EACH INVESTOR OR HIS AGENT, DURING THIS OFFERING AND PRIOR TO THE SALE OF ANY INTERESTS, THE OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM REPRESENTATIVES OF THE GENERAL PARTNER CONCERNING ANY ASPECT OF THE PARTNERSHIP AND ITS PROPOSED BUSINESS AND TO OBTAIN ANY ADDITIONAL RELATED INFORMATION TO THE EXTENT THE PARTNERSHIP POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

WHENEVER THE MASCULINE OR FEMININE GENDER IS USED IN THIS MEMORANDUM, IT SHALL EQUALLY, WHERE THE CONTEXT PERMITS, INCLUDE THE OTHER, AS WELL AS INCLUDE ENTITIES.

SPECIAL NOTICE TO FLORIDA INVESTORS:

UPON THE ACCEPTANCE OF FIVE (5) OR MORE FLORIDA INVESTORS, AND IF THE FLORIDA INVESTOR IS NOT A BANK, A TRUST COMPANY, A SAVINGS INSTITUTION, AN INSURANCE COMPANY, A DEALER, AN INVESTMENT COMPANY AS DEFINED IN THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED, A PENSION OR PROFIT-SHARING TRUST, OR A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT OF 1933, AS AMENDED), THE FLORIDA INVESTOR ACKNOWLEDGES THAT ANY SALE OF AN INTEREST TO THE FLORIDA INVESTOR IS VOIDABLE BY THE FLORIDA INVESTOR EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE FLORIDA INVESTOR TO THE ISSUER, OR AN AGENT OF THE ISSUER, OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE FLORIDA INVESTOR, WHICHEVER OCCURS LATER.

**TABLE OF CONTENTS**

Page

DIRECTORY ..................................................................................................................vi
SUMMARY ..................................................................................................................vii
1.  GENERAL COMMENTS ...............................................................................................1
2.  INVESTMENT OBJECTIVE AND STRATEGY ...............................................................1
    Investment Objective.............................................................................................1
    Investment Style....................................................................................................2
    Investment Strategy and Method of Operation .....................................................2
    Flexibility ..............................................................................................................3
3.  MANAGEMENT ...........................................................................................................3
    General.................................................................................................................3
    Biography ..............................................................................................................4
4.  ALLOCATION OF NET PROFITS AND NET LOSSES; INCENTIVE ALLOCATION TO
    GENERAL PARTNER ...................................................................................................5
    Allocation of Net Profits and Net Losses...............................................................5
    Incentive Allocation to General Partner .................................................................5
5.  WITHDRAWALS OF CAPITAL AND RETIREMENT OF PARTNERS ..............................5
    Generally...............................................................................................................5
    Required Retirement..............................................................................................6
    Payments on Retirement........................................................................................6
    Distributions in Cash or in Kind.............................................................................6
    Suspension of Withdrawals....................................................................................7
    Death, Bankruptcy or Legal Incapacity of a Partner ..............................................7
6.  OTHER PROVISIONS OF THE PARTNERSHIP AGREEMENT ......................................7
    Terms of the Partnership........................................................................................7
    Admission of Partners and Additional Capital Contributions ..................................7
    Liability of Partners and Indemnification of General Partner and Others ................7
    Amendment of the Partnership Agreement.............................................................8
    Dissolution of the Partnership ...............................................................................8
    Assignability of Limited Partnership Interests ........................................................8
    Power of Attorney..................................................................................................8
7.  CERTAIN RISKS ..........................................................................................................8
    Market Risks .........................................................................................................9
    Portfolio Turnover and Expenses...........................................................................9
    Non-Diversification ................................................................................................9
    Short Sales ............................................................................................................9
    Leverage ...............................................................................................................9
    Non-U.S. Securities.............................................................................................10
    Small Cap Stocks ...............................................................................................10
    Lack of Liquidity of Partnership Assets, Valuation ...............................................10
    Options...............................................................................................................10
    Counterparty and Custody Risk............................................................................10
    High Growth Industry Related Risks .....................................................................10
    Reliance on Principal ...........................................................................................11
    Non-Disclosure of Positions.................................................................................11
    Special Situations and Distressed Securities........................................................11
    Lack of Operating History....................................................................................11
    Limited Withdrawal and Transfer Rights; In Kind Distributions .............................11
    Incentive Allocation ............................................................................................12
    Absence of Regulatory Oversight ........................................................................12
    Conflicts of Interest ............................................................................................12
8.  PURCHASE OF "NEW ISSUES" ................................................................................13

9.  EXPENSES ............................................................................................................ 13
10. TAXATION AND ERISA MATTERS............................................................................ 14
        Federal Taxation ................................................................................................ 14
        California Taxation ............................................................................................. 15
        Idaho Taxation .................................................................................................. 16
        General............................................................................................................. 16
        Investment by Pension Plans, IRAs and Other Tax-Exempt Investors ................ 17
11. BROKERAGE AND CUSTODIAL ARRANGEMENTS.................................................. 17
12. FISCAL YEAR; FISCAL PERIODS; FINANCIAL STATEMENTS; AUDITORS.............. 18
13. PROSPECTIVE INVESTORS; ADMISSION OF LIMITED PARTNERS .......................... 18
        Prospective Investors........................................................................................ 18
        Procedure for Becoming a Limited Partner........................................................ 19

v

## DIRECTORY

| | |
|---|---|
| Principal Office: | Wood River Partners, L.P.<br>44 Montgomery Street, Suite 3700<br>San Francisco, California 94104 |
| General Partner: | Wood River Associates, L.L.C.<br>44 Montgomery Street, Suite 3700<br>San Francisco, California 94104 |
| Management Company: | Wood River Capital Management, L.L.C.<br>44 Montgomery Street, Suite 3700<br>San Francisco, California 94104 |
| Prime Brokers: | Morgan Stanley & Co. Incorporated<br>555 California Street<br>San Francisco, California 94104 |
| | Citigroup<br>390 Greenwich Street, 5th Floor<br>New York, New York 10013 |
| Auditors: | American Express Tax and Business Services Inc.<br>1185 Avenue of the Americas<br>New York, New York 10036 |
| Counsel: | Seward & Kissel LLP<br>One Battery Park Plaza<br>New York, New York 10004 |

Written Inquiries relating to the Partnership should be addressed to Wood River Partners, L.P. at the mailing address of its principal office set forth above.

## SUMMARY

The following is a summary of this Confidential Explanatory Memorandum (the "Memorandum") and other documents relating to the Partnership. The Memorandum and related agreements should be reviewed carefully for more information with respect to the Partnership

**The Partnership**

Wood River Partners, L.P. is a Delaware limited partnership (the "Partnership") that commenced operations on February 1, 2003.

**Investment Objective and Approach**

The Partnership seeks to achieve capital appreciation through the combination of long and short equity investments in a diversified number of industries, with a particular emphasis in media and communications, technology and technology-related companies. The Partnership is also expected to make investments in other industries including, but not limited to, healthcare (as well as biotechnology), financials, cyclicals, and consumer staples.

Investments typically are broad based, concentrated primarily in U.S. securities, but also in U.S. ADRs of important international companies. The Partnership may invest in multi-cap (small, mid and large capitalization companies) value and growth securities. The portfolio is expected to typically hold 30 to 40 long positions. Short positions are implemented on a more opportunistic basis. The Partnership may seek to hedge long positions and market risk with Exchange Traded Funds ("ETFs"). The number of long and short positions varies with market conditions. Maximum individual long positions in the portfolio typically are capped at 10% of the original cost; short positions (other than ETFs) typically are capped at 5% of the original cost.

**Management**

The general partner of the Partnership is Wood River Associates, L.L.C. (the "General Partner"), a Delaware limited liability company. The General Partner's principal office is at 44 Montgomery Street, Suite 3700, San Francisco, California 94104. Wood River Capital Management, L.L.C., a Delaware limited liability company (the "Management Company"), is responsible for certain administrative matters. The principal and managing member of the General Partner and the Management Company is John Whittier (the "Managing Member"). The Managing Member has a significant investment in the Partnership, thereby further aligning his interests with those of investors. The Managing Member will be the principal portfolio manager for the Partnership's portfolio and is primarily responsible for all investment decisions

regarding the Partnership's portfolio.

**Risk Factors**

Investment in the Partnership involves significant risk factors and is suitable only for persons who can bear the economic risk of the loss of their investment, who have limited need for liquidity in their investment and who meet the conditions set forth in this Memorandum. There can be no assurances that the Partnership will achieve its investment objective. Investment in the Partnership carries with it the inherent risks associated with investments in securities, as well as additional risks including, but not limited to, the use of short sales, options, leverage and investments in high growth industries.

**Expenses**

All expenses are borne by the Partnership, including legal, accounting, auditing and other professional expenses, administration expenses, research expenses and investment expenses such as commissions, interest on margin accounts and other indebtedness, custodial fees, bank service fees and other reasonable expenses related to the purchase, sale or transmittal of Partnership assets and its share of any office overhead expenses of the General Partner or the Management Company. These office overhead expenses may include rent, supplies, stationery, charges for furniture and fixtures and compensation of analysts and other personnel although it is contemplated that such items may be paid for or provided by brokers and, accordingly, there may be no charge to the Partnership for such items. Organizational expenses of the Partnership were borne by the Partnership and paid for with soft dollars.

**Allocation of Net Profits and Losses; Incentive Allocation to General Partner**

Any net profits of the Partnership (including net unrealized gains) will be allocated to the partners in accordance with the ratio of their capital account balances. As of the end of each fiscal year, if the net profits allocated to the capital account of a limited partner exceed a "hurdle rate" equal to a non-cumulative 5% annualized return, there will be reallocated to the General Partner from the capital account of such limited partner 20% of all net profits allocated to such limited partner, subject to a "loss carryforward" provision (sometimes referred to as a "highwater mark").

**The Offering**

The minimum investment is $500,000, subject to waiver at the discretion of the General Partner. The General Partner may, in its sole discretion, admit limited partners, or accept additional capital contributions from existing limited partners at any time. However, the Partnership may close to new investors from time to time.

viii

**Withdrawals**

A limited partner may withdraw all or a portion of his capital account as of the last day of each calendar quarter pursuant to written notice which must be received by the Partnership at least 60 days prior to the withdrawal (i.e., 60 days prior to the relevant quarter end); provided, however, that each capital contribution by a limited partner is subject to a "lock-up" provision such that a limited partner may not withdraw capital from a specific capital contribution, nor any profits attributable to such capital contribution, until such capital contribution has been invested in the Partnership for at least 6 months.

In general, upon a limited partner's retirement, at least 90% of the amount of the estimated value of the limited partner's capital account as of the date of retirement will be paid within 30 days after the date of retirement and the balance, if any, promptly after the completion of the audit of the Partnership for such year. Limited partners who make partial withdrawals will be paid as promptly as practicable, generally within 30 days.

**Reports**

Each limited partner will receive unaudited reports of the performance of the Partnership at least quarterly and will receive audited year-end financial statements annually.

1.    **GENERAL COMMENTS**

Wood River Partners, L.P. (the "Partnership") is a Delaware limited partnership that commenced operations on February 1, 2003. The Partnership's principal office is located at 44 Montgomery Street, Suite 3700, San Francisco, California 94104. The Partnership's general partner is Wood River Associates, L.L.C. (the "General Partner"), a Delaware limited liability company with its principal office at 44 Montgomery Street, Suite 3700, San Francisco, California 94104. Wood River Capital Management, L.L.C., a Delaware limited liability company, serves as the management company (the "Management Company") and is responsible for certain administrative matters.

This Memorandum sets forth the investment program of the Partnership, the principal terms of the limited partnership agreement (the "Partnership Agreement") and certain other pertinent information. However, the Memorandum does not set forth all the provisions and distinctions of the Partnership Agreement that may be significant to a particular prospective limited partner. Each prospective limited partner should examine this Memorandum, the Partnership Agreement and the Subscription Agreement accompanying this Memorandum in order to assure itself that the terms of the Partnership Agreement and the Partnership's investment program are satisfactory to it.

Prospective limited partners are invited to review any materials available to the General Partner relating to the Partnership, the operations of the Partnership and any other matters regarding this Memorandum. In this connection, it is noted that the Partnership's counsel, Seward & Kissel LLP, will make available to the Partnership opinions of counsel as to the legality of the Partnership interests offered herein and as to the tax consequences of investment in the Partnership which are discussed herein. All such materials are available at the office of the Partnership at any reasonable hour after reasonable prior notice. The General Partner will afford prospective limited partners the opportunity to ask questions of and receive answers from its representatives concerning the terms and conditions of the offering and to obtain any additional information to the extent that the General Partner or the Partnership possess such information or can acquire it without unreasonable effort or expense.

The Partnership may, in the future, reorganize into a "Master-Feeder" structure. The reorganization would be effected by the Partnership contributing all of its assets to a master fund (the "Master Fund"), which would be a Cayman Islands corporation (or similar vehicle). All portfolio investments would then be held at the Master Fund level and the Partnership would be allocated its pro rata share of the Master Fund's gains and losses.

An investment in the Partnership may be deemed speculative and is not intended as a complete investment program. It is designed only for experienced and sophisticated persons who are able to bear the risk of the substantial impairment or loss of their investment in the Partnership.

2.    **INVESTMENT OBJECTIVE AND STRATEGY**

**Investment Objective**

The Partnership seeks to achieve capital appreciation through the combination of long and short equity investments in a diversified number of industries, with a particular emphasis in media and communications, technology and technology-related companies. The Partnership is also expected to make investments in other industries including, but not limited to, healthcare (as well as biotechnology), financials, cyclicals, and consumer staples.

Investments typically are broad based, concentrated primarily in U.S. securities, but also in U.S. ADRs of important international companies. The Partnership may invest in multi-cap (small, mid and large capitalization companies) value and growth securities. The portfolio is expected to typically hold 30 to 40 long positions. Short positions are implemented on a more opportunistic basis and accordingly the number of positions will vary.. The Partnership may seek to hedge long positions and market risk with Exchange Traded Fund ("ETFs"). The number of long and short holdings will also fluctuate with market

conditions.  Maximum individual long positions in the portfolio are capped at 10% of the original cost; short positions typically are capped at 5% of the original cost.

## Investment Style

The primary objective of the Partnership is to create consistent absolute returns for its limited partners.  After generating positive annual returns, the goal of the Partnership will be to create above average returns for its investors.  Utilizing both trading and investing strategies is expected to generate a blended return of short and long-term capital gains.  The Partnership expects to capitalize on market volatility by implementing trading strategies (both long and short securities), which are expected to garner short-term gains.

It is also expected that a multi-use strategy using option securities will enhance the total returns of the Partnership.  More specifically, options are expected to improve total returns through uses including, but not limited to: extending profitable holdings into long-term positions; hedging individual positions and/or the entire portfolio; creating premium by selling covered options against existing long and short positions; selling "naked" options to create long and short positions at more attractive "out-of-the-money" prices (in addition to this particular strategy, options may be closed in order to opportunistically lock-in gains).

Leverage through the use of margin borrowing is almost certain to be used to seek to capitalize on trading opportunities and take advantage of the absolute low borrowing rates.  The Partnership will use leverage in a manner that the General Partner deems prudent.

It is expected that ongoing volatility in the world's capital markets will lead to an actively managed portfolio.  This, in turn, will likely lead to high portfolio turnover for the trading portion of the Fund.  Less turnover is expected for medium and long-term positions.

## Investment Strategy and Method of Operation

The Partnership maintains an investment portfolio typically diversified across 20-40 long positions and short positions (implemented on a more opportunistic basis), with a particular focus on media and communications, technology and technology-related industries, which includes, but is not limited to: television, radio, cable system operators, cable programmers, Internet, telecommunications and data communications equipment and services, software, computer hardware and peripherals, storage, technology-related services, computer products distribution, semiconductors and components, semiconductor and other capital equipment, contract manufacturing, office equipment and defense technology companies.

The Partnership bases its investment strategy on fundamental research, as well as both quantitative and qualitative analysis.  Investment ideas are generated through meetings and conversations with company managements, interactions with independent research analysts and organizations, and communications with the General Partner's extensive network of contacts within the investment community and related industries.

The Partnership attempts to identify investment opportunities by recognizing emerging trends and areas of accelerating growth.  The Partnership also seeks to identify potential value situations where the price of individual securities do not reflect the intrinsic value of a company as determined by discounted cash flow analysis, comparable company valuations, and evaluation of a company's assets.  The Partnership typically uses a comprehensive approach to analyzing potential investment ideas which focus on: the quality of the company's management, the company's market position relative to its principal competitors, the company's products and product cycles, the company's attractiveness to potential acquirers, the potential earnings growth of the company, the company's assets and cash flow, the health of the company's balance sheet, and the valuation of the company.

The Partnership may engage in short sales of securities to seek to capitalize on inefficient markets.  To identify candidates for short sales, the General Partner focuses on companies that it

believes are not effectively adapting to changes within the marketplace; companies with deteriorating margins, cash flow and balance sheet metrics, companies with overvalued equities where there is excessive leverage which might trigger a liquidity crisis or bankruptcy; companies involved in fraud and/or accounting irregularities, and companies that have a high likelihood of significant earning reductions.

The Partnership may also use ETFs to hedge the Fund's long positions, as well as protect against general market risk.

The Partnership may buy securities on margin and may arrange with banks, brokers and other financial institutions to borrow money against a pledge of securities in order to employ leverage in such amounts as the General Partner deems prudent.

<u>Flexibility</u>

While the Partnership will invest primarily in publicly traded U.S. equities (including both long and short positions), the Partnership has broad and flexible investment authority.   In order to maintain flexibility and to capitalize on investment opportunities as they arise, the Partnership is not required to invest any particular percentage of its portfolio in any type of investment or region, and the amount of the Partnership's portfolio which is invested in any type of investment, which is long or short, or which is weighted in different countries or different sectors can change at any time based on the availability of attractive market opportunities.  Accordingly, the Partnership's investments may at any time include long or short positions in ADRs, U.S. or non-U.S. common stocks, preferred stocks, stock warrants and rights, bonds, notes or other debentures or debt participations, partnership interests, swaps, options (including options on stock market indices) and other securities or financial instruments including those of investment companies.  The Partnership may purchase, hold, sell or deal in commodities, commodity contracts, commodity futures, financial futures or related options, but will not make such investments until, to the extent required, the General Partner has registered as a commodity pool operator with the Commodity Futures Trading Commission.

There can be no assurance that the Partnership will achieve its investment objective.

3.    <u>MANAGEMENT</u>

<u>General</u>

The general partner of the Partnership is Wood River Associates, L.L.C. (the "General Partner"), a Delaware limited liability company with its principal office at 44 Montgomery Street, Suite 3700, San Francisco, California 94104.  The General Partner will be responsible for all decisions concerning the investments of the Partnership.  Wood River Capital Management, L.L.C., a Delaware limited liability company, serves as the management company (the "Management Company") and is responsible for certain administrative matters.  The principal and managing member of the General Partner and the Management Company is John Whittier (the "Managing Member").  The Managing Member has a significant investment in the Partnership, thereby further aligning his interests with those of investors.  The Managing Member will be the principal portfolio manager for the Partnership's portfolio and is primarily responsible for all investment decisions regarding the Partnership's portfolio.  Biographical information concerning the Managing Member and other key personnel is set forth below.

Each of the General Partner and the Management Company will use its best efforts in connection with the purposes and objectives of the Partnership and will devote so much of its time and effort to the affairs of the Partnership as may, in its judgment, be necessary to accomplish the purposes of the Partnership.  However, it should be noted that the General Partner and the Management Company (or their principals, affiliates or employees) may conduct any other business, including any business within the securities industry, whether or not such business is in competition with the Partnership.  See discussion at Section 7 under "Conflicts of Interest".

## Biography

**John Whittier** has over thirteen years of experience in the securities business, having worked on both the "buy" and "sell" side since 1991. From 1991 through 1997, he worked as a securities analyst for the investment firm Donaldson, Lufkin, and Jenrette ("DLJ"). Mr. Whittier served as a Vice President, responsible for covering media and communications companies (specifically the cable, broadcasting and wireless communications industries). In addition to his research coverage responsibilities, Mr. Whittier was the co-head of the media and communications group's team of analysts and associates.

In September 1997, Mr. Whittier left DLJ to form Wood River Capital Management, L.L.C. ("WRCM"). From September 1997 through 2003, Mr. Whittier's primary activity has been managing a family office (which he continues to manage) and he has also been managing (and continues to manage) several investment portfolios consisting of both public and private equity securities. The public equity portfolio of the family office managed by Mr. Whittier out performed its benchmark (the NASDAQ Index) since 1999. In 1999, the portfolio's performance more than doubled in value. In 2000, with the NASDAQ declining nearly 40% in value, the portfolio returned an absolute gain of nearly 2%[1]. From 2001 through 2002, like many funds focused on communications and technology areas, the value of the portfolio of the family office declined (although it outperformed its benchmark). In February 2003, Mr. Whittier launched the Partnership. The Partnership's gross annualized return in 2003 was 43.3%, and its net annualized return was 34.6%[2]. WRCM presently has employees and offices in San Francisco, California and Sun Valley, Idaho.

Mr. Whittier received a B.A. from the University of California, at Berkeley in 1989.

**Thomas Wightman** is an equity analyst for the Partnership focusing on healthcare, including biotechnology, cyclicals, consumer staples and financials. Prior to joining WRCM in 2000, he was an analyst covering financials, consumer staples and technology with Carlson Capital, L.P. in Dallas, Texas. Mr. Wightman received a B.A. in Business Administration from Texas Christian University in 1996.

**Jason Foster** is an equity analyst for the Partnership focusing on telecommunication services, communications equipment and other technology related industries. He has been employed as an analyst by WRCM since 2000. From 1999 through 2000, he worked with Morgan Stanley in institutional sales covering several major institutional growth accounts on the West Coast. Prior to his employment at Morgan Stanley, he worked from 1996 through 1999 with Donaldson, Lufkin, and Jenrette both in equity research as an analyst in telecom services, as well with the institutional sales group covering major mutual funds on the West Coast. Mr. Foster received a B.A. in Finance from Texas Christian University in 1996.

**Jacques Soenens** is an equity analyst for the Partnership covering software, information technology services, semiconductor, networking, server/pc, storage, internet services and media, and electronic manufacturing services. He has been with WRCM since 1999. From 1996 through 1999, he worked as a research analyst at Donaldson, Lufkin, and Jenrette covering multiple technology sectors. Prior to coming to DLJ, he worked as a research associate at Prudential Securities and London Link, a

---

[1] The performance information for the portfolio of the family office was determined by Wood River Capital Management, L.L.C. based on unaudited information. The investment strategy used in the management of the portfolio of the family office is substantially similar to the investment strategy used by the Partnership. The performance of the family office does not include deduction of expenses or the Incentive Allocation to which a limited partner in the Partnership is subject. Past performance is not indicative of future performance.

[2] The gross annualized return for 2003 was determined by the General Partner based on unaudited information and includes deduction of Partnership expenses but not the Incentive Allocation that was paid by the limited partners. The net annualized return for 2003 was determined by the General Partner based on unaudited information and includes deduction of the Partnership's expenses and the Incentive Allocation that was paid by the limited partners. Past performance is not indicative of future performance.

UK based media group. Mr. Soenens received a B.S. in Management (BSM) from the Freeman School of Business at Tulane University in 1993.

**4.    ALLOCATION OF NET PROFITS AND NET LOSSES; INCENTIVE ALLOCATION TO GENERAL PARTNER**

**Allocation of Net Profits and Net Losses**

Except with respect to "new issues" (discussed in Section 8 below), the net profit or net loss of the Partnership as of the end of each fiscal period (as defined in Section 12 below) will be allocated to each partner in the proportion which such person's capital account as of the beginning of that fiscal period bore to the aggregate of all the capital accounts as of the beginning of that fiscal period. Net profit and net loss of the Partnership will be determined on the accrual basis of accounting using generally accepted accounting principles as a guideline and will be deemed to include net unrealized profits or losses on investment positions as of the end of each fiscal period.

**Incentive Allocation to General Partner**

Subject to the "Loss Carryforward" provision discussed below, if for any fiscal year the net profits allocated to a limited partner exceed a "hurdle rate" equal to a non-cumulative 5% annualized return, an amount equal to 20% of all such net profits will be deducted from the limited partner's capital account as of the end of such fiscal year. In the event that a partner withdraws or is required to retire at any time other than at the end of a fiscal year, such deduction will be made with respect to such partner on the date of his retirement as though it were being made at the end of a fiscal year. The total amount deducted from the capital accounts of the limited partners will be allocated to the capital account of the General Partner. The General Partner may, in its sole discretion, waive or reduce the 20% incentive allocation for limited partners that are members, principals, employees or affiliates of the General Partner or the Management Company, relatives of such persons and for certain large or strategic investors. The Partnership's fiscal year will end on December 31 of each year.

Under a Loss Carryforward provision contained in the Partnership Agreement, no deduction from a limited partner's capital account with respect to 20% of any net profits will be made from the capital account of a particular limited partner with respect to a fiscal year until any net loss previously allocated to the capital account of such limited partner has been offset by subsequent net profits. In the event a limited partner makes a partial withdrawal, an appropriate reduction in the Loss Carryforward (or adjustment in the computation of the 20% incentive allocation) will be made in the manner described in Section 6.01 of the Partnership Agreement.

**5.    WITHDRAWALS OF CAPITAL AND RETIREMENT OF PARTNERS**

**Generally**

A limited partner may withdraw all or a portion of his capital account as of the last day of each calendar quarter; provided, however, that each capital contribution by a limited partner is subject to a "lock-up" provision such that a limited partner may not withdraw any capital from a specific capital contribution, nor any profits attributable to such capital contribution, until such capital contribution has been invested in the Partnership for at least 6 months. Any limited partner desiring to make a withdrawal from his capital account must give written notice to the Partnership of (i) such limited partner's intention to make such withdrawal and (ii) the amount thereof, which notice must actually be received by the Partnership at least 60 days prior to the withdrawal date. Notwithstanding the foregoing, the General Partner, in its sole discretion, may waive or modify any terms related to withdrawals for a limited partner pursuant to written agreement with the limited partner.

The General Partner may withdraw all or any part of its capital account as of the last day of each calendar quarter; provided, however, that if the capital to be withdrawn by the General Partner would reduce its capital account (computed without regard to net losses) to less than 75% of its initial capital

contribution, the General Partner must give 75 days' written notice of the proposed withdrawal to the limited partners.

## Required Retirement

The General Partner, in its sole discretion, may require any limited partner to retire from the Partnership at any time on no fewer than 10 days' notice, such retirement to be effective on the date specified in such notice. If the General Partner, in its sole discretion, deems it to be in the best interests of the Partnership to do so because the continued participation of any limited partner in the Partnership might cause the Partnership to violate any law, rule or regulation or expose the Partnership to the risk of litigation, arbitration, administrative proceedings or any similar action or proceeding, the General Partner may require such limited partner to retire from the Partnership at any time on no fewer than on 5 days notice, such retirement to be effective on the date specified in such notice.

## Payments on Retirement

A partner retiring in accordance with the Partnership Agreement will be entitled to receive an amount equal to the value of such partner's capital account as of the date of his retirement and the estate or legal representative of any deceased, bankrupt, legally incapacitated or disabled partner may, in the discretion of the General Partner, be paid the value of such partner's capital account as of the end of the fiscal year during which such partner died or became bankrupt or legally incapacitated.

At least ninety percent (90%) of the estimate of such amount will be paid within 30 days after the date of such partner's retirement or the end of the fiscal year, as the case may be. Promptly after the General Partner has determined the capital accounts of the partners as of such date (which in the General Partner's discretion may be after the Partnership's independent public accountants have completed their examination of the Partnership's financial statements), the Partnership will pay to such partner or his representative the excess, if any, of the amount to which such partner is entitled over the amount previously paid, or such partner will be obligated to repay to the Partnership the excess, if any, of the amount previously paid over the amount to which such partner is entitled, in each case together with interest thereon from the date of such partner's retirement or the last day of the fiscal year, as the case may be, to the date of the payment of such excess at an annual rate equal to the broker's call rate charged by any of the Partnership's prime brokers.

The payment to a retiring partner of his capital account shall be subject to the retention of a reserve for partnership liabilities as provided in Section 10.02 of the Partnership Agreement. If the reserve (or portion thereof) is later determined by the General Partner to have been in excess of the amount required, the proportionate amount of such excess shall be returned to each partner with interest thereon at an annual rate equal to the broker's call rate charged by any of the Partnership's prime brokers.

## Distributions in Cash or in Kind

Distributions to a partner on withdrawal or retirement generally will be made in cash; however, at the discretion of the General Partner, such distributions may be made in securities owned by the Partnership selected by the General Partner or partly in cash and partly in securities selected by the General Partner. If the General Partner determines to distribute securities in kind, such securities may be distributed directly to the withdrawing partner or alternatively, distributed into a liquidating trust or liquidating account and sold by the Partnership for the benefit of the withdrawing partner, in which case (i) payment to such partner of that portion of his withdrawal attributable to such securities will be delayed until such time as such securities can be liquidated and (ii) the amount otherwise due such partner will be increased or decreased to reflect the performance of such securities through the date on which the liquidation of such securities is effected.

6

### Suspension of Withdrawals

The General Partner may suspend withdrawals for the whole or any part of any period when:

(i)     any stock exchange on which a substantial part of securities owned by the Partnership are traded is closed, otherwise than for ordinary holidays, or dealings thereon are restricted or suspended; or

(ii)    there exists any state of affairs which constitutes a state of emergency or period of extreme volatility or illiquidity as a result of which (a) disposal of a substantial part of the investments of the Partnership would not be reasonably practicable and might seriously prejudice the limited partners of the Partnership or (b) it is not reasonably practicable for the Partnership fairly to determine the value of its net assets.

### Death, Bankruptcy or Legal Incapacity of a Partner

In the event of the death, bankruptcy or legal incapacity of a partner, the estate or legal representative of such partner shall succeed to such partner's right to share in net profits or net losses of the Partnership and to receive distributions from the Partnership. Such estate or representative may, in the discretion of the General Partner, be paid as of the end of the fiscal year during which such partner died or became bankrupt or legally incapacitated, the value of such partner's capital account as of the end of such year in liquidation of such partner's interest in the Partnership. Alternatively, the General Partner may, in its discretion, admit such estate or representative to the Partnership as a limited partner. Of course, if such estate or representative timely withdraws such partner's capital account, the estate or representative will be paid as of the date of such partner's retirement.

### 6.    OTHER PROVISIONS OF THE PARTNERSHIP AGREEMENT

### Terms of the Partnership

The Partnership will continue until December 31, 2025 and thereafter from year to year unless dissolved as provided in Section 9.01 of the Partnership Agreement.

### Admission of Partners and Additional Capital Contributions

The General Partner is authorized to admit additional limited partners to the Partnership, or accept additional capital contributions from existing limited partners, on the first day of each calendar month and at such other times as the General Partner shall, in its sole discretion, permit. However, the Partnership may close to new investors from time to time. Capital contributions shall be made in cash unless the General Partner, in its sole discretion, permits contributions in securities or partly in cash and partly in securities.

The General Partner may admit additional general partners (i) as of the beginning of any quarter upon 75 days' prior written notice to all limited partners, (ii) at any time with the consent of the majority in interest of the limited partners or (iii) at any time if such additional general partner is affiliated with the General Partner or its principals.

### Liability of Partners and Indemnification of General Partner and Others

The General Partner is liable to creditors for the debts of the Partnership. However, none of the General Partner, the Management Company, their respective members, partners, principals, employees or affiliates, nor any person designated to wind up the affairs of the Partnership pursuant to the Partnership Agreement will be liable for any loss or cost arising out of, or in connection with, any activity undertaken (or omitted to be undertaken) in connection with the Partnership, except for any liability caused by his, her or its gross negligence or willful misconduct.

7

The Partnership will, to the fullest extent legally permissible under the laws of the State of Delaware, indemnify and hold harmless the General Partner, the Management Company, their respective members, principals, affiliates or employees and any persons designated to wind up the affairs of the Partnership pursuant to the Partnership Agreement against any loss, liability or expense incurred in connection with the performance by the General Partner, the Management Company, their respective members, principals, affiliates and employees or other persons of their responsibilities to the Partnership; provided, however, that such persons shall not be indemnified for losses resulting from their own gross negligence or willful misconduct.

A limited partner who does not take part in the management or control of the business of the Partnership will not be personally liable for any debt or obligation of the Partnership in excess of his capital contribution. Under certain circumstances, a limited partner may, under Delaware law, be required to return for the benefit of creditors amounts previously distributed to such partner.

## Amendment of the Partnership Agreement

The Partnership Agreement may be amended by the General Partner in its sole discretion in any manner that does not adversely affect any limited partner. The Partnership Agreement may also be amended by action of both the General Partner and limited partners owning a majority in interest of the capital accounts of all the limited partners in any manner that does not discriminate among the limited partners.

## Dissolution of the Partnership

The Partnership may be dissolved at any time by the General Partner, whereupon its affairs shall be wound up by the General Partner. The retirement, dissolution or bankruptcy of the General Partner will dissolve the Partnership unless at such time there is another general partner who agrees to continue the business of the Partnership. If there is no remaining general partner who agrees to continue the business of the Partnership, the affairs of the Partnership shall be promptly wound up (i) by the General Partner, or (ii) if the General Partner is unavailable, by the person previously designated by the General Partner, or (iii) if the General Partner has made no such designation, by the person selected by a majority in interest of the capital accounts of the limited partners. Such person shall take all steps necessary or appropriate to wind up the affairs of the Partnership as promptly as practicable.

Neither the admission of partners nor the retirement, bankruptcy, death, dissolution, or legal incapacity of any limited partner will dissolve the Partnership.

## Assignability of Limited Partnership Interests

Neither the interest of any limited partner in the Partnership nor any beneficial interest therein is assignable, in whole or in part, without the prior written consent of the General Partner given in its sole discretion.

## Power of Attorney

The General Partner will be granted an irrevocable power of attorney to sign on behalf of each limited partner a Certificate of Limited Partnership and any amendments thereto or termination thereof, as well as any documents required by reason of the dissolution of the Partnership or any documents required to be submitted by the Partnership to any governmental or administrative agency, to any securities exchange, board of trade, clearing corporation or association or to any self-regulatory organization or trade association.

7.    **CERTAIN RISKS**

The Partnership may be deemed to be a speculative investment and is not intended as a complete investment program. Investment in the Partnership is suitable only for persons who can bear the economic risk of the loss of their investment, who have limited need for liquidity in their investment

and who meet the conditions set forth in this Memorandum and the Subscription Agreement. There can be no assurances that the Partnership will achieve its investment objective. Investment in the Partnership involves significant risks and while the following summary of certain of these risks should be carefully evaluated before making an investment in the Partnership, the following does not intend to describe all possible risks of such an investment:

## Market Risks

The profitability of a significant portion of the Partnership's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments. There can be no assurance that the General Partner will be able to predict accurately these price movements. Although the General Partner may attempt to mitigate market risk through the use of long and short positions or other methods, there may be a significant degree of market risk.

## Portfolio Turnover and Expenses

The investment strategy of the Partnership will involve the taking of frequent trading positions, and, as a result, turnover and brokerage commission expenses of the Partnership may significantly exceed those of other investment entities of comparable size. In addition, since the Partnership is able to defer expenses incurred in a particular year to a subsequent year (see discussion at Section 9 below), expenses of the Partnership in that subsequent year may be higher than if expenses had been deferred.

## Non-Diversification

It is anticipated that the Partnership's portfolio will be invested primarily in U.S. equities and related options. Accordingly, the Partnership's portfolio may not be diversified among industries, geographic areas or types of securities. Further, the Partnership's portfolio may not necessarily be diversified among a wide range of issuers. Accordingly, the investment portfolio of the Partnership may be subject to more rapid change in value than would be the case if the Partnership were required to maintain a wide diversification among industries, investment areas, types of securities and issuers.

## Short Sales

Short selling, or the sale of securities not owned by the Partnership, necessarily involves certain additional risks. Such transactions expose the Partnership to the risk of loss in an amount greater than the initial investment, and such losses can increase rapidly and without effective limit. There is the risk that the securities borrowed by the Partnership in connection with a short sale would need to be returned to the securities lender on short notice. If such request for return of securities occurs at a time when other short sellers of the subject security are receiving similar requests, a "short squeeze" can occur, wherein the Partnership might be compelled, at the most disadvantageous time, to replace borrowed securities previously sold short with purchases on the open market, possibly at prices significantly in excess of the proceeds received earlier.

## Leverage

While the use of margin borrowing can substantially improve the return on invested capital, such use may also increase the adverse impact to which the portfolio of the Partnership may be subject. Borrowings will usually be from securities brokers and dealers and will typically be secured by the Partnership's securities and other assets. Under certain circumstances, such a broker-dealer may demand an increase in the collateral that secures the Partnership's obligations and if the Partnership were unable to provide additional collateral, the broker-dealer could liquidate assets held in the account to satisfy the Partnership's obligations to the broker-dealer. Liquidation in that manner could have extremely adverse consequences. In addition, the amount of the Partnership's borrowings and the interest rates on those borrowings, which will fluctuate, will have a significant effect on the Partnership's profitability.

<u>Non-U.S. Securities</u>

Investing in securities of non-U.S. governments and companies which are generally denominated in non-U.S. currencies, and utilization of currency forward contracts and options on currencies involve certain considerations comprising both risks and opportunities not typically associated with investing in securities of United States issuers. These considerations include changes in exchange rates and exchange control regulations, political and social instability, expropriation, imposition of non-U.S. taxes, less liquid markets and less available information than are generally the case in the United States, higher transaction costs, less government supervision of exchanges, brokers and issuers, difficulty in enforcing contractual obligations, lack of uniform accounting and auditing standards and greater price volatility.

<u>Small Cap Stocks</u>

At any given time, the Partnership may have significant investments in smaller-to-medium sized companies of a less seasoned nature whose securities are traded in the over-the-counter market. These "secondary" securities often involve significantly greater risks than the securities of larger, better-known companies.

<u>Lack of Liquidity of Partnership Assets, Valuation</u>

Partnership assets may, at any given time, include securities and other financial instruments or obligations which are very thinly traded. The sale of any such investments may be possible only at substantial discounts. Further, such investments may be extremely difficult to value with any degree of certainty.

<u>Options</u>

Purchasing put and call options, as well as writing such options, are highly specialized activities and entail greater than ordinary investment risks. Because option premiums paid or received by an investor are small in relation to the market value of the investments underlying the options, buying and selling put and call options can result in large amounts of leverage. As a result, the leverage offered by trading in options could cause the value of a limited partner's capital account to be subject to more frequent and wider fluctuations than would be the case if the Partnership did not invest in options.

<u>Counterparty and Custody Risk</u>

To the extent the Partnership invests in swaps, derivative or synthetic instruments, or other over-the-counter transactions including forward contracts, or in certain circumstances, non-U.S. securities, the Partnership may take a credit risk with regard to parties with whom it trades and may also bear the risk of settlement default. These risks may differ materially from those entailed in exchange-traded transactions which generally are backed by clearing organization guarantees, daily marking-to-market and settlement, and segregation and minimum capital requirements applicable to intermediaries. Transactions entered directly between two counterparties generally do not benefit from such protections and expose the parties to the risk of counterparty default.

In addition, there are risks involved in dealing with the custodians or brokers who settle Partnership trades, particularly with respect to non-U.S. investments. It is expected that all securities and other assets deposited with custodians or brokers will be clearly identified as being assets of the Partnership and hence the Partnership should not be exposed to a credit risk with regard to such parties. However, it may not always be possible to achieve this segregation and there may be practical or time problems associated with enforcing the Partnership's rights to its assets in the case of an insolvency of any such party.

<u>High Growth Industry Related Risks</u>

The Partnership may have significant investments in the securities of high growth companies (e.g., technology, communications and healthcare). It is noted that these securities may be very volatile.

In addition, these companies may face undeveloped or limited markets, have limited products, have no proven profit-making history, may operate at a loss or with substantial variations in operating results from period to period, have limited access to capital and/or be in the developmental stages of their businesses, have limited ability to protect their rights to certain patents, copyrights, trademarks and other trade secrets, or be otherwise adversely affected by the extremely competitive markets in which many of their competitors operate.

### Reliance on Principal

John Whittier is the Managing Member of the General Partner and the portfolio manager for the Partnership's portfolio. In the event that John Whittier resigns from the General Partner, dies or otherwise becomes unable to participate in the management of the Partnership, limited partners generally would have no special withdrawal rights but rather would have the right to withdraw their limited partnership interests only in accordance with the withdrawal provisions (although the 6 month lock-up provision would be waived). If John Whittier no longer participated in the management of the Partnership, it is possible that a significant number of limited partners would exercise their right to withdraw at the next applicable withdrawal date. There can be no assurance that the Partnership's portfolio could be liquidated in an efficient manner to accommodate such withdrawals, and limited partners could experience losses. In addition, there can be no assurance that enough limited partners would choose to remain invested in the Partnership to make it feasible to continue to manage its portfolio.

### Non-Disclosure of Positions

In an effort to protect the confidentiality of its positions, the Partnership generally will not disclose all of its positions to limited partners on an ongoing basis, although the Partnership, in its sole discretion, may permit such disclosure on a select basis to certain limited partners if the Partnership determines that there are sufficient confidentiality agreements and procedures in place. Further, the Partnership may not disclose its investment positions in its annual financial statements, if it determines that such confidential treatment is desirable.

### Special Situations and Distressed Securities

The Partnership may have significant investments in companies involved in (or the target of) acquisition attempts or tender offers or companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies and similar transactions. In any investment opportunity involving any such type of business enterprise, there exists the risk that the transaction in which such business enterprise is involved either will be unsuccessful, take considerable time or will result in a distribution of cash or a new security the value of which will be less than the purchase price to the Partnership of the security or other financial instrument in respect of which such distribution is received. Similarly, if an anticipated transaction does not in fact occur, the Partnership may be required to sell its investment at a loss. Because there is substantial uncertainty concerning the outcome of transactions involving financially troubled companies in which the Partnership may invest, there is a potential risk of loss by the Partnership of its entire investment in such companies.

### Lack of Operating History

The Partnership is a newly-formed entity with a limited operating history. Although the Managing Member of the General Partner has significant experience in securities analysis and investment management, he has not previously been responsible for operating an investment management company.

### Limited Withdrawal and Transfer Rights; In Kind Distributions

A limited partner generally will be permitted to withdraw his limited partnership interest as of the end of each calendar quarter; provided, however, that each capital contribution by a limited partner is subject to a "lock-up" provision such that a limited partner may not withdraw any capital from a specific capital contribution, nor any profits attributable to such capital contribution, until such capital contribution

11

has been invested in the Partnership for at least 6 months. Accordingly, a limited partnership interest in the Partnership is a relatively illiquid investment. Further, if a substantial number of limited partners were to make withdrawals and the Partnership did not have a sufficient amount of cash or liquid securities, the Partnership might have to meet such withdrawal requests through distributions of illiquid securities. Further, transfers of limited partnership interests will be permitted only with the written consent of the General Partner. As a result, the limited partnership interests should only be acquired by limited partners willing and able to commit their assets for an appreciable period of time.

### Incentive Allocation

The allocation of a percentage of each limited partner's net profits to the General Partner may create an incentive for the General Partner to cause the Partnership to make investments that are riskier or more speculative than would be the case if this allocation were not made. Since the General Partner's incentive allocation is calculated on a basis which includes unrealized appreciation of the Partnership's assets, such allocation may be greater than if it were based solely on realized gains.

### Absence of Regulatory Oversight

While the Partnership may be considered similar to an investment company, it does not intend to register as such under the Investment Company Act of 1940 (the "1940 Act"), in reliance upon an exemption available to privately offered investment companies, and, accordingly, the provisions of the 1940 Act (which, among other matters, require investment companies to have disinterested directors, require securities held in custody to at all times be individually segregated from the securities of any other person or marked to clearly identify such securities as the property of such investment company and regulate the relationship between the adviser and the investment company) will not be applicable.

### Conflicts of Interest

The Management Company and its Managing Member have and will continue to manage several investment portfolios of public equity securities for high net worth investors. Further, the General Partner and the Management Company (and their principals) conduct investment activities for their own accounts and may serve as investment adviser or investment manager to other client accounts in the future. Such other entities or accounts (the "Other Clients") may have investment objectives or may implement investment strategies similar to those of the Partnership

The General Partner and the Management Company (or their principals) may give advice or take action with respect to the Other Clients that differs from the advice given with respect to the Partnership. To the extent a particular investment is suitable for both the Partnership and the Other Clients, such investments will be allocated between the Partnership and the Other Clients pro rata based on assets under management or in some other manner which the General Partner and the Management Company determine is fair and equitable under the circumstances to all clients, including the Partnership. From the standpoint of the Partnership, simultaneous identical portfolio transactions for the Partnership and the Other Clients may tend to decrease the prices received, and increase the prices required to be paid, by the Partnership for its portfolio sales and purchases. Where less than the maximum desired number of shares of a particular security to be purchased is available at a favorable price, the shares purchased will be allocated among the Partnership and the Other Clients in an equitable manner as determined by the General Partner and the Management Company.

In addition, purchase and sale transactions (including swaps) may be effected between the Partnership and the Other Clients subject to the following guidelines: (i) such transactions shall be effected for cash consideration at the current market price of the particular securities, and (ii) no extraordinary brokerage commissions or fees (i.e., except for customary transfer fees or commissions) or other remuneration shall be paid in connection with any such transaction.

As a result of the foregoing, the General Partner and the Management Company (and their principals) may have conflicts of interest in allocating their time and activity between the Partnership and

the Other Clients, in allocating investments among the Partnership and the Other Clients and in effecting transactions between the Partnership and the Other Clients, including ones in which the General Partner and the Management Company (and their principals) may have a greater financial interest.

Each of the General Partner and the Management Company will use its best efforts in connection with the purposes and objectives of the Partnership and will devote so much of its time and effort to the affairs of the Partnership as may, in its judgment, be necessary to accomplish the purposes of the Partnership. The Partnership Agreement specifically provides that the General Partner, the Management Company, and their respective members, partners, principals, employees or affiliates may conduct any other business, including any business within the securities industry, whether or not such business is in competition with the Partnership. Without limiting the generality of the foregoing, the General Partner, the Management Company, their respective members, partners, principals, employees or affiliates may act as investment adviser or investment manager for others, may manage funds or capital for others, may have, make and maintain investments in their own name or through other entities and may serve as an officer, director, consultant, partner or stockholder of one or more investment funds, partnerships, securities firms or advisory firms. The Partnership Agreement also recognizes that it may not always be possible or consistent with the investment objectives of the various persons or entities described above and of the Partnership for the same investment positions to be taken or liquidated at the same time or at the same price.

8.    **PURCHASE OF "NEW ISSUES"**

From time to time, the Partnership may, to the extent permitted by the Rules of the National Association of Securities Dealers, Inc., as may be amended from time to time (the "Rules"), purchase equity securities that are part of an initial public offering (sometimes referred to as "IPOs" or "new issues"). Under the Rules, brokers may not sell such securities to a private investment fund if the fund has investors who are "Restricted Persons" unless the fund has a mechanism in place that excludes such Restricted Persons from receiving allocations of profits from new issues. Restricted Persons include persons employed by or affiliated with a broker and portfolio managers of hedge funds and other registered and unregistered investment advisory firms. The profits and losses with respect to new issues will generally be allocated to investors in the Partnership that are not Restricted Persons. The Partnership may, however, avail itself of a "de minimis" exemption pursuant to which a portion of any new issue profits and losses may be allocated to Restricted Persons. The Partnership Agreement provides that the General Partner is authorized to determine, among other things: (i) the manner in which new issues are purchased, held, transferred and sold by the Partnership and any adjustments with respect thereto; (ii) the Partners who are eligible and ineligible to participate in new issues; (iii) the method by which profits and losses from new issues are to be allocated among Partners in a manner that is permitted under the Rules (including whether the Partnership will avail itself of the "de minimis" exemption or any other exemption); and (iv) the time at which new issues are no longer considered as such under the Rules.

The rate-of-return experienced by limited partners who are Restricted Persons may differ materially from that of limited partners who are not Restricted Persons.

9.    **EXPENSES**

The General Partner is authorized to incur and pay in the name and on behalf of the Partnership all expenses which it deems necessary or advisable.

All expenses will be borne by the Partnership including legal, accounting, auditing and other professional expenses, administration expenses, research expenses and investment expenses such as commissions, interest on margin accounts and other indebtedness, custodial fees, bank service fees and other expenses related to the purchase, sale or transmittal of Partnership assets as shall be determined by the General Partner in its sole discretion and its share of any office overhead expenses of the General Partner or the Management Company. These office overhead expenses may include rent, supplies, stationery, charges for furniture and fixtures and compensation of analysts and other personnel although it is contemplated that such items may be paid for or provided by brokers and, accordingly, there may be no charge to the Partnership for such items. The General Partner is specifically authorized to defer to a

subsequent year expenses incurred in the current year and anticipates that it may do so if deferring the expenses increases the likelihood that the particular expense will be paid for or provided for by brokers (rather than borne by the Partnership).

The organizational expenses of the Partnership (including expenses of the initial offer and sale of limited partnership interests) were paid by the Partnership (with so-called "soft dollars". See Section 11 – "Brokerage and Custodial Arrangements").

## 10. TAXATION AND ERISA MATTERS

### Federal Taxation

The Partnership has been advised by its counsel, Seward & Kissel LLP, that as a partnership, the Partnership will not be a taxable entity for Federal income tax purposes. Instead, each partner will be required to take into account for each fiscal year, for purposes of computing his own income tax, his proportionate share of the items of taxable income or loss allocated to him pursuant to the Partnership Agreement, whether or not any income is paid out to him. The manner in which such items of taxable income or loss are allocated among the partners is set forth in Article VII of the Partnership Agreement. Such taxable income or loss will be required to be taken into account in the taxable year of the partner in which the fiscal year of the Partnership ends.

The income, gains, losses and deductions of the Partnership will not be from a "passive activity" within the meaning of Section 469 of the Internal Revenue Code of 1986, as amended (the "Code"), and therefore (i) the deduction by a limited partner of his share of the losses or deductions of the Partnership will not be restricted under Code Section 469 and (ii) a limited partner who is an individual will not be able to offset losses or deductions from "passive activities" against his share of income or gain of the Partnership.

The Partnership will be required each year to make the determination as to whether it will take the position for Federal income tax purposes that it is (i) a trader in securities or (ii) an investor in securities. This determination will be made separately each year based primarily on the level of the Partnership's securities activities during the particular year. Accordingly, the Partnership's status as a trader or an investor may vary from year to year and is difficult to predict in advance. If the Partnership is characterized as a trader, each partner who is an individual may deduct his share of the expenses of the Partnership (other than interest expense) under Code Section 162 as a business expense. Alternatively, if the Partnership is characterized as an investor, the expenses of the Partnership (other than interest expense) would constitute "miscellaneous itemized deductions", and as such, would be deductible by an individual only to the extent that his share of such expenses, when combined with his other "miscellaneous itemized deductions", exceeds 2% of his adjusted gross income. Further, the amount in excess of such 2% floor would be subject to the overall limitation on itemized deductions imposed by Code Section 68. Also, the amount in excess of such 2% floor would be considered a tax preference item in computing the alternative minimum tax for an individual taxpayer. For Federal income tax purposes, interest expense of the Partnership is considered "investment interest". Subject to certain limited exceptions, investment interest is deductible by an individual only to the extent of his net investment income (which generally does not include net long-term capital gains). Investment interest which is not deductible in any taxable year because of this limitation may be carried forward to the succeeding taxable year.

The Partnership generally will not realize gain or loss on a short sale of a security until the Partnership closes the transaction by delivering the borrowed security to the lender. Gain arising from the closing of a short sale generally is treated as short-term capital gain.

In February 2003, the Internal Revenue Service (the "IRS") released final Treasury Regulations expanding previously existing information reporting, record maintenance and investor list maintenance requirements with respect to certain "tax shelter" transactions (the "Tax Shelter Regulations"). The Tax Shelter Regulations may potentially apply to a broad range of investments that would not typically be viewed as tax shelter transactions, including investments in investment partnerships and portfolio

investments of investment partnerships. Under the Tax Shelter Regulations, if the Partnership engages in a "reportable transaction," the Partnership and, under certain circumstances, a limited partner would be required to (i) retain all records material to such "reportable transaction"; (ii) complete and file IRS Form 8886, "Reportable Transaction Disclosure Statement" as part of its Federal income tax return for each year it participates in the "reportable transaction", and (iii) send a copy of such form to the IRS Office of Tax Shelter Analysis at the time the first such tax return is filed. The scope of the Tax Shelter Regulations may be affected by further IRS guidance. Non-compliance with the Tax Shelter Regulations may involve significant penalties and other consequences. Each limited partner should consult its own tax advisers as to its obligations under the Tax Shelter Regulations.

<u>California Taxation</u>

The following discussion of California taxation is based on advice received by the Partnership from American Express Tax and Business Services Inc.

A partnership is generally not a taxable entity in most states. Notwithstanding this, there still may be a requirement for information reporting, other filings and/or withholding taxes. Every partnership, which is engaged in a trade or business or derives income from California sources must file an annual partnership return and pay an annual $800 tax. The tax is not dependent on the operations of the partnership but is imposed for the privilege of conducting business there. For this purpose, a partnership is considered to be doing business in California if any of its partners or other agents is conducting business on behalf of the partnership in California.

While the partnership itself is not subject to income taxes, resident partners are required to report and are subject to tax on their allocable share of the taxable income, loss, gain, and/or deductions from the partnership. In the case of nonresident partners, where there is any income or gain from a trade or business within California, there is a withholding obligation imposed on the partnership. In the case of foreign nonresident partners, the partnership is required to withhold tax on the allocable amount of such income or gain. The withholding is at a rate of 8.84% in the case of C corporations and 9.3% in the case of individuals, partnerships and fiduciaries. In the case of domestic nonresident partners, the partnership is required to withhold at a rate of 7% on distributions, including property, of California source income to the nonresident partner. For this purpose, a domestic nonresident partner includes individuals who are nonresidents of California, corporations not qualified to do business in California, nonresident estates and trusts, as well as partnerships or LLCs without a permanent place of business in California.

An exception to the above requirements is provided in the case of an *Investment Partnership*. In general, income of nonresidents, derived from *qualifying investment securities* of an *investment partnership* is considered income from other than California sources, and is therefore, not taxable by California. Therefore, such income would also not be subject to the general withholding rules discussed above. An *"Investment Partnership"* must meet two quantitative requirements. First, no less than 90% of the cost of the partnership's total assets must consist of *qualifying investment securities*, deposits at banks and other financial institutions, and office equipment and space needed to carry out those activities. Secondly, no less than 90% of the partnership's gross income must be from interest, dividends and gains from the sale or exchange of *qualifying investment securities*. *Qualifying investment securities* consist of common and preferred stock, convertible debt instruments, bonds, debentures, foreign currency exchange contracts and forwards, repurchase agreements, regulated futures contracts, options to purchase or sell qualifying investment securities, stock and bond index funds and the like.

It is contemplated that the investments to be acquired and held by the Partnership will constitute qualifying investment securities. Therefore, there should be no California source income subject to taxation or withholding for nonresidents. This result may be altered where a nonresident partner engages in other activities in California. Please consult your tax advisor as to whether the reporting of this income would be altered if this were applicable.

15

## Idaho Taxation

The following discussion of Idaho taxation is based on advice received by the Partnership from American Express Tax and Business Services Inc.

Every partnership, whether foreign or domestic, which transacts business in the State of Idaho shall be required to file a return. Such return shall set forth the names and addresses of the persons entitled to share in the net income of the partnership and the amount of their distributive share of income. Idaho has entered into the Multistate Tax Compact ( hereinafter "MTC"), which is designed to facilitate the determination of state and local tax liability for multistate taxpayers, including the equitable apportionment of income. Under the MTC, business income is income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management and disposition of the property constitute integral parts of such regular trade or business.

It is contemplated that one or more partners of the Partnership will engage in the active conduct of the trade or business of the partnership in the State of Idaho. The Partnership or such partner will maintain a place of business or hold out a portion of a location for use in the active conduct of such trade or business. Therefore, the Partnership would be deemed to be engaged in a trade or business in Idaho and be subject to the above filing requirement. Rather than file an Idaho tax return, a nonresident partner may elect to have the Partnership pay the tax on the share of Partnership income derived from Idaho sources. In that case, the Partnership will be taxed on such income at the corporate income tax rate, presently 7.6%.

For nonresident individuals, trusts and estates, Idaho taxable income includes only those components, which are derived from or related to sources within Idaho. Under Idaho's general tax principles, income from the ownership or disposition of any interest in intangible property would ordinarily be considered derived from or relating to sources within Idaho where such property is employed in a trade or business conducted or carried on within Idaho. The recently adopted MTC, whose application is elective by any taxpayer, requires that in the case of *multistate taxpayers,* business income be determined based on apportionment or allocation. Under its provisions, capital gains and losses from the sale of intangible property, as well as dividends and interest, are allocable to Idaho only if the taxpayer's commercial domicile is in Idaho. Commercial domicile is the principal place from which the trade or business is directed or managed.

While it is contemplated that the principal place of business will be the offices of the General Partner and Management Company in San Francisco, California, there will be substantial business activities conducted in Idaho. As a facts and circumstances test, it is not free from doubt, as to which location may be deemed to be the commercial domicile of the Partnership. It should be noted that the state of Idaho might assert that a portion or all of the indicated income is derived from Idaho sources based on the commercial domicile of the partnership and the results of any such assertion cannot be determined with absolute certainty. Notwithstanding this, more likely than not, the Partnership will be required to file a partnership return as a result of activities performed on its behalf in Idaho. It appears that there will be taxable income apportioned to Idaho, based on a three factor formula consisting of the receipts, property and payroll of the partnership, or, if applicable, based on separate books and records to be maintained by the partnership. As such, nonresident partners can elect to have the Partnership pay the applicable tax (at the aforementioned corporate tax rate) on such income allocable to them, rather than be required to file an Idaho tax return. At the present time, it is not anticipated that the income apportioned to Idaho and therefore subject to the nonresident tax will be material. The conclusion reflected herein is based on the indicated facts and circumstances. Please consult your tax advisor regarding the potential impact this may have on your own personal taxes.

## General

The advice from Seward & Kissel LLP on Federal tax matters and from American Express Tax and Business Services Inc. on Idaho and California tax matters is based on the investment program of the Partnership as described in this Memorandum and the Partnership Agreement and under present

provisions of the laws and regulations issued thereunder and the cases and rulings interpreting such laws and regulations. There can be no assurance that the positions the Partnership takes on its tax returns with respect to expenses or otherwise will be accepted by the Internal Revenue Service.

As promptly as practicable after the end of each fiscal year, the Partnership will send to each partner a report indicating the amounts representing his respective share of net long-term capital gain or loss, net short-term capital gain or loss, operating income or loss, foreign taxes, dividends and other appropriate items of income and deduction for purposes of reporting such amounts for Federal income tax purposes.

The tax consequences of an investment in the Partnership may vary depending upon the particular circumstances of each prospective limited partner. Accordingly, each prospective limited partner should consult his own tax advisors with respect to the effect of an investment in the Partnership on his personal tax situation and, in particular, the state and local tax consequences to him of an investment in the Partnership. Tax-exempt investors should also review the discussion below under "Investment by Pension Plans, IRAs and Other Tax-Exempt Investors" regarding "unrelated business taxable income" and "debt-financed income".

<u>Investment by Pension Plans, IRAs and Other Tax-Exempt Investors</u>

The Partnership may accept contributions from individual retirement accounts, pension, profit-sharing or stock bonus plans, and governmental plans and units (all such entities are herein referred to as "Retirement Trusts"). As a condition to their admission to the Partnership, Retirement Trusts will be required to make certain representations in the Partnership's Subscription Agreement, including a representation that the investment in the Partnership by the Retirement Trust has been authorized by the appropriate person or persons and that the Retirement Trust has consulted its counsel with respect to such investment.

The Partnership will not accept any capital contribution if after such capital contribution the value of limited partnership interests in the Partnership held by Retirement Trusts would be 25% or more of the value of the total limited partnership interests in the Partnership. If the limited partnership interests held by Retirement Trusts were to exceed this 25% limit, then the Partnership's assets would be considered "plan assets" under ERISA, which could result in adverse consequences to the General Partner and the fiduciaries of the Retirement Trusts.

As discussed in Section 2 above, the Partnership may use leverage in connection with its investments. In this regard, a Retirement Trust or other tax-exempt entity (a "Tax-Exempt Investor") will generally be subject to tax on the portion of its share of the Partnership's profits attributable to the use of certain leverage. Such portion will be considered "debt-financed income" and will be taxable as "unrelated business taxable income" under the Federal income tax law. It should be noted that the law is not entirely clear as to the proper way to determine what portion of a Tax-Exempt Investor's share of the Partnership's profits is attributable to the use of leverage and therefore is "debt-financed income." Accordingly, while the Partnership will compute each Tax-Exempt Investor's share of "debt-financed income" from the Partnership in a manner which the Partnership determines is reasonable, there can be no assurance that the Internal Revenue Service will accept the method of computation utilized by the Partnership.

In a private ruling, the Internal Revenue Service has taken the position that a portion of the gain realized from the sale (e.g., withdrawal) of a partnership interest by a tax-exempt entity is "debt-financed income" when the partnership uses borrowed funds to purchase property even though the tax-exempt entity did not use borrowed funds to purchase its partnership interest.

11.    <u>BROKERAGE AND CUSTODIAL ARRANGEMENTS</u>

The General Partner is authorized to determine the broker or dealer to be used for each securities transaction for the Partnership. In selecting brokers or dealers to execute transactions, the General Partner need not solicit competitive bids and does not have an obligation to seek the lowest

available commission cost. It is not the General Partner's practice to negotiate "execution only" commission rates, thus the Partnership may be deemed to be paying for research and related services provided or paid for by the broker which are included in the commission rate. Accordingly, research and related services may include, but are not limited to, written information and analyses concerning specific securities, companies or sectors; market, financial and economic studies and forecasts, as well as discussions with research personnel; financial and industry publications; statistical and pricing services, along with hardware, software, data bases and other technical and telecommunication services, lines, and equipment utilized in the investment management process. Research services obtained by the use of commissions arising from the Partnership's portfolio transactions may be used by the General Partner in its other investment activities. All other services obtained by the use of commissions arising from the Partnership's investment transactions will be limited to services that would otherwise be a Partnership expense (which as described in Section 9 above may include the Partnership's share of overhead expenses of the General Partner or the Management Company). Certain of the foregoing commission arrangements are outside the parameters of Section 28(e) of the U.S. Securities Exchange Act of 1934, as amended, which permits use of commissions or "soft dollars" to obtain "research and execution" services. In selecting brokers and negotiating commission rates, the General Partner will take into account the financial stability and reputation of brokerage firms, the brokerage, research and other services provided by such brokers, and referrals of investors (consistent with best execution), although the Partnership may not, in any particular instance, be the direct or indirect beneficiary of the research or related services provided.

The Partnership's prime brokers will be Morgan Stanley & Co. Incorporated and Citigroup. Accordingly, the Partnership will maintain accounts at its prime brokers through which the Partnership will execute trades, borrow funds in connection with trades, clear and settle its securities transactions and maintain custody of its securities. Further, the Partnership may also be required (or find it advantageous) to maintain custody of certain of its non-U.S. securities at brokers or financial institutions located in non-U.S. jurisdictions. See Section 7, under "Counterparty and Custody Risk".

The Partnership reserves the right, in its sole discretion, to change its brokerage and custodial arrangements without further notice to limited partners.

12.     FISCAL YEAR; FISCAL PERIODS; FINANCIAL STATEMENTS; AUDITORS

The Partnership has adopted a fiscal year ending on December 31. Since limited partners may be admitted or required to retire and additional capital contributions or withdrawals may be made during the course of a fiscal year, the Partnership Agreement provides for fiscal periods, which are portions of a fiscal year, for the purpose of allocating net profits and net losses due to changes occurring in capital accounts at such times.

The limited partners receive unaudited reports at least quarterly regarding the performance of the Partnership. The books and records of the Partnership will be audited at the end of each fiscal year by a firm of certified public accountants selected by the General Partner, and the partners will be furnished with audited year-end financial statements, including a statement of profit or loss for such fiscal year. The partners will also be provided with the status of such partners' capital accounts at such time. In general, the Partnership's financial statements will be prepared in accordance with generally accepted accounting principles ("GAAP").

American Express Tax and Business Services Inc. has been appointed auditors for the Partnership. The General Partner reserves the right, in its sole discretion, to change the Partnership's auditors without further notice to limited partners.

13.     PROSPECTIVE INVESTORS; ADMISSION OF LIMITED PARTNERS

Prospective Investors

Admission as a limited partner in the Partnership is not open to the general public. The Partnership is not intended as a complete investment program and is designed only for persons who are

able to bear the economic risk of the loss of their investment in the Partnership and either are sophisticated persons in connection with financial and business matters or are represented by such a person in connection with their investment in the Partnership. The Partnership generally will be open to investment only by "accredited investors" within the meaning of Regulation D of the Securities Act of 1933, as amended. The Partnership may close to new investors from time to time.

The minimum investment in the Partnership is $500,000, subject to such exception as the General Partner in its sole discretion shall determine.

Prospective investors should read the Partnership Agreement being furnished to them concurrently with this Memorandum. The Partnership Agreement sets forth the specific provisions relating to the operations of the Partnership.

### Procedure for Becoming a Limited Partner

In order to become a limited partner, a prospective limited partner should: (i) complete and execute two copies of the Subscription Agreement, inserting the amount of such partner's capital contribution, such partner's residence address and his taxpayer identification or social security number; (ii) complete and execute two copies of the signature page of the Partnership Agreement and (iii) return both copies of each of (i) and (ii) to the General Partner at 44 Montgomery Street, Suite 3700, San Francisco, California 94104. A copy of the form of the Subscription Agreement together with the Partnership Agreement (with two signature pages attached) is contained in the materials accompanying this Memorandum. Capital contributions shall be made in cash unless the General Partner, in its sole discretion, permits contributions in securities or partly in cash and partly in securities.

After receipt of the Subscription Agreement, the General Partner will notify each prospective limited partner of the date (the "Admission Date") by which, and the address to which, such partner will be required to transmit the amount of such partner's capital contribution under the Subscription Agreement. Shortly after the Admission Date, the General Partner will return to each new limited partner such partner's copies of the Subscription Agreement and the signature page of the Partnership Agreement as executed by the General Partner.

In order to comply with United States and international laws aimed at the prevention of money laundering and terrorist financing, each prospective investor that is an individual will be required to represent in the Subscription Agreement that, among other things, he is not, nor is any person or entity controlling, controlled by or under common control with the prospective investor, a "Prohibited Person" as defined in the Subscription Agreement (generally, a person involved in money laundering or terrorist activities, including those persons or entities that are included on any relevant lists maintained by the U.S. Treasury Department's Office of Foreign Assets Control, any senior foreign political figures, their immediate family members and close associates, and any foreign shell bank). Further, each prospective investor that is an entity will be required to represent in the Subscription Agreement that, among other things, (i) it has carried out thorough due diligence to establish the identities of its beneficial owners, (ii) it reasonably believes that no beneficial owner is a "Prohibited Person", (iii) it holds the evidence of such identities and status and will maintain such information for at least five years from the date of its complete redemption from the Partnership, and (iv) it will make available such information and any additional information that the Partnership may require upon request.

The General Partner reserves the right to request such further information as it considers necessary to verify the identity of a prospective investor. In the event of delay or failure by the prospective investor to produce any information required for verification purposes, the General Partner may refuse to accept a capital contribution until proper information has been provided and any funds received will be returned without interest to the account from which the moneys were originally debited.

It is noted that if a broker is instrumental in the sale of a Partnership Interest to a particular partner, the broker may, in certain limited situations, charge such partner a fully disclosed sales charge. Investors who do not make their capital contribution to the Partnership through such brokers will not be subject to any such sales charge. In no event will any sales charges be payable to the Partnership or the

General Partner.  It should also be noted that the General Partner may pay fees to persons (whether or not affiliated with the General Partner) who are instrumental in the sale of interests in the Partnership. Any such fees will in no event be payable by or chargeable to the Partnership or any limited partner or prospective limited partner.

                                                    **WOOD RIVER PARTNERS, L.P.**

02302.0003 #318170v6

                                          20