# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**JUDGE BUCHWALD**

SECURITIES AND EXCHANGE COMMISSION

Plaintiff,

-against-

WOOD RIVER CAPITAL MANAGEMENT, LLC,
WOOD RIVER ASSOCIATES, LLC,
JOHN HUNTING WHITTIER,
WOOD RIVER PARTNERS, L.P., and
WOOD RIVER PARTNERS OFFSHORE, LTD.,

Defendants.

x

05 CV 8713
05 Civ.

COMPLAINT

ECF CASE



RECEIVED
OCT 13 2005
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Wood River Capital Management, LLC, Wood River Associates, LLC ("the "General Partner") John Hunting Whittier ("Whittier"), Wood River Partners, L.P., and Wood River Partners Offshore, Ltd. (collectively, the "Defendants"), alleges that:

### NATURE OF THE ACTION

1.        The Commission brings this action to stop a fraud being perpetrated by the Defendants, who repeatedly made material misrepresentations regarding the oversight and diversification of two hedge funds managed by John H. Whittier, Wood River Partners, L.P. and Wood River Partners Offshore, Ltd. From February 2003 to the present, investors placed tens of millions of dollars in Wood River Partners, L.P. based on promises that the fund would be broadly diversified and closely watched by an auditor. Instead, Whittier failed to have any audits conducted, allowed only a few employees to have access to the fund's portfolio and proceeded to

amass an extraordinary position in one small-cap stock. By July 2005, that one security, the common stock of EndWave Corporation, accounted for more than sixty-five percent of Wood River Partners' claimed $265 million assets under management. Wood River Partners purchased so many shares of EndWave stock that at one point the fund owned more than forty percent of that issuer's outstanding shares. But until last week, the Defendants never disclosed the size of their position in EndWave. The Defendants filed neither the stock ownership reports that were required to be filed when the fund's position exceeded five percent of the issuer's outstanding shares, nor the reports required to be filed when the fund's position exceeded 10 percent.

2.     During the summer of 2005, Whittier launched a new hedge fund—Wood River Partners Offshore. By September, this fund also had an overwhelming concentration in EndWave. Whittier made similar misrepresentations about the diversification of this new fund, and similarly failed to disclose that he had placed the majority of its assets into one small-cap stock.

3.     Since mid-July 2005, the price of EndWave's common stock has declined substantially. As a result, the value of the assets held by Wood River Partners, L.P. and Wood River Partners Offshore, Ltd. has decreased significantly. The Defendants have not disclosed the decline in the hedge funds' value to investors.

4.     By engaging in such conduct, the Defendants have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); Sections 10(b), 13(d), 16(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78m(d), and 78p(a), and Rules 10b-5, 13d-1, 13d-2, 16a-2 and 16a-3, 17 C.F.R. §§ 240.10b-5, 240.13d-1, 240.13d-2, 240.16a-2, and 240.16a-3. In addition, defendants Wood River Asset Management, LLC, Wood River Associates, LLC and John Hunting Whittier have

violated, and unless enjoined will continue to violate, Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. § 80b-6(1) and (2).

5.    The Commission brings this action pursuant to Section 20(b) and (d) of the Securities Act, 15 U.S.C. §§ 77t(b) and (d), Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d) and Section 209(d) and (e) of the Advisors Act, 15 U.S.C. § 80b-9(d) and (e), seeking to preliminarily and permanently enjoin the Defendants from engaging in the wrongful conduct alleged in this Complaint.  The Commission also seeks a final judgment ordering the Defendants to disgorge any ill-gotten gains and to pay prejudgment interest thereon, ordering the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).  The Commission also seeks other equitable relief during the pendency of this action, including an order: (a) freezing the assets of Wood River Asset Management, LLC, Wood River Associates, LLC, Wood River Partners, L.P., and Wood River Partners Offshore, Ltd. (collectively, the "Wood River Defendants"), (b) prohibiting the destruction of documents, and (c) an order appointing a receiver for the Wood River Defendants.

## JURISDICTION

6.    This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and  Sections 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 77u(e) and 78aa, and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14.

7.    Defendants, directly and indirectly, singly and in concert, have made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

8.      Certain of the transactions, acts, practices and courses of business occurred within the Southern District of New York. Among other things, defendants selected and used Merrill Lynch as prime broker, a New York-based broker dealer introduced certain investors to the defendant hedge funds, defendants placed a number of portfolio transactions through broker-dealers based in New York, and many of defendants' portfolio transactions cleared through clearing firms in New York. Currently, Merrill Lynch Broadcort holds 1,765,082 shares of stock in accounts defendants opened in New York. In addition, one of the larger investors in Wood River Partners placed its investment through the New York office of a large international bank.

9.      Unless restrained and enjoined, the Defendants will continue to engage in the transactions, acts, practices and courses of business alleged herein, and in transactions, acts, practices, and courses of business of a similar type and object.

## DEFENDANTS

10.     **John Hunting Whittier**, age 38, is a former analyst with the firm of Donaldson, Lufkin & Jenrette. Whittier owns and controls Wood River Capital Management, L.L.C., the investment adviser to at least two hedge funds. Whittier also has served as a money manager for portfolios owned by others. Whittier resides in Hailey, Idaho.

11.     **Wood River Capital Management, L.L.C.** is a Delaware limited liability company with offices in San Francisco and Ketchum, Idaho. John H. Whittier is its majority shareholder and principal executive. Wood River Capital Management, L.L.C. is the investment manager for the Wood River Partners and the Wood River Partners Offshore hedge funds.

12.     **Wood River Associates, LLC** is a Delaware limited liability company with offices in San Francisco and Ketchum, Idaho. It serves as the general partner of Wood River Partners, L.P. Whittier is the principal and managing member of Wood River Associates.

4

13.    **Wood River Partners, L.P.** is a Delaware limited partnership with offices in San Francisco and Ketchum, Idaho. The partnership's general partner, Wood River Associates, L.L.C., is a Delaware limited liability company headquartered at the same address. Whittier is the principal and managing member of Wood River Associates. Whittier set up Wood River Partners in or about February 2003.

14.    **Wood River Partners Offshore, Ltd.** is a Cayman Islands general business corporation. Whittier is its President and is the only non-Cayman Island based director. Whittier set up Wood River Partners Offshore in or about June 2005. The fund was launched on July 1, 2005.

## FACTS

**Defendants Promise Investors in Wood River Partners Diversification and Accountability**

15.    Between February 2003 and the present, investors placed tens of millions of dollars in Wood River Partners. During this time period, Whittier made material misrepresentations in fund offering materials, in marketing materials and in discussions with numerous investors.

**A.    Misrepresentations Regarding Audits and Audited Financial Statements**

**The Limited Partnership Agreement and Fund Offering Materials**

16.    The Wood River Partners' Limited Partnership Agreement, at Section 11.05, required the partnership to provide the limited partners with "the audited financial statements of the Partnership prepared by the Partnership's independent public accountants promptly after the end of each fiscal year."

17.    On or about June 2004, Whittier and Wood River Partners issued a Confidential Private Offering Memorandum (the "Offering Memorandum") which set forth the terms of Wood

5

River Partners and its investment program. The Offering Memorandum promised investors certain financial reports on the performance of their investments. It stated that "American Express Tax & Business Services, Inc." (AMEX TBS) "ha[d] been appointed" as its auditor and promised: (1) that the fund's books and records will be audited at the end of each fiscal year by a firm of certified public accountants selected by the General Partner, and (2) the limited partners will receive audited year-end financial statements, including a statement of profit or loss for such fiscal year. The Offering Memorandum stated that, in general, the Partnership's financial statements will be prepared in accordance with generally accepted accounting principles (GAAP).

18.    AMEX TBS does not perform audits. Its affiliate, Goldstein Golub Kessler (GGK), does perform audit work for certain AMEX TBS customers. On February 26, 2004, GGK signed a retainer letter to serve as the independent auditor for Wood River Partners from February 1, 2003 through December 31, 2003, but Whittier did not countersign the letter. As a result, GGK never performed any audit work for Wood River Partners.

**The Defendants' Marketing Materials**

19.    Whittier prepared marketing materials, which he used for presentations at marketing meetings attended by potential new investors and intermediaries, such as finders and brokers. Whittier and Wood River Capital Management also had a marketing team that received these materials. These glossy, color brochures and/or Power Point presentations varied little over time.

20.    These marketing materials also typically included a section titled "Organizational Chart," which listed the names of Whittier's employees. This chart typically listed "Service Providers to Wood River Capital Management," including: "American Express Tax & Business

Services Inc. Independent Auditors." This reference gave the false appearance that AMEX TBS was auditing Wood River Partners.

21.    Whittier continued to use such marketing materials long after it was clear that AMEX TBS was not functioning as the fund's auditor. For example, Whittier used such marketing materials at investor marketing meetings in New York on September 6-8, 2005 and in Boston on September 9, 2005.

**Statements to Investors**

22.    At various times, several different investors asked to receive copies of the fund's audited financial statements for 2004. In response, Whittier and his staff dodged the questions, or came up with excuses for why the completion of the audited financial statements had been delayed. However, none of the Defendants disclosed to investors (a) that the Defendants had not, in fact, entered into an engagement agreement with any auditor, (b) that the books and records of the fund were not being audited, and (c) that, as a result, the investors would not receive audited year-end financial statements.

**Lack of Transparency**

23.    In addition to having no one functioning as an independent auditor, Wood River Partners did not regularly allow any independent party to have access to information regarding the fund's portfolio. Unlike many hedge funds, Wood River Partners did not have an independent administrator that regularly reviewed the fund's positions or its statements of net asset value. Indeed, Whittier even refused requests from many of his own employees for access to information regarding the fund's portfolio.

**B.    Misrepresentations Regarding Diversification**

**The Fund Offering Memorandum and the Limited Partnership Agreement**

24.    The June 2004 Offering Memorandum for Wood River Partners provides that the

fund would be broadly diversified, and that no long position would comprise more than 10% of

the fund's portfolio.  In particular, the first page of the Offering Memorandum explained that:

> The Partnership seeks to achieve capital appreciation through the
> combination of long and short equity investments in a <u>diversified</u> number
> of industries, with a particular emphasis in media and communications,
> technology and technology-related companies. . .

(emphasis added).  While the Offering Memorandum disclaimed responsibility to allocate the

portfolio among types of investments or regions and listed "non-diversification" as a risk factor,

it claimed that the portfolio would be "broad based" and would include "30 to 40 long positions."

The Offering Memorandum specifically capped investment in any one long position:

> Maximum individual long positions in the portfolio are capped at 10% of
> the original cost; short positions typically are capped at 5% of the original
> cost.

**The Defendants' Marketing Materials**

25.    The marketing materials prepared by Whittier, which he and his marketing team

used for presentations at marketing meetings attended by potential new investors and

intermediaries, such as finders and brokers, also created the expectation that the fund would be

broadly diversified. These glossy, color brochures and/or Power Point presentations, which

varied little over time, typically included a section titled "Portfolio Balance & Exposure."  This

section typically made the following claims:

| | |
|---|---|
| Portfolio Balance | 30-50 Longs / 25-40 Shorts |
| Position Size Range (At Inception) | Longs: 1-7%/ Shorts: 1-5% |

8

Max Position Size (Appreciated Value)      8 to 9%

Most of the remainder of these marketing materials introduced Whittier's research analysts and described general investment strategies. Consistent with the Offering Memorandum, these marketing materials gave investors comfort that Whittier's funds were balanced, diversified, and that individual positions were capped.

26.      Whittier continued to use such marketing materials long after it was clear that the fund was not broadly diversified and that the fund's position in EndWave was well in excess of ten percent of the fund's portfolio. For example, Whittier used such marketing materials at investor marketing meetings in New York on September 6-8, 2005 and in Boston on September 9, 2005. The materials used at these meetings repeated the above-quoted representations regarding "Portfolio Balance" and stated that the maximum position size was 8% to 9%. The materials did not break out the size of the EndWave position that Whittier had amassed by that time, which was far in excess of 9% of the fund's portfolio.

**Investors Responded to these Representations**

27.      Several investors made their decisions to invest in Wood River based on promises of diversification. Many investors understood based on, among other things, specific discussions with Whittier, and materials provided by Wood River Partners, that the hedge fund invested primarily in well-known media and technology companies. For example, one investor was repeatedly told by Whittier that the fund invested in "names that everyone has heard of," companies such as Comcast Cable Communications, Inc., Time Warner Companies, Inc., and Sirius Satellite Radio, Inc.

**C.      The Defendants' Undisclosed Position in EndWave**

9

28.     EndWave Corporation is a corporation organized under the laws of the State of Delaware which is headquartered in Sunnyvale, California. According to the Company's December 31, 2004 Annual Report on Form 10K, EndWave designs, manufactures and markets radio frequency, or RF, modules that enable the transmission, reception and processing of high frequency signals in telecommunication networks, defense electronics and homeland security systems. The Company has reported net losses for the 2002, 2003, and 2004 fiscal years.

29.     According to EndWave's December 31, 2004 Annual Report on Form 10K, the lowest bid price for the company's common stock in 2004 was $5.50 and the highest bid price was $19.20. In mid-March 2005, the stock traded in the $20 range, and then began a gradual rise. By early May 2005, EndWave's share price had climbed to $30. By June, Whittier held a substantial position in EndWave common stock, a stock that he had been trading in for some time. Thereafter, EndWave began a dramatic rise, reaching a high of $54 on July 13, 2005.

**By June 30, 2005, Wood River Partners Owned Over One Third of EndWave's Stock**

30.     During the relevant period, Wood River changed the prime brokers and other brokerage firms with which it did business with some frequency. As of June 30, 2005, Wood River Partners maintained a prime brokerage account at Merrill Lynch as well as a separate account at Paulson Investments.

31.     There is no clear record of the value of the assets Wood River Partners had under management in the summer of 2005. On June 7, 2005, Whittier signed a letter to Merrill Lynch stating that, "Current assets under management for the Wood River Partners, L.P. (the "Fund") are $250,000,000.00." According to a document received by an investor -- a letter from Trident Financial Services LLC to John Whittier of Wood River Capital Management LLC dated July 29, 2005 -- "the value of the portfolio of Wood River [P]artners, LP on July 1, 2005 was

10

$265,167,286."

32.     According to the June 30, 2005 account statements for Wood River Partners'

Merrill Lynch prime brokerage account and its Paulson Investments account, at month-end,

Wood River Partners held 3,775,013 shares of EndWave in those two accounts alone. EndWave

stock traded at $47.60 at the time. As a result, this position had a value of $179,690,618, or

nearly 68% of the fund's claimed assets under management. This 68% concentration in

EndWave vastly exceeded the Offering Memorandum's ten percent cap on individual long

positions. Whittier did not disclose this large EndWave concentration to his investors.

33.     Wood River Partner's EndWave holdings of 3,775,013 shares also constituted

approximately 35% of EndWave's 10,639,584 total shares outstanding as of May 6, 2005 as

reported in EndWave's first quarter 2005 quarterly report. This percentage ownership far

exceeds the five percent threshold which triggers the requirement to file an ownership report with

the SEC, pursuant to Section 13(d) of the Exchange Act. This stock holding also far exceeds the

ten percent threshold which triggers the requirement to file additional ownership and transaction

reports under Section 16(a) of the Exchange Act.

34.     The Wood River Partners' Limited Partnership Agreement assigns the General

Partner, Whittier's Wood River Associates, the responsibility to file on behalf of the partnership

all reports required by any governmental agency. Whittier knew that he was required to file a

statement pursuant to Section 13(d) of the Exchange Act when positions he accumulated for

Wood River Partners exceeded five percent of a publicly traded company. On July 13, 2005,

Whittier signed and filed with the SEC a statement on Schedule 13G disclosing that Whittier,

Wood River Associates, L.L.C., and Wood River, L.P. beneficially owned 9.5% of a public

company called MediaBay, Inc.

11

**The July 26, 2005 Report to the Wood River Marketing Staff**

35.     On July 26, 2005, Whittier sent an e-mail message to two of his "marketers," individuals who among other things found investors for the funds Whittier managed. In this "update," Whittier identified the funds "July '05 – Top 5 Longs (4-5% holdings)." The list included five stocks, among them Microsoft Corp., Sirius Satellite Radio, Inc., and EBay, Inc. The list did not include EndWave. In this same e-mail, Whittier listed his "Top 6-10 (3-3.5% holdings)." That list included other well-known stocks like Yahoo!, Inc. and Amgen, Inc. – but not EndWave. Next, Whittier addressed another group of holdings:

> Top 10 small cap/distressed investment holdings (typically weighted 2-2.5%):
> PTSEF, MBAY, NOIZ, LINK, ENWV, LINK, STXN, LGVN, AMM, RAD, . . . .

The reference to ENWV refers to EndWave. Far from being one of ten stocks in a group weighted between 2 and 2.5% of the portfolio, by the end of June EndWave constituted over 50% of the fund. In sending this false information to his marketing team, Whittier either knew or was reckless in not knowing that they would convey this false information to potential investors or intermediaries.

**By July 31, 2005, Wood River Partners Owned Nearly Half of EndWave's Stock**

36.     According to account statements from Merrill Lynch, Paulson, Fidelity, and UBS Warburg, as of the end of July 2005, Wood River Partners' EndWave position had grown to 5,150,523 shares. The EndWave position in these accounts, worth approximately $180 million, constituted over 65% of the claimed $265,000,000 assets under management, valued as of July 1, 2005. The EndWave position when compare to EndWave's 10,763,546 total shares outstanding as of July 29, 2005, also constituted more than 45% of the shares outstanding. Yet the

12

Defendants still had not filed required ownership reports under Sections 13(d) and 16(a) of the Exchange Act, or otherwise disclosed the extent of the fund's position in EndWave to investors.

**As of August 31, 2005, Wood River Partners Owned About 45% of EndWave Stock**

37.    According to account statements from Merrill Lynch, Paulson, Fidelity, and IXIS Securities, at the end of August 2005, Wood River Partners' EndWave position equaled 5,222,980 shares. This position, then worth approximately $162 million, constituted more than 60% of the assets under management, using the $265 million valuation (as of July 1, 2005). The EndWave position still constituted an ownership interest of more than 45% of that company (based on EndWave's July 29, 2005 total shares outstanding of 10,763,546.) Yet the Defendants still had not filed required ownership reports under Sections 13(d) and 16(a) of the Exchange Act, or otherwise disclosed the extent of the fund's position in EndWave to investors.

**D.    The Defendants' Troubles Mount**

**EndWave's Share Price Declines by mid-September**

38.    After peaking at $54 on July 13, EndWave's share price declined through the rest of July and August. By mid September, the stock traded in a band between $28 and $30.

**Whittier Fails to Meet a $50 Million Redemption Request**

39.    By mid-September, representatives of BNP Paribas (BNP) had been pressing Wood River Partners and Whittier to redeem a $49 million investment BNP had made on behalf of a customer. BNP had given notice of its redemption on June 29, the redemption amount was determined as of July 29, and the redemption payment had come due in at the end of August. In several conversations the week of September 19, Whittier told the BNP representatives that he did not have the liquidity necessary to pay the redemption at that time. In pressing BNP to give him more time to meet the redemption request, Whittier again claimed that (including three other

accounts he managed) he had "a diversified overall portfolio of assets." But, Whittier

conceded—perhaps for the first time—that "there are concentrated positions."

40.    Whittier continued to try to keep that portfolio secret. He was reluctant to turn

over brokerage statements and denied a request to allow BNP to speak to his brokers. Whittier

entreated BNP that he was "looking for total confidentiality" and that he wanted to "prevent

absolute chaos from happening." At one point, Whittier stated that if he had to liquidate,

"nobody would get anything," and he (Whittier) "would go to jail."

**The September 22, 2005 Valuation**

41.    After the close of market on Thursday, September 22, Whittier sent an 11-page

facsimile transmission to BNP which represented portions of account statements from several

(apparently 7) different brokerage accounts. The names of the securities listed on the statements

had been blackened out. The named owners of these accounts included several different Wood

River entities: Wood River Partners, L.P., Wood River Offshore, Wood River Partners LLC, and

Wood River Capital Management. In addition, the dates of the statements varied, some

statements were for June 2005, some for July 2005, some for August 2005. In a summary note

accompanying these documents, Whittier summarized the holdings as follows:

> **Wood River Capital Management, L.L.C.**
> **Separately Managed Accounts**
>
> Managed Account #1: $105,000,000
> Managed Account #2: $46,624,317
> Managed Account #3: $31,186,462
> Managed Account #4: $8,162,000
>
> Total: $190,972,779
>
> **Wood River Partners Offshore, Ltd; Balance Summary**
>
> Total Equity Positions:

14

Merrill Lynch: $34,310,776.42
CDC/IXIS: $9,624,369.11

Total: $43,935,145.53

This summary totals to $234,907,924.95.

42.     After reviewing these statements, BNP asked Whittier why he could not immediately send the full redemption amount, given this representation of the overall account values. Whittier responded that in fact there was not that much money in the accounts anymore; he stated that he had sold some of the assets, and that everything he had sold went to margin calls.

**On September 27, Whittier Offers to Pay an Old Investor with New Investor Funds**

43.     On September 16 or 17, one investor representative for whom Whittier managed funds in a separately managed account noticed that Whittier had placed approximately 24,000 additional shares of EndWave into the separately managed account. As the account had previously held 17,000 shares of EndWave, the investor became concerned. Observing the high trading volumes in EndWave, the investor representative surmised that Whittier's Wood River accounts were responsible for most of the trades. The investor representative concluded that the EndWave holdings in Wood River accounts were much larger than he had thought. Ultimately, on or about September 27, the investor representative asked Whittier to redeem his investments. Whittier responded, "I have some new money coming in on Monday and I will be able to pay you then – just give me some more time." When the investor representative confronted Whittier about offering a Ponzi-like payment, Whittier denied running a Ponzi scheme and added that he just needed a little space.

15

**EndWave Shares Fall Further**

44. On September 20, 2005, EndWave's share price fell from $30.15 to $25.19. For the next week, the stock traded in the mid-$20 range. Then, on September 29, EndWave's share price plummeted from $23.65 to $14.27 on heavy volume. EndWave issued a press release that day stating that it was unaware of any developments accounting for the steep fall in its share price and increased market activity.

**E.    Whittier's New Wood River Partners Offshore Fund**

**The Offering Materials**

45. In addition to Wood River Partners, Whittier launched a new offshore fund during the summer of 2005. In June 2005, Whittier issued a "Confidential Explanatory Memorandum" ("Explanatory Memorandum") describing the investment program for Wood River Partners Offshore, Ltd. (the "Offshore Fund"). The Explanatory Memorandum contains the same provisions discussed earlier for the Offering Memorandum for Wood River Partners, except for the following variances: (1) the Explanatory Memorandum states that the offshore fund will "typically have 40 to 50 long positions" instead of the "30 to 40" identified for the onshore fund, (2) it provides that "Maximum individual long positions in the portfolio will typically be capped at 10%; short positions will typically be capped at 5% in each case measured at the time of investment[,]" and (3) it identifies a different auditor, Goldstein Golub Kessler International Cayman (GGK) and other different service providers (emphasis added).

46. The Offshore Fund was officially launched on July 1, 2005. By the end of July 2005, the Offshore Fund had received $7.6 million in subscriptions. In addition, during July 2005, the Offshore Fund had received approximately $25.65 million in advance subscriptions.

**The Offshore Fund's July and August Performance**

16

47.    At the end of July 2005, the Offshore Fund reported a monthly gain of 3.5%. Based on the balance sheet for July 2005, the Offshore Fund did not have any open positions in EndWave. Rather, during the course of July 2005, the Offshore Fund had owned approximately 490,000 shares of EndWave, but had sold all of those shares at a total loss of $707,850.17. This was, by far, the largest realized loss that the Offshore Fund had with respect to any of its securities holdings in July 2005.

48.    At the end of August 2005, the Offshore Fund reported a monthly gain of 3.1% and a gross year-to-date gain of 6.8%. Based on the balance sheet for August 2005, the Offshore Fund's ownership in EndWave, however, had changed dramatically since July 2005. At the end of August 2005, the Offshore Fund owned 1,125,200 shares of EndWave, valued at $34,903,704. This $34.9 million represented approximately 98% of the Offshore Fund's total open positions at the end of August 2005.

**Marketing Representations about the Offshore Fund**

49.    Despite this 98% concentration in EndWave, marketing materials prepared for the Offshore Fund, which included the August performance results, contained virtually the same representations Whittier had included in the marketing materials for Wood River Partners. Specifically, the August 2005 report stated that the maximum position size for any particular security would be "8 to 9%" – nowhere near the 98% that was invested in EndWave. In addition, the August 2005 report stated that the portfolio balance would be "30 – 50 Longs / 25 – 40 Shorts," when, in reality, the Offshore Fund had only two long positions at the end of August 2005 – with one of them representing 98% of the Offshore Fund's total open positions. Moreover, the August 2005 report stated that the position size range for long positions in the Offshore Fund was 1 – 7% - nowhere the 98% that was invested in EndWave. In September

17

2005, Whittier provided these marketing materials for the Offshore Fund to his marketing team to be used to attract the interest of potential investors and intermediaries.

**The Offshore Fund's September Results**

50.     Based on the values shown in brokerage statements of various brokerage accounts used by the Offshore Fund, as of September 29, 2005, the Offshore Fund held 1,862,976 shares of EndWave worth approximately $44,059,382.40. This position constituted approximately 17% of EndWave's total shares outstanding. The Defendants did not report this position on required ownership reports.

**F.      The Defendants Finally File a Statement on Schedule 13D**

51.     On October 7, 2005, after having been contacted by the SEC staff, the Defendants finally disclosed that they had accumulated a massive position in EndWave. Even this late filing, however, is incomplete and fails to disclose for how long Wood River Partners held positions in excess of five percent of EndWave's stock. The statement on Schedule 13D discloses the Defendants aggregate ownership of 4,289,018 shares of EndWave, or 39.8% of EndWave's total shares outstanding. Of this total amount, Wood River Partners reported owning 2,451,042 shares, or 22.7%, and Wood River Partners Offshore reported owning 1,837,976, or 17.1%.

**FIRST CLAIM**

**Violations of Section 10(b) of the
Exchange Act and Rule 10b-5 by Each Defendant**

52.     The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 51 above.

53.     As more fully set forth above, each defendant knowingly or recklessly solicited investments based on representations that the Wood River Partners and Wood River Partners

18

Offshore would be broadly diversified, would cap long equity positions at 10%, and would be audited annually. This conduct, combined with the undisclosed large position in EndWave stock, allowed the defendants to manipulate the market for EndWave stock.

54.     Accordingly, defendants, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly or recklessly: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, transactions, practices and courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities and upon other persons, in connection with the purchase or sale of a security.

55.     By reason of the foregoing, defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## SECOND CLAIM

### Violations of Section 17(a) of the Securities Act by Each Defendant

56.     The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 55 above.

57.     As more fully set forth above, defendants each knowingly, recklessly, or negligently made numerous materially false and misleading statements regarding the diversification of the Wood River Partners and Wood River Partners Offshore hedge funds and the stock positions in their portfolio. Defendants also repeatedly stated that the Wood River Partners' financial statements would be audited by an independent auditor.

58.     Accordingly, defendants, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or by the use of the mails, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, not misleading; or (c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

59.     By reason of the foregoing, each defendant violated Section 17(a) of the Securities Act.

**THIRD CLAIM**

**Violations of Section 206(1) and (2) of the Investment
Advisors Act by Defendants Wood River Capital Management,
Wood River Associates, and Whittier**

60.     The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 59 above.

61.     Whittier, Wood River Associates and Wood River Capital Management acted as investment advisers to the Wood River Partners and Wood River Partners Offshore hedge funds. For compensation, they engaged in the business of advising the Hedge Fund and its shareholders, directly and through publications and writings, as to the value of securities and as to the advisability of investing in, purchasing, or selling securities.

62.     The Wood River Partners Limited Partnership Agreement allowed Whittier's Wood River Associates, the general partner, to collect an "Incentive Allocation" of 20% of all net profits allocated to a limited partner once the limited partner had received a non-cumulative

20

annualized return of at least 5% and there was no loss carried forward from a prior year. The general partner also could deduct certain fees and expenses in computing the fund's net profits or losses. In marketing materials, Whittier, Wood River Associates and Wood River Capital Management described these fees as a 20% performance fee and a 1% management fee.

63.    Whittier, Wood River Associates and Wood River Capital Management charged similar fees for the Wood River Partners Offshore hedge fund, including incentive fees of 20% and fixed fees of either 1% or 2% depending upon which sub-class of shares an investor purchased.

64.    Whittier, Wood River Associates and Wood River Capital Management, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly: (1) employed devices, schemes or artifices to defraud a client or prospective client; and (2) engaged in transactions, practices or courses of business which operated as a fraud or deceit upon a client or prospective client.

65.    By reason of the foregoing, Whittier, Wood River Associates and Wood River Capital Management violated Sections 206(1) and (2) of the Advisers Act.

**FOURTH CLAIM**

**Violations of Sections 13(d) and 16(a) of the Exchange Act and Rules 13d-1, 13d-2, 16a-1, and 16a-2 by Each Defendant**

66.    The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 65 above.

67.    Exchange Act Section 13(d)(1) and Rule 13d-1 thereunder require the filing of a statement on either Schedule 13D or 13G within ten days after a person becomes the beneficial owner of more than 5% of the stock of an issuer whose stock is registered pursuant to Exchange

21

Act Section 12. In addition to background information about the person purchasing the stock, Exchange Act Section 13(d) and Rule 13d-1 require disclosure of detailed information about the source and amount of the funds used to make the purchases, the purpose of the transaction (including any plans or proposals that would result in an extraordinary corporate transaction), the number of shares beneficially owned, and any agreements concerning the issuer's security (including disclosure of finder's agreements).

68. Additionally, Exchange Act Section 13(d)(2) and Rule 13d-2 thereunder require the beneficial owner to file an amendment, as soon as practicable under the circumstances, if any material change occurs in the information in the filer's Schedule 13D or 13G.

69. Exchange Act Section 16(a) requires that beneficial owners of more than ten percent of any class of any equity security registered pursuant to Exchange Act Section 12 and the officers and directors of the issuer of any such security (hereinafter "insiders") file a statement with the Commission by the effective date of a registration statement filed pursuant to Exchange Act Section 12, or within ten days of becoming such officer, director or beneficial owner, reporting the amount of all equity securities of such issuer of which they are a beneficial owner. Section 16(a) also requires an insider to file with the Commission a statement indicating any changes in the insider's ownership of the issuer's equity securities.

70. The rules enacted pursuant to Section 16(a) provide that an initial statement by an insider is to be made on a Form 3 and subsequent statements of changes in beneficial ownership are to be made on a Form 4 or a Form 5. Rule 16a-1 defines a beneficial owner, solely for purposes of determining whether a person is a beneficial owner of more than ten percent of a class of registered equity securities, to be a person who is a beneficial owner as defined by Exchange Act Section 13(d) and the rules thereunder. Rule 13d-3, in turn, provides that "a

22

beneficial owner of a security includes any person who, directly or indirectly, through any

contract, arrangement, understanding, relationship or otherwise has or shares (1) [v]oting power

which includes the power to vote, or to direct the voting of, such security; and/or (2) [i]nvestment

power which includes the power to dispose, or to direct the disposition of, such security."

71.     During the summer and fall of 2005, defendants acquired and held well in excess

of ten percent of the common stock of EndWave.  Despite acquiring these very large positions in

EndWave, defendants did not file ownership reports pursuant to either Section 13(d) or Section

16(a) of the Exchange Act, nor did defendants file Forms 4 or 5 to report on subsequent

transactions.  As the general partner of Wood River Partners, Wood River Associates and

Whittier had the obligation to file these reports on behalf of that fund.  Likewise, as President

and a Director of Wood River Partners Offshore, Ltd., Whittier had the obligation to make these

filings for the Offshore Fund.  As the investment manager to these funds, Wood River Capital

Management also had a duty to file these required reports.

72.     By reason of the foregoing, defendants violated Sections 13(d) and 16(a) of the

Exchange Act and Rules 13d-1, 13d-2, 16a-1, and 16a-2 thereunder.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court enter a Final Judgment:

73.     Permanently enjoining defendants from violating Section 17(a) of the Securities

Act, 15 U.S.C. § 77q(a), Sections 10(b), 13(d), and 16(a) of the Exchange Act, 15 U.S.C. §§ 78j(b),

78m(d), 78p(a) and Rules 10b-5, 13d-1, 13d-2, 16a-1, and 16a-2 thereunder, 17 C.F.R. §§

240.10b-5, 240.13d-1, 240.13d-2, 240.16a-2, and 240.16a-3;

23

74.    Permanently enjoining Defendants Wood River Associates, Wood River Capital Management, and Whittier from violating Section 206 of the Investment Advisors Act, 15 U.S.C. § 80b-6;

75.    Ordering defendants to account for and to disgorge any ill-gotten gains realized from the conduct alleged herein and to pay prejudgment interest thereon;

76.    Ordering defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d) and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3);

77.    Granting such further and other relief as the Court may deem just and equitable.

Dated:  October *13*, 2005

_Peter N. Bresan_

Peter H. Bresnan (PB-9168)
Kevin ORourke (KO-1056)
C. Joshua Felker
James Lee Buck, II
Peter J. Haggerty
Attorneys for Plaintiff Securities
  and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4442 (Kevin O'Rourke)
(202) 772-9246 (facsimile-Kevin O'Rourke)


Robert B. Blackburn
Local Counsel for
Plaintiff Securities
  and Exchange Commission
3 World Financial Center
Room 4300
New York, New York 10281