# EXHIBIT K

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905
**(Cite as: Not Reported in F.Supp.)**

Page 1

**H**

In re Towers Financial Corp. Noteholders Litigation
S.D.N.Y.,1995.

United States District Court, S.D. New York.
In re TOWERS FINANCIAL CORPORATION
NOTEHOLDERS LITIGATION, and Related
Cases.
**No. 93CIV 0810(WK)(AJP).**

Sept. 20, 1995.
<u>PECK</u>, District Judge:

REPORT AND RECOMMENDATION

**\*1** These class action proceedings, consolidated as *In re Towers Financial Corporation Noteholders Litigation,* were brought on behalf of a proposed class of purchasers of promissory notes (the "Notes") issued by Towers Financial Corporation ("Towers"), against Steven Hoffenberg, the chief executive officer and president of Towers, and certain other Towers officers, directors, and employees (the "Towers Defendants"); various professionals who provided services to Towers (the "Professional Defendants"); and the broker-dealers who sold the Notes (the "Broker-Dealer Defendants"). The complaint asserts claims pursuant to section 12(1) and (2) and section 15 of the Securities Act of 1933, <u>15 U.S.C. §§ 77e</u>, <u>77l(l) and (2)</u>, and <u>77o</u>; section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), <u>15 U.S.C. § 78j(b)</u>, and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, <u>17 C.F.R. § 240.10b-5</u>; section 20 of the Exchange Act, <u>15 U.S.C. § 78t</u>; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), <u>18 U.S.C. §§ 1961</u>-68; applicable state "blue sky" statutes; and common law claims of fraud, negligent misrepresentation, negligence, and breach of fiduciary duty.

Presently before the Court is the motion of defendant law firm Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin ("Squadron Ellenoff") to dismiss the Second Consolidated Amended Class Action Complaint (the "complaint") as to Squadron Ellenoff pursuant to <u>Fed.R.Civ.P. 12(b)(6)</u> and <u>9(b)</u>, and to award sanctions pursuant to <u>Fed.R.Civ.P. 11</u>.

For the reasons set forth below, I recommend that the Court dismiss the complaint as to Squadron Ellenoff, but deny Squadron Ellenoff's motion for sanctions.

THE COMPLAINT: AN OVERVIEW

On a motion to dismiss, the Court must accept the well-pleaded allegations in the complaint as true. *E.g., <u>Cosmas v. Hassett,</u> 886 F.2d 8, 11 (2d Cir.1989)* Accordingly, this opinion will summarize the allegations in the 172-page, 569-paragraph complaint, without resort to the phrase "plaintiffs allege" before each statement from the complaint.

Plaintiffs bring this action on their own behalf and, pursuant to <u>Fed.R.Civ.P. 23</u>, as a class action on behalf of all persons who purchased or reinvested in Notes issued by Towers during the period from February 15, 1989 through February 9, 1993 (the "Class Period").[FN1] (Cplt.¶ 1.) This class action arises out of a far-reaching "Ponzi scheme" designed to deceive plaintiffs and the plaintiff class into purchasing Towers' Notes.[FN2] (Cplt.¶¶ 2-3.) Towers' five Note offerings during the Class Period raised approximately $245 million from over 3,500 investors. (*Id.* ¶¶ 2, 230.) Although Towers held itself out as a healthy and growing concern, it was failing on a massive scale and kept afloat only through the mis-use of the infusions of cash provided by the Note offerings. (*Id.* ¶ 20.) As a result of defendants, conduct, investors were induced to purchase Notes and/or reinvest in additional Note purchases when their original Notes matured. Unbeknownst to the investors, the source of the interest they received on the Notes was the principal paid by later Note investors. (*Id.* ¶ 3.) When the SEC sued Towers on February 8, 1993 for fraudulently misrepresenting the results of its operations and the risk of investment in its financial instruments, Towers' Ponzi scheme collapsed, Towers

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

filed for bankruptcy protection, and the worthlessness of the Notes was revealed. (*See id.* ¶ 3.)

*The Defendants*

**\*2 *The Towers Defendants***

Towers, a Delaware corporation *with* its principal place of business in New York, was in the business of purchasing and then trying to collect certain accounts receivable. (Cplt.¶ 27.) Towers also operated through subsidiaries including: (1) Towers Credit Corporation, which purchased commercial accounts receivable and tried to collect them for its own account; (2) Towers Collection Services, Inc. ("Towers Collection"), which collected past-due accounts receivable for third parties on a contingency basis; and (3) Towers Healthcare Receivables Funding Corporations I, II, III, IV and V (collectively "THRFC I-VI" or the "Healthcare Subsidiaries"), which issued approximately $196 million in bonds between July 1990 and May 1992 (the "Bonds") and engaged in factoring healthcare receivables. (*Id.* ¶¶ 27-30.) The complaint does not name Towers and its subsidiaries as defendants, since Towers and its subsidiaries filed for bankruptcy in March 1993 and are protected by the automatic stay under § 362 of the Bankruptcy Code. (*Id.* ¶ 31.)

Defendant Steven Hoffenberg was the Chief Executive Officer, President and Chairman of the Board of Directors of Tower. (Cplt.¶ 32.) Directly and through defendants Professional Business Brokers Inc. and the Hoffenberg Family Trust, Hoffenberg owned 71.4% of Towers, stock. (*Id.* ¶¶ 33, 260.)

Defendant Mitchell Brater was Chief Operating Officer and Vice Chairman of Towers, Board of Directors. (*Id.* ¶ 34.) Brater owned approximately 20@ of Towers' stock. (*Id.* ¶ 263.) Brater owned defendant Eton Securities Corporation, a securities broker-dealer, through which Brater supervised and coordinated the sale of the Notes by other broker-dealers. (*Id.* ¶ 48.)

The complaint refers to defendants Hoffenberg, Professional Business Brokers, the Hoffenberg Family Trust, Brater, Eton Securities and certain additional Towers, officers and/or directors collectively as the "Towers Defendants." (Cplt. t 49.) [FN3]

"To mislead the public and law enforcement and regulatory agencies with jurisdiction over financial matters, the Towers Defendants committed perjury, falsified business records, distributed sham financial statements, misled state and federal officials, and otherwise engaged in a pattern of criminal conduct." (Cplt.¶ 253.)

*The Professional Defendants*

"The fraud Towers perpetrated on the Noteholders could not have been achieved without the active and culpable participation of accountants, lawyers and other persons and entities ostensibly independent from Towers." (Cplt.¶ 254.)

Defendant H. Bruce Bronson, Jr. provided legal services and advice to Towers in connection with the Note offerings, through the law firm defendants Law Offices of H. Bruce Bronson, Jr.; Gibney, Anthony & Flaherty; and Bronson & Migliaccio. Mr. Bronson and his three law firms are referred to in the complaint collectively as the "Bronson Defendants." (Cplt.¶ 51.) "Bronson, as either a sole practitioner or a member of Gibney, Anthony & Flaherty or Bronson & Migliaccio, is the lawyer directly responsible for the Offering Memoranda [defined and described below], which were used in connection with the largest Ponzi scheme in United States history." (*Id.* ¶ 340.) The Bronson Defendants "knew, or were reckless in not knowing, that the various offering memoranda contained material misstatements and omissions of material facts." (*Id.* ¶ 341; *see also id.* ¶¶ 350-54.)

**\*3** Moreover, Bronson assisted Defendant Brater in supervising Towers' compliance with the conditions of its claimed exemption from registration and therefore knew that, because of the manner in which Towers mass marketed the Notes through its wide network of broker-dealers, Towers' purported exemption from the registration requirement of section 5 of the Securities Act was without foundation. Finally, the Bronson Defendants represented

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905
**(Cite as: Not Reported in F.Supp.)**

Towers before various state agencies, in an effort to divert state regulators who developed suspicions as to the legitimacy of the Notes.

(*Id.* ¶ 340; *see also id.* ¶¶ 342-49, 355-56.)

Defendant Duff & Phelps Credit Rating Co. ("Duff & Phelps") is a securities rating service and a publisher of business and financial information. (Cplt.¶ 52.) Duff & Phelps issued opinions rating Towers' Bonds; Towers used the Bond ratings as endorsement of Towers, Towers' overall financial condition, and all of Towers, debt offerings, including the Notes. (*See generally id.* ¶¶ 52, 405-17.)

Defendant Richard A. Eisner & Company ("Eisner"), a firm of certified public accountants, served as the CPAs and independent auditor for Towers' Healthcare Subsidiaries. (Cplt.¶¶ 53, 418.) Eisner knew or recklessly disregarded that because the Healthcare Subsidiaries accounted for approximately half of Towers' total assets, their financial condition had a material effect on Towers' operations and financial condition. (*Id.* ¶ 420.) Eisner's unqualified opinions that the Healthcare Subsidiaries, fiscal 1991 and 1992 financial statements were presented in conformity with generally accepted accounting principles ("GAAP") formed an integral basis for defendant Basson's unqualified opinions about Towers' fiscal 1991 and 1992 financial statements. (*Id.* ¶¶ 421, 424.) Eisner knew or recklessly disregarded that those financial statements contravened GAAP in numerous ways. (*Id.* ¶ 424.) Eisner also certified to the indenture trustee for Towers' Bonds that the Healthcare Subsidiaries were maintaining the level of collateral required under the Bond indenture when Eisner knew or recklessly disregarded that Towers and/or the Healthcare Subsidiaries were substantially overstating the value of the receivables held as collateral for the Bonds, and diverting tens of millions of dollars for their own purposes. (*Id.* ¶ 426.)

Defendant Squadron Ellenoff is a New York based law firm that served as counsel to Towers and defendants Hoffenberg and Brater and represented Towers before the SEC and other regulatory agencies. (Cplt.¶¶ 54, 357.) In the course of representing Towers before the SEC in 1988, Squadron Ellenoff received access to a confidential memorandum prepared by the accounting firm of Spicer & Oppenheim that revealed Towers' fraudulent accounting practices, but "Squadron Ellenoff went on to continue through various means," including making or failing to correct false statements to the SEC, "to sustain Towers' criminal course of conduct throughout the ensuing four years." (Cplt. ¶ 361; *see also id.* ¶¶ 357-404.) "By the false statements made to the SEC and others, Squadron Ellenoff intended to prevent or delay, and did delay, the SEC from stopping Towers ... from selling Notes." (*Id.* ¶ 401.) The complaint's allegations against Squadron Ellenoff are described in further detail below.

**\*4** The complaint refers to the Bronson Defendants, Duff Phelps, Eisner and Squadron Ellenoff collectively as the "Professional Defendants." (Cplt.¶ 54.) FN4

*The Broker-Dealer Defendants*

Defendants J.B. Bogart & Associates, Inc., Consolidated Financial Services, Inc., Dain Bosworth, Inc., David deBaradinis, East-West Capital Management Inc., First Affiliated Securities Inc., Halpert & Company Inc., Martin Kaiden Company, and Monterey Bay Securities are securities broker-dealers who offered and sold Towers' Notes. (Cplt.¶¶ 56-64.) These broker-dealers are sued individually and as representatives of a defendant class (pursuant to Fed.R.Civ.P. 23(a) and 23(b)(1) & (3)) consisting of all persons and entities who participated as sellers of Notes during the Class Period (the "Broker-Dealer Defendant Class"). (*Id.* ¶¶ 65, 236.) The complaint refers to the named broker-dealer defendants and the members of the Broker-Dealer Defendant Class collectively as the "Broker-Dealer Defendants." (*Id.* ¶ 227.) There are at least 170 members of the Broker-Dealer Defendant Class. (Cplt. ¶ 237; *see id.* ¶¶ 66-226.)

The Broker-Dealer Defendants "provided the essential link to the investing public which enabled Towers to consummate its unregistered offering and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905
(Cite as: Not Reported in F.Supp.)

sale" of the Notes. (*Id.* ¶ 491.) The Broker-Dealer Defendants contributed to the Note offerings, non-compliance with the rules and regulations exempting certain offerings from registration, by, *inter alia,* distributing the Offering Memoranda to a large and indiscriminate number of offerees, offering and selling the Notes to inappropriate unsophisticated investors, and failing to appropriately screen potential investors. (*Id.* ¶ 493; *see also id.* ¶¶ 494-503.) Because the Note offerings were in reality public offerings, the Broker-Dealer Defendants are statutory underwriters, strictly liable to the Plaintiff Class under § 12(l) of the Securities Act. (*Id.* ¶¶ 497-98.)

### The Com-plaint's Cons-piracy Allegations

The complaint alleges that a "conspiracy, common scheme, enterprise and course of conduct commenced, by express or tacit agreement, as early as in or about 1988 and, during its course, involved all defendants identified above." (Cplt. ¶ 241.) Specifically: "Defendants accomplished their conspiracy ... by marketing, artificially inflating, and maintaining the terms of the Notes throughout the Class Period; by concealing from Plaintiffs and the Plaintiff Class the true financial condition of Towers and the worthlessness of the Notes; and by maintaining and advancing the Towers Ponzi scheme at the expense of Plaintiffs and the Plaintiff Class. Each of the Defendants knowingly and intentionally agreed to commit and committed acts in furtherance of the conspiracy...." (*Id.*) Towers could not have accomplished its fraudulent scheme to defraud investors without the active participation of accountants, lawyers, insurance companies, rating agencies and securities broker-dealers. (*Id.* ¶ 254.)

### The Complaint's Allegations Concerning the Offer and Sale of Unregistered Securities (i.e., the Notes)

\*5 Prior to the sale of the Notes in issue beginning in 1989, Towers had offered other notes to the public in 1986. (Cplt. ¶ 242.) The sales were not registered under section 5 of the Securities Act, and in late 1988 and early 1989, Final Consent Judg-

ments of Permanent Injunction were entered in an action by the SEC against Hoffenberg and Brater, prohibiting them from further violations of § 5. (*Id.* ¶¶ 242-43.) Defendant Squadron Ellenoff represented Towers in this SEC action and defendant Bronson represented Towers before "various state regulatory agencies." (Cplt. ¶¶ 340, 35.)

Beginning in about February 1989, Towers offered and sold over $245 million of the Notes at issue to over 3500 investors in over 40 states. (Cplt. ¶¶ 230, 244, 249.) Towers offered the Notes to United States residents pursuant to five memoranda, termed the Domestic Offering Memoranda, dated February 15, 1989, February 20, 1990, October 1, 1990, October 15, 1991 and March 23, 1992, and to non-United States residents pursuant to an Explanatory Memorandum (collectively referred to in the complaint as the "Offering Memoranda"). (*Id.* ¶ 245.)

Defendant Brater, individually and through defendant Eton Securities, together with other employees and agents of Towers, sent over 25,000 copies of the Domestic Offering Memoranda to over 2,000 broker-dealers, 170 of whom sold the Notes to the Plaintiff Class. (*Id.* ¶ 248.)

Towers defrauded investors and regulators by falsely claiming exemption for the Notes from registration under section 4(2) of the Securities Act (transactions by an issuer not involving a public offering) and Regulation D (exemption for limited offers and sales). These exemptions did not apply to the Notes offerings because more than 35 investors had net assets of less than $1 million or an annual salary of less than $200,000 at the time they invested in the Notes. (*Id.* ¶ 249(a).)

### The Complaint's Allegations That Defendants Fraudulently Prepared and Disseminated Offering Memoranda, Annual Reports and Financial Statements to Convince Investors That the Notes Were Legitimate Investments and That Towers Was a Viable Issuer

In addition to being unregistered, the complaint alleges that the "Notes were sold through fraudulent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905
**(Cite as: Not Reported in F.Supp.)**

means." (Cplt.¶ 250.)

In soliciting investments in the Notes, the Towers Defendants and the Broker Dealer Defendant Class disseminated the Offering Memoranda, Towers "annual reports," and a variety of uniform and standardized written offering materials for the purpose of inducing investors to believe the Notes were sound, legitimate investment vehicles and Towers was a prosperous, dynamic and growing concern. In fact, Towers was a fraudulent enterprise which sustained itself through the infusion of cash raised through the fraudulent solicitation of investments from Noteholders and others.

(*Id.* ¶ 250.)

The Offering Memoranda represented that Towers intended to use the proceeds from the Notes offerings to purchase current accounts receivable or loan portfolios for its own account. (Cplt.¶ 277.) The Offering Memoranda stated that Towers would acquire accounts receivable at a price of up to 95% of their face value, earn a minimum 5% "factoring feel" for each receivable collected, and reinvest the collection proceeds in additional receivables. (*Id.*) The Offering Memoranda further stated that Towers expected to compound its "factoring feel" up to six times per year through this purchase and collection of receivables and reinvestment of the collection proceeds in more receivables. (*Id.*)

*6 Towers, however, purchased few, if any, current accounts receivables with the Notes proceeds. (*Id.* ¶ 278.) Rather, Towers purchased "past-due, largely uncollectible accounts receivable or loan portfolios at prices substantially lower" than the 95% of face value stated in the Offering Memoranda. (*Id.*) Rather than using the Note proceeds to buy accounts receivable, Towers used the proceeds to pay, *inter alia,* interest on the Notes, company expenses (including the compensation of defendants Hoffenberg, Brater and others), and professional fees. (*id.* ¶ 279.)

Furthermore, the Offering Memoranda stated that the Notes would be fully collateralized by accounts receivable having a total face value in excess of the

value of the Notes sold. (*Id.* ¶ 280.) The Notes, however, "were severely undercollateralized ... because of the low face amount and quality of accounts receivable purchased by Towers." (*Id.*)

The Domestic Memoranda stated that Towers would deposit the Note proceeds in "special escrow" accounts at Chase Manhattan Bank to the extent that Towers did not use the funds to purchase accounts receivable (*Id.* ¶ 281.) The Explanatory Memorandum represented that Towers would hold the Note proceeds in special interest-bearing accounts and would deposit the proceeds from the collection of accounts receivable (purchased with the Note proceeds) under a "lock box" system with Chase Manhattan Bank. (*Id.*) The Offering Memoranda detailed the terms governing Towers' ability to withdraw funds from the "special" accounts at Chase Manhattan Bank. (*Id.* ¶ 283.) For example, the offering Memoranda stated that "Excess Profit Amounts" could be "withdrawn and used for any corporate purpose only if the face value of accounts receivable purchased with Note proceeds combined with the proceeds from the collection of those receivables exceeded the value of the Notes sold." (*Id.*) Even though the value of the accounts receivable never exceeded the value of Notes sold, defendant Hoffenberg frequently withdrew funds from the special accounts. (*Id.*) Thus, for example, as of June 1991, although Towers had purchased few accounts receivable with the $124 million in Note proceeds, only $5 million was in Chase Manhattan Bank. (*Id.* ¶ 282.)

Towers' Annual Reports for fiscal years 1988, 1989, 1990 and 1991 also were distributed to investors to promote the fraudulent solicitation of the Notes. (*Id.* ¶ 286.) The "Annual Reports contained false and misleading financial statements which falsely reported that Towers was a financially successful and growing company, when, in fact, each year it was incurring very substantial and increasing losses." (*Id.* ¶ 286; *see id.* ¶¶ 287-96.)

Towers created and distributed to investors false and misleading financial statements that overstated its total assets, net income and shareholders' equity.

Not Reported in F.Supp.
Case 1:07-cv-06305-HB    Document 10-12    Filed 08/31/2007    Page 7 of 28    Page 6
Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905
(Cite as: Not Reported in F.Supp.)

(*Id.* ¶¶ 287-96.) The Annual Reports, financial statements showed net income increasing from $1.4 million in fiscal 1988 to $5.4 million in 1992, when Towers really had a loss of $29 million increasing to a $95 million loss. (*Id.* ¶¶ 287-96.) Towers inflated its net income in the following ways: (1) overstating Towers Collection's fee income from collecting receivables for third parties by using an invented "30/30 rule" (*id.* at 309-13); FN5 (2) falsely recording Towers Collection's collection receivables as Towers' own assets, when they belonged to Towers, clients (*id.* ¶¶ 314-15); (3) recording loan portfolios of nonperforming, distressed loans acquired from banks liquidated by the Federal Deposit Insurance Company at inflated values and falsely recognizing income from collecting on the FDIC loan portfolios (*id.* ¶¶ 295-99); (4) improperly recording the value of and income received from collection of accounts receivable purchased from the Bank of America portfolio and Southwestern Bell Yellow Pages, which had written off those past due accounts receivable as worthless (*id.* ¶¶ 293-94, 301); and (5) improperly recording its investment in United Diversified Corporation ("UDC") by failing to write off or place a reserve against this investment after Hoffenberg agreed in February 1989 to UDC's liquidation (*id.* ¶¶ 302-08).

*The Complaint's Claims for Relief*

*7 Counts I and II of the complaint assert claims on behalf of the Section 12(1) Plaintiff Subclass FN6 and the Section 12(2) Plaintiff Subclass FN7 against the Towers Defendants and the Broker-Dealer Defendants (collectively referred *to* in the complaint as the "Seller Defendants"), for violation of §§ 5(a) & (c) and § 12(i) and (2) of the Securities Act, 15 U.S.C. §§ 77e(a) & (c), 77l(l). (Cplt.¶¶ 505-17.)

Count III asserts a claim on behalf of the Section 12(l) and Section 12(2) Plaintiff Subclasses against the "Individual Defendants" FN8 under Section 15 of the Securities Act, for liability for violations of Section 12(i) and (2) of the Securities Act. (Cplt.¶¶ 518-20.)

Count IV asserts a claim against all defendants for violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5. (Cplt.¶¶ 521-32.)

Count V asserts that the Individual Defendants are liable as "controlling persons" under Section 20 of the Exchange Act for the violations of Section 10(b) and Rule 10b-5. (Cplt.¶¶ 533-35.)

Count VI asserts a claim on behalf of the Blue Sky Plaintiff Subclass FN9 against the SellingDefendants for having "violated the applicable state Blue-Sky statutes." (Cplt. ¶ 539; *see also* id. ¶¶ 536-41.)

Count VII asserts a claim against defendants Hoffenberg and Brater for RICO violations under 18 U.S.C. § 1962(a) and/or (d). (Cplt.¶¶ 542-49.) Count VIII asserts the same RICO claims against Hoffenberg, Brater and certain other Towers Defendants (specified in paragraph 551 of the complaint) (Cplt.¶¶ 550-53.)

Counts IX and X assert common law claims of negligent misrepresentation and negligence against all defendants. (Cplt.¶¶ 554-60.)

Count XI asserts a claim for breach of fiduciary duty against all defendants except the Bronson Defendants, Duff & Phelps, Squadron Ellenoff and ACI. (Cplt. ¶¶ 561-55.)

Finally, Count XII asserts a claim for common law fraud against all defendants. (Cplt.¶¶ 566-69.) The "Defendants employed a scheme to defraud as a part of which the Defendants made and participated in the making of material misrepresentations of fact and the omission of material facts." (*Id.* ¶ 568.)

ALLEGATIONS OF THE COMPLAINT AS TO SQUADRON ELLENOFF

Defendant Squadron Ellenoff is a New York based law firm that served as counsel to Towers and defendants Hoffenberg and Brater during SEC investigations beginning in 1988. (Cplt.¶¶ 54, 357.) Squadron's representation commenced in 1988, during an SEC investigation of Towers for failure to register notes issued in 1986 ("the 1986 Notes") as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905

(Cite as: Not Reported in F.Supp.)

required under § 5 of the Securities Act, 15 U.S.C. § 77(a). (Cplt.¶¶ 242, 243, 357.) As a result of that action, a final consent judgment of permanent injunction and order (the "SEC injunction") was entered on November 16, 1988 as to Hoffenberg and on May 12, 1989 as to Brater, prohibiting them from further violations of § 5 of the Securities Act. (Cplt.¶ 243.)

**\*8** Despite its knowledge of Towers, criminal conduct, Squadron Ellenoff "went on to contrive through various means to sustain Towers' criminal course of conduct throughout the ensuing four years," through the following activities:
preparation and dissemination of a misleading "Offer of Rescission" circulated by Towers to Noteholders in or about December 1988; preparation and submission of false and misleading documents to the SEC; making misrepresentations to the SEC; and representing witnesses, including Hoffenberg, Brater, Ferro and others, who gave testimony before the SEC known to Squadron Ellenoff partner Ira Sorkin ("Sorkin") to have been misleading, evasive and perjurious, all in an effort to mislead, intimidate, and confuse SEC attorneys and investigators to forestall or prevent discovery of the fraudulent course of conduct in which Towers and its co-conspirators were engaged.

(Cplt.¶ 361.)

### A. *Squadron Ellenoff's Receipt of the Spicer & Oppenheim Memo*

In the course of its representation of Towers, Squadron Ellenoff received a confidential memorandum dated May 18, 1988, prepared by the accounting firm of Spicer & Oppenheim. (Cplt.¶ 357.) Spicer & Oppenheim had been retained by Towers to assist Towers' counsel in "identifying theoretical support for their [Towers'] income recognition policy," known as the 30/30 Rule. (*Id.* ¶ 358.)

The Spicer & Oppenheim memo uncovered many of the fraudulent practices perpetrated by Towers. (*Id.* ¶ 360.) Nevertheless, Squadron Ellenoff continued to "contrive through various means to sustain

Towers' criminal course of conduct throughout the ensuing four years." (*Id.* ¶ 361.)

### B. *Squadron Ellenoff's Preparation of the offer of Rescission*

In response to the 1988 SEC action against Towers for its failure to register the 1986 Notes, Towers offered to rescind the 1986 Note purchases. (Cplt.¶ 362.) The offer to rescind, prepared by Squadron Ellenoff, provided purchasers the choice between the return of their investment (reduced by the interest payments already received from Towers) along with simple interest at S.41%, or the alternative of holding the original 1986 Note investment until maturity at the interest rate initially offered (typically over 12%). (*Id.* ¶¶ 364, 365.)

Motivated by the prospect of attorneys' fees, Squadron Ellenoff failed to disclose in the offer of rescission the adverse facts revealed in the Spicer & Oppenheim memo and the other "false premises upon which investors had committed their funds." (Cplt.¶¶ 367, 368.) As a result, investors rescinded only $445,000 out of a total $37 million in 1986 Notes. (*Id.* ¶ 366.) Had Towers made such disclosures, the 1986 Notes investors would have rescinded their purchases and Towers, fraudulent scheme would have ended in 1988, before any of the Notes at issue in this suit were sold by Towers. (*Id.* ¶ 367.) The Court points out, however, that this suit is brought by holders of the Notes, *i.e.,* the Notes sold between February 15, 1989 and February 9, 1993, not holders of the 1986 Notes.

### C. *Squadron Ellenoff's Silence in the Face of Hoffenberg's Misstatements in Depositions Before the SEC*

**\*9** Attorney Ira Sorkin, a Squadron Ellenoff partner, represented Hoffenberg, Brater and others during further SEC investigations. (Cplt.¶ 370.) In the course of depositions conducted by the SEC, Sorkin "acquiesced in, ratified or failed to reveal the falsity of numerous statements" Sorkin knew to be false, including:

(a) that Towers, promissory notes were collateral-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905
(Cite as: Not Reported in F.Supp.)

ized;

(b) that Towers had the expectation it could compound a factoring fee up to six times per year, when its own records reveal that it was incapable of factoring funds that frequently;

(c) that all investors who purchased the Notes were accredited investors;

(d) that funds raised from Noteholders were placed in an escrow account, when, in fact, they were placed in a checking account;

(e) that Towers never withdrew funds from the escrow account to a point where the excess profits remaining in escrow was anything but "substantial," when, in fact, Towers withdrew from the escrow account despite the fact that Towers was operating at a substantial loss;

(f) that the proceeds from Note offerings withdrawn from the escrow account were used to run Towers' business as specified in the offering documents, when, in fact, the proceeds were diverted by Towers to the personal use of Towers insiders and for use in the Ponzi scheme.

(Cplt.¶ 370(a)-(f).)

### D. *Squadron Ellenoff's Knowledge of Towers' Fraudulent Conduct*

Squadron Ellenoff knew that Towers had repeatedly filed and withdrawn an SEC Form F-10 in bad faith in order "to forestall the SEC from taking further action against Towers." (Cplt.¶ 371.) Further, Squadron Ellenoff knew that Towers had no intention of ever complying with the obligations of a "reporting company" under the Exchange Act, since Squadron Ellenoff knew from the Spicer & Oppenheim memo that Towers, financial reporting practices were inconsistent with recognized accounting practices. (*Id.*)

Squadron Ellenoff learned in November 1991 that an SEC investigation of Towers was underway and that Towers "continued to offer and sell the Notes

in violation of the federal securities laws." (Cplt.¶¶ 372-73.) Despite Squadron Ellenoff's first hand knowledge that Towers was selling its Notes to unaccredited investors, Squadron Ellenoff continued to claim to the SEC that all Towers' investors were "accredited." (*Id.* ¶¶ 375-76.)

### E. *Sorkin's Correspondences with the SEC*

In April 1992, Dorothy Heyl of the New York Regional office of the SEC wrote to Towers' accountants demanding documentation of Towers' accounting practices. (Cplt.¶ 377.) In response, Michael Rosoff, one of Towers' accountants, wrote Sorkin a letter identifying categories of documents he claimed Towers had or would produce to the SEC. (*Id.*) Sorkin adopted Rosoff's representations, despite the fact that he knew or should have known that Towers could not produce the information because it did not exist. (Cplt. ¶¶ 378-79.)

**\*10** In response to an SEC document subpoena in May 1992, Sorkin again adopted Rosoff's representations about Towers' business practices concerning the acquisition and valuation of collection receivables from the FDIC, Southwestern Bell Yellow Pages, Inc., Bank of America and others. (Cplt.¶¶ 380-81.) Squadron Ellenoff knew that these statements were false. (*Id.* ¶ 382.)

### F. *Squadron Ellenoff's Preparation of Wells Submissions to the SEC*

On October 9, 1992, the SEC told Sorkin that the SEC would recommend filing a civil enforcement action against Towers, Hoffenberg, and others for violation of section 5 of the Securities Act with respect to all five Towers Note offerings and violation of Rule 10b-5 and section 17(a) of the Exchange Act for dissemination of false and misleading financial information and numerous misrepresentations and omissions of material fact. (Cplt.¶ 383.) In November 1992, Squadron Ellenoff submitted a "Wells submission" to the SEC on behalf of Towers, contending that none of the claims asserted by the SEC against Towers "has any valid basis in fact or law." <u>FN10</u> (Cplt.¶ 384.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Squadron Ellenoff further asserted in the Wells, submission that: (1) Towers' financial statements in all five Offering Memoranda for the Note sales and in its annual reports were "entirely consistent with GAAP," that is, "generally accepted accounting principles"; (2) any nondisclosures were "not material to the financial statements and annual reports"; and (3) Towers, Hoffenberg and Brater had no reason to believe the Towers Notes were sold to unaccredited investors. (Cplt.¶¶ 384-86.) With respect to the collateral behind the Notes, Squadron Ellenoff asserted (1) that the scope of the permissible collateral for the Notes was "fully and clearly disclosed in Towers' various offering memoranda"; and (2) the collateral arrangements were sufficient to make investors whole even if Towers ceased doing business. (id. ¶ 387.) Finally, throughout the Wells submission, Squadron Ellenoff alleged that the validity of the assumptions underlying the 30/30 Rule was "constantly tested," and that Towers collects approximately 30% of the assigned accounts it accepts for collection. (Id. ¶ 389.) In fact, Towers had not conducted any tests to determine the validity of Towers' 30/30 rule. (Id.)

On January 15, 1993, Squadron Ellenoff prepared a supplemental Wells submission in which it included the opinion of Sidney Davidson, a semi-retired professor of accounting in support of Towers' 30/30 rule. (Cplt.¶ 391.)

In February 1993, the SEC filed a civil complaint against Towers, Hoffenberg, Ferro, and Brater alleging violations of sections 17(a), 5(a) and 5(c) of the Securities Act and section 10(b) of the Exchange Act and SEC Rule 10b-5. (Cplt.¶ 394.) Squadron Ellenoff represented Towers in the suit until withdrawing as counsel. (Id. ¶ 396.) In a May 12, 1993 affidavit, Sorkin of Squadron Ellenoff stated that, during the SEC investigation, Squadron Ellenof f was unable to obtain answers to certain questions because Towers' records were insufficient, or because various individuals could not recall certain transactions or events. (Id. ¶ 397.) Additionally, Squadron Ellenoff associate Philip Raible stated in a May 13, 1993 affidavit that, based on his review, Towers' books and records

were not sufficiently detailed, complete, or up to date. (Id. ¶ 399.) Squadron Ellenoff's statements that Towers' records were incomplete demonstrate that it knowingly misrepresented Towers, financial stability to the SEC and to the press. (Cplt.¶ 400.) Through these false statements, Squadron Ellenoff intended to prevent or delay, and did delay, the SEC from forcing Towers to end its sale of the Notes. (Id. ¶ 402.)

### G. *Plaintiffs, Reliance on the Integrity of the Regulatory Process*

**\*11** Plaintiffs "relied upon the integrity of the regulatory process and the truth of the representations made to the SEC by Squadron Ellenoff in purchasing their Notes." (Id. ¶ 402.) The now worthless Notes "could not have been sold without the services of Squadron Ellenoff in perpetrating the fraudulent scheme." (Id. ¶¶ 403-04.)

### ANALYSIS

### I. *APPLICABLE LAW*

### A. *The Standard for a Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6)*

A district court should deny a motion to dismiss "I unless it appears to a certainty that a plaintiff can prove no set of facts entitling him to relief.' " *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir.1993) (*quoting Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 779 (2d Cir.1984)), *cert. denied*, 115 S.Ct. 86 (1994). A court must accept as true the facts alleged in the complaint and draw all reasonable inferences in favor of the nonmoving party-here, plaintiffs. *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989); *Macmillan, Inc. v. Federal Ins. Co.*, 764 F.Supp. 38, 41 (S.D.N.Y.1991). This general rule applies to fraud claims. *IUE AFL-CIO Pension Fund*, 9 F.3d at 1052; *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir.1990) ("When fraud is asserted, the general rule is simply applied in the light of Rule 9(b)'s particularity requirements.").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905
**(Cite as: Not Reported in F.Supp.)**

Additionally, a Rule 12(b)(6) motion challenges only the face of the pleading. Thus, in deciding a 12(b)(6) motion, "the Court must limit its analysis to the four corners of the complaint." _Vassilatos v. Ceram Tech Int'l Ltd., 92 Civ. 4574, 1993 WL 177780 at *5 (S.D.N.Y. May 19, 1993) (citing Kopec v. Coughlin, 922 F.2d 152, 154-55 (2d Cir.1991))._ When additional materials are submitted to the Court for consideration with a 12(b)(6) motion, the Court must either exclude the additional materials and decide the motion based solely upon the complaint, or convert the motion to one for summary judgment under Fed.R.Civ.P. 56. Fed.R.Civ.P. 12(b); _Fonte v. ]Board of Managers of Continental Towers Condominiums, 848 F.2d 24, 25 (2d Cir.1988)._

However, the Second Circuit has held that:

[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a prospectus upon which it solely relies and which is integral to the complaint, the defendant may produce the prospectus when attacking the complaint for its failure to state a claim, because plaintiff should not so easily be allowed to escape the consequences of its own failure.... Similarly, when a district court decides a motion to dismiss a complaint alleging securities fraud, it may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC, particularly where plaintiff has been put on notice by defendant's proffer of these public documents.

_Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir.1991)_ (Court considered stock purchase agreement and offering memorandum even though they were not public disclosure documents required to be filed with the SEC, because they were integral to the complaint), _cert. denied, 503 U.S. 960, 112 S.Ct. 1561 (1992); see also, e.g., Kramer v. Time Warner Inc., 937 F.2d 767, 773-74 (2d Cir.1991)_ (district court correctly considered Offer to Purchase and Joint Proxy Statement in ruling on motion to dismiss). Similarly, in _O'Brien v. National Property Analysts Partners, 719 F.Supp. 222, 224-25 n. 4 (S.D.N.Y.1989),_ the Court held that "[b]ecause the Complaint repeatedly refers to the private placement memoranda as the sources of

alleged misrepresentations, it is entirely appropriate for the Court to review them on a motion to dismiss."

**\*12** Defendants on this and the related motions _sub judice_ have submitted the five Offering Memoranda extensively referred to in the complaint (_e.g.,_ Cplt. ¶¶ 277-85.) In light of the decisions in _Cortec, Time Warner_ and _O'Brien_ cited above, there can be no doubt that the Court may consider the Offering Memoranda in deciding the pending motions to dismiss, and the Court thus will consider the Offering Memoranda.

In opposition to Squadron Ellenoff's motion to dismiss, plaintiff's have submitted Squadron Ellenoff's two Wells submissions on behalf of Towers to the SEC, two affidavits from Squadron Ellenof f personnel in the related _SEC v. Towers_ action, and certain other documents submitted in the _SEC v. Towers_ action. (_See_ the exhibits to the affidavit dated November 15, 1993 of Jared Stammel, one of plaintiffs' attorneys.) Squadron Ellenoff objects to the Court's consideration of these documents. (Reply Memorandum of Defendant Squadron Ellenoff in Support of Motion to Dismiss at 2.) The two Wells' submissions appear to be sufficiently integral to the complaint's allegations as to Squadron Ellenoff (_see, e.g.,_ Cplt. ¶¶ 384-89) to be considered on this motion. _See, e.g., International Audiotext Network, Inc. v. American Tel. & Tel. Co., 62 F.3d 69, 71-72 (2d Cir.1995)_ (court considered supplemented documents not attached or incorporated but "integral" to the complaint). The other documents from the _SEC v. Towers_ actions submitted by plaintiffs are more problematic. Nevertheless, because my recommendation would be no different whether plaintif f s I submissions are considered or disregarded, I have followed the safer course and considered all of plaintiffs' additional documents.

### B. _Pleading Requirements for Fraud Under Fed.R.Civ.P. 9(b)_

In considering the sufficiency of plaintiffs' § 10(b) claim, the Court must determine the adequacy of the complaint's allegations pursuant to Rule 9(b) of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-06305-HB   Document 10-12   Filed 08/31/2007   Page 12 of 28   Page 11
Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905
**(Cite as: Not Reported in F.Supp.)**

the Federal Rules of Civil Procedure. *Shields v. Citytrust Bancorp,* 25 F.3d 1124, 1127 (2d Cir.1994).

Fed.R.Civ.P. 9(b) sets forth special pleading requirements for fraud claims:
In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Although Rule 9(b) must be read together with Rule 8(a), which requires only a "short and plain statement of the claim," the fraud allegations in the complaint must be specific enough to allow the defendant "a reasonable opportunity to answer the complaint." *Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir.1990); *O'Brien v. National Property,* 719 F.Supp. at 225 (Rule 9(b) is "designed to provide a defendant with fair notice of a plaintiff's claim in order to enable a defendant to prepare a defense, protect defendant's reputation or goodwill from harm, and reduce the number of strike suits.") Furthermore, the complaint must give the defendant "adequate information" to allow the defendant "to frame a response." *Id.*

*13 In order to satisfy the Rule 9(b) pleading requirement for fraud, Courts in this circuit require that the complaint allege:
(1) precisely what statements were made in what documents or oral representations or what omissions were made, (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) the same, (3) the context of such statements and the manner in which they misled the plaintiffs, and (4) what the defendants obtained as a consequence of the fraud. *Friedman v. Arizona World Nurseries Ltd. Partnership,* 730 F.Supp. 521, 530 (S.D.N.Y.1990), *aff'd,* 927 F.2d 594 (2d Cir.1991). These requirement have been applied stringently, especially where allegations of securities fraud are involved. *Tobias v. First City Nat'l Bank & Trust Co.,* 709 F.Supp. 1266, 1276 (S.D.N.Y.1989). The Court, however, also must bear in mind the Second

Circuit's admonition that "a court must read the complaint generously, and draw all inferences in favor of the pleader." *Cosmas v. Hassett,* 886 F.2d at 11.

In addition, when the complaint is based on an offering memorandum, Rule 9(b)' s requirements are "somewhat relaxed." *Stevens v. Equidyne Extractive Industries 1980, Petro/Coal Program,* 694 F.Supp. 1057, 1061 (S.D.N.Y.1988). The offering memorandum satisfies the time, place and content requirement of Rule 9(b) *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986).

The Second Circuit requires that "a plaintiff alleging fraud in connection with a securities transaction must specifically allege the acts or omissions upon which his claim rests. It will not do merely to track the language of Rule 10b-5 and rely on such meaningless phrases as 'scheme and conspiracy' or 'plan and scheme and course of conduct to deceive.' " *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175 (1980).

Furthermore, a complaint alleging fraud against multiple defendants must state the allegations specifically attributable to each individual defendant. *E.g., DiVittorio v. Equidyne Extractive Indus.,* 822 F.2d 1242, 1247 (2d Cir.1987).

### C. Elements of a Section 10(b) Primary Violation Claim

Section 10(b) of the Exchange Act and SEC Rule 10b-5 prohibit fraudulent activities in connection with the purchase or sale of securities, whether or not those securities are registered.[FN11]

In order to state a prima facie case of a violation of § 10(b) and Rule 10b-5, a plaintiff must allege that: [1] "in connection with the purchase or sale of securities, the defendant, [2] acting with scienter, [3] made a false material representation or omitted to disclose material information and that [4] plaintiff's reliance on defendant's action [5] caused [plaintiff] injury."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905
**(Cite as: Not Reported in F.Supp.)**

*In re Time Warner Inc. Sec. Lit* 9 F.3d 259, 264 (2d Cir.1993) (quoting *Bloor v. Carro, Spanback, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985)), *cert. denied,* 114 S.Ct. 1397 (1994). The failure to establish any element is fatal to a section 10(b)/Rule 10b-5 claim. *See, e.g., Central Bank of Denver v. First Interstate Bank of Denver,* 114 S.Ct. 1439, 1455 (1994); *Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88, 94 (2d Cir.1981) ("Because we find that Wilson has failed to demonstrate his reliance on any actions by appellees, we need not reach the other elements of his 10b-5 claim.").

### D. *The Supreme Court's Decision in Central Bank of Denver v. First Interstate Bank of Denver*

**\*14** Plaintiffs were forced to replead the complaint as a result of the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 114 S.Ct. 1439 (1994), which abolished aiding and abetting liability under § 10(b).

In *Central Bank,* the holders of defaulted bonds sued the indenture trustee on the theory that the trustee aided and abetted the other defendants' violations by recklessly ignoring its oversight duties. In holding that the claim against the trustee could not stand, the Supreme Court found that § 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act.... The proscription does not include giving aid to a person who commits a manipulative or deceptive act." *Id.* at 1448.

The public policy rationale underlying the *Central Bank* case is to "reduce the number of parties implicated by" § 10(b). *See In re Kendall Square Research Corp. Sec. Litig.,* 868 F.Supp. 26, 28 (D.Mass.1994). While *Central Bank* severely curbed actions against secondary actors in § 10(b) cases, however, the Court explicitly held that such actors are not "always free from liability under the securities acts." Specifically, the Court held:
Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on

which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming all of the requirements for primary liability under Rule 10b-5 are met.

114 S.Ct. at 1455.

Prior to *Central Bank,* most plaintiffs who alleged 10(b) violations by lawyers did so under a theory of "aiding and abetting" liability rather than primary liability.[FN12] Yet, even with the reduced showing of involvement in fraud that was necessary under an "aiding and abetting" theory, judges in the Southern District of New York were reluctant to find lawyers liable for aiding and abetting under § 10(b) *See, e.g., Quintel Corp., N.V. v. Citibank, N.A.,* 589 F.Supp. 1235, 1243 (S.D.N.Y.1984) ("The Second Circuit has vigorously enforced Rule 9(b) where securities law 'fraud' is alleged against professionals such as attorneys.").

An assertion of aiding and abetting liability against a lawyer was especially difficult to prove if there was no fiduciary relationship between the lawyer and the plaintiff. In such a situation, the plaintiff had to allege that the defendant lawyer had an "actual intent to aid in [the] primary fraud" instead of mere "recklessness." *See Ross v. Bolton,* 904 F.2d 819, 824 (2d Cir.1990); *see also, e.g., Armstrong v. McAlpin,* 699 F.2d at 91 ("If there is no fiduciary duty, the 'scienter' requirement scales upward-the assistance rendered must be knowing and substantial."); *Quintel v. Citibank,* 589 F.Supp. at 1244-45. Thus, even prior to *Central Bank,* plaintiffs asserting § 10(b) liability against lawyers rarely survived a motion to dismiss.[FN13]

**\*15** Although neither the Second Circuit nor the Southern District have yet to address a securities fraud case asserting primary liability against a law firm in the wake of *Central Bank,* it is safe to say that plaintiffs face even greater difficulties today.

### II. *SUMMARY OF RECOMMENDATION TO DISMISS PLAINTIFF'S RULE 10b-5 CLAIM*

As a preliminary matter, this opinion first addresses, and rejects, plaintiffs' claim that because

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905
(Cite as: Not Reported in F.Supp.)

Page 13

they are alleging liability under Rule 10b-5(a) and (c), plaintiffs need only allege Squadron Ellenoff's participation in the fraud and not other recognized elements of a 10b-5 action (*see* Point III, below).

Accordingly, I recommend that plaintiffs' Rule 10b-5 claims be dismissed because the complaint fails to sufficiently allege that: (1) Squadron Ellenoff made any material omissions for which it can be held responsible in the absence of a fiduciary duty to plaintiffs (*see* Point IV, below); (2) plaintiffs relied on Squadron Ellenoff's misrepresentations or omissions (*see* Point V, below); (3) such reliance caused plaintiffs' losses (see Point VI, below); and (4) Squadron Ellenoff's statements to the SEC were made "in connection with" the purchase or sale of any security (*see* Point VII, below). Because any one of those grounds is sufficient to dismiss plaintiffs' Rule 10b-5 claim, I do not address whether the complaint sufficiently alleges actionable misrepresentations by Squadron Ellenoff or whether scienter is adequately plead.

Additionally, I recommend that the pendent state claims be dismissed (*see* Point VIII, below) and that Squadron Ellenoff's motion for sanctions be denied (*see* Point IX, below).

### III. *PLAINTIFFS MUST PROVE ALL OF THE ESTABLISHED ELEMENTS OF A RULE 10b-5 CLAIM EVEN WHEN PROCEEDING UNDER RULE 10b-5(a) & (c)*

Plaintiffs assert that since they are alleging liability under Rule 10b-5(a) and (c) rather than under Rule 10b-5(b), they only need allege Squadron Ellenoff's participation in the fraud, and need not allege specific misrepresentations, reliance or causation. ("Plaintiffs, Supplemental Memorandum in opposition to Defendants' Motion to Dismiss the Second Consolidated Amended Class Action Complaint" ["Pltfs' Supp.Br."], at 1-5, 22-25.)

Rule 10b-5(a) and (c) makes it unlawful "to employ any device, scheme or artifice to defraud" and to engage in any "course of business that operates as a fraud or deceit," while (b) refers to any "untrue statement of a material fact" or omission. (*See* n.

11, above.)

The only case from within the Second Circuit cited by plaintiffs in support of its proposition that it need not allege specific misrepresentations, reliance or causation is *In re Union Carbide Corp. Consumer Products Business Sec. Litig., 676 F.Supp. 458 (S.D.N.Y.1987).* (*See* Pltfs' Supp. Br. at 3-4 n. 6.) *Union Carbide* is of no help to plaintiffs. In that case, plaintiffs alleged that Morgan Stanley had prepared certain projections that Union Carbide included in an offer to Purchase and other documents issued to the investing public, and that Morgan Stanley knew or recklessly disregarded that they were misleading. *Id.* at 465-66. The Court noted that Morgan Stanley's alleged role did not violate Rule 10b-5(b) because Union Carbide (not Morgan Stanley) made the statements to the investing public, but that Morgan Stanley's alleged role could constitute a scheme to defraud or act operating as a fraud under Rule 10b-5(a) or (c). *Id.* at 467.

*16 In so holding, the Court relied on the "fraud on the market" theory for proving reliance and causation. As discussed in Point V(C) below, that theory is not applicable here. Moreover, the Court discussed the other elements of a Rule 10b-5 claim, including misrepresentation and scienter. *Id.* at 468-70. Thus, *Union Carbide* does not excuse plaintiffs from proving all of the established elements of a 10b-5 claim, even when proceeding under Rule 10b-5(a) and (c) rather than Rule 10b-5(b). *See, e.g., SEC v. U.S. Environmental, Inc.* 94 Civ. 6608, 1995 WL 505890 at *3 (S.D.N.Y. Aug. 24, 1995) (holding that "defendant's 'personal involvement in a scheme or plan, to violate the Securities Act, without more, is insufficient" to state claim for primary liabilities under Rule 10b-5).

### IV. *SQUADRON ELLENOFF RAD NO DUTY TO DISCLOSE TOWER'S MISREPRESENTATIONS TO PLAINTIFFS, AND THUS CANNOT BE LIABLE FOR ANY OMISSIONS*

Under § 10(b) and Rule 10b-5, plaintiffs may allege liability for either material misrepresentations or omitting to state a material fact necessary to render

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905
**(Cite as: Not Reported in F.Supp.)**

the statements made not misleading, *i.e.,* omissions. *See, e.g.,* SEC Rule 10b-5(b); *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 266-68 (2d Cir.1993), *cert. denied,* 114 S.Ct. 1397 (1994).

In addition to plaintiffs' allegation of Squadron Ellenoff's affirmative misrepresentations, plaintiffs allege that Squadron Ellenoff violated § 10(b) and Rule 10b-5 by failing to disclose Towers' failing financial condition during the SEC investigation. Specifically, plaintiffs allege that Squadron Ellenoff failed to reveal to investors and the SEC: (1) the Spicer & Oppenheim memo revealing Towers' fraudulent financial practices (Cplt.¶¶ 358-61); (2) Hoffenberg's misstatements before the SEC (Cplt.¶ 370(a)-(f); (3) Towers' fraudulent filing of a SEC Form F-10 (Cplt.¶ 371); and (4) that Towers was selling Notes to unaccredited investors (Cplt.¶¶ 375-76).

In order for a plaintiff to state a cause of action for § 10(b) liability for material omissions (as opposed to misrepresentations), the plaintiff must show that the defendant had some fiduciary duty running to the plaintiff. The Supreme Court explicitly stated in *Central Bank* that "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." 114 S.Ct. at 1447. Further, the Supreme Court has previously decreed that under the federal securities laws, a duty to disclose "arises from the relationship between parties," *Dirks v. SEC,* 463 U.S. 646, 657-58, 103 S.Ct. 3255, 3263 (1983), and will exist only if there is "a fiduciary or other similar relation of trust and confidence between them." *Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 1115 (1980); *see also, e.g., In re Time Warner Inc. Sec. Litig.,* 9 F.3d at 267 ("an omission is actionable under the securities laws only when the [defendant] is subject to a duty to disclose the omitted facts.") FN14

*17 Courts that have considered the issue of a lawyer's liability for securities fraud have held that lawyers have no duty to disclose information about clients to third party purchasers or investors in the absence of a fiduciary or other relationship of trust

between the attorney and the third party. *See, e.g., Fortson v. Winstead, McGuire, Sechrest & Minick,* 961 F.2d 469, 472 (4th Cir.1992); *Schatz v. Rosenberg,* 943 F.2d 485, 490-94 (4th Cir.1991), *cert. denied,* 503 U.S. 936, 112 S.Ct. 1475 (1992); *Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1124 (5th Cir.1988) ("Traditionally, lawyers are accountable only to their clients for the sufficiency of their legal opinions.... An attorney required by law to disclose material facts to third parties might thus breach his or her duty, required by good ethical standards, to keep attorney-client privileges."), *cert. denied,* 492 U.S. 918, 109 S.Ct. 3242 (1989); *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 496 (7th Cir.1986) ("When the nature of the offense is a failure to 'blow the whistle,' the defendant must have a *duty* to blow the whistle. And this duty does not come from § 10(b) or Rule 10b-5; if it did the inquiry would be circular. The duty must come from a fiduciary relation outside securities law."); *In re Cascade Int'l Sec. Litig.,* 840 F.Supp. 1558, 1564 (S.D.Fla.1993); *Morin v. Trupin,* 711 F.Supp. 97, 113 (S.D.N.Y.1989) (" '[n]either lawyers nor accountants are required to tattle on their clients in the absence of some duty to disclose.' ") (*quoting Barker v. Henderson,* 797 F.2d at 497; *Quintel Corp. v. Citibank,* 589 F.Supp. at 1245 (an "attorney is not generally responsible for the motives of his clients"; counsel to partnership owed no duty of disclosure to limited partners). FN15

In *Schatz v. Rosenberg,* the sellers of a failed business sued the purchaser (Rosenberg) and the purchaser's attorney after the deal fell through as a result of the purchaser's bankruptcy. 943 F.2d at 488. The sellers alleged that the lawyer was liable because: (1) the lawyer had provided legal services to Rosenberg in the past and in connection with the purchase of plaintiff's business; (2) the lawyer had a copy of Rosenberg's financial statement which it knew to be false; (3) the lawyer prepared draft closing documents for the purchase of plaintiff's business; and (4) the lawyer and plaintiffs' lawyers jointly agreed on language in the purchase agreement stating that defendant's financial reports were accurate. *Id.* at 489. The Fourth Circuit held that the law firm had no § 10(b) liability to the plaintiff,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905
(Cite as: Not Reported in F.Supp.)

"absent some fiduciary or other confidential relationship with the third party" which plaintiffs could not establish. 943 F.2d at 490, 492.

Similarly, in *In re Cascade Int'l Sec. Litig.*, 840 F.Supp. 1558 (S.D.Fla.1993), shareholders of Cascade International brought a § 10(b) primary securities fraud claim against, among others, Cascade's two law firms, accusing them of preparing Cascade's fraudulent filings with the SEC and drafting false letters to shareholders and false press releases to the press. *Id.* at 1563. Moreover, the plaintiffs accused one firm of "defending Cascade against accusations made by the press, securities analysts and members of the public that the company was in financial difficulty, without investigating whether the representations made by [the firm] on behalf of Cascade were true." *Id.* The *Cascade* Court held that the law firms had no duty to disclose to the plaintiffs because the

**\*18** law firms represented *Cascade*, not any third party, and therefore did not have a duty to investigate their client. While Plaintiffs claim a great injustice would be done to purchasers of Cascade stock if these law firms were to be dismissed from the suit, this Court does not believe that the current law requires a law firm to direct its activities from representation to investigation of their clients at the slightest suggestion that their clients may be involved in unsavory activities. The Court will not go so far as to require law firms to fully investigate their clients at any hint that they may be conducting fraudulent activities, and then to punish the law firms if they do not do so.

*Id.* at 1564.

Thus, this Court finds that a law firm has no duty of disclosure sufficient to sustain a § 10(b) action, absent a fiduciary relationship or other relationship of trust with the plaintiff investors.

Plaintiffs here do not allege in the complaint that they have any fiduciary relationship or other relationship of trust with Squadron Ellenoff. In fact, plaintiffs never allege that Squadron Ellenoff had any direct communication with them; they allege

only that Squadron Ellenoff made false statements to the SEC. (*See* Cplt. ¶ 400.) Accordingly, I recommend that the Court dismiss plaintiffs' Rule 10b-5 claim insofar as it is based on alleged omissions by Squadron Ellenoff.

## V. *PLAINTIFFS CANNOT SHOW THAT THEY RELIED ON SQUADRON ELLENOFF'S STATEMENTS TO THE SEC, AND PLAINTIFFS' ALTERNATIVE RELIANCE THEORIES ARE INAPPLICABLE*

### A. *Plaintiffs Have Not Alleged Reliance on Squadron Ellenoff's Statements to the SEC*

The reliance element of a § 10(b) claim, also referred to as "transaction causation," requires that the Court ask "whether defendants' unlawful action caused' the plaintiff to make the purchase or sale." *Pollack v. Laidlaw Holdings, Inc.*, 90 Civ. 5788, 1995 WL 261518 at \*11 (S.D.N.Y. May 3, 1995) (citing *Burke v. Jacoby*, 981 F.2d 1372, 1378 (2d Cir.1992), *cert. denied*, 113 S.Ct. 2338 (1993)).

A plaintiff's burden with respect to the reliance element of a Rule 10b-5 claim varies depending on whether the claim alleges misrepresentations or omissions. *See, e.g., Burke v. Jacoby*, 981 F.2d at 1378. If the plaintiff alleges that defendant has affirmatively made false statements, "plaintiff must demonstrate that he or she relied on the misrepresentation when entering the transaction that caused him or her economic harm." *Id.* (citing cases). If a plaintiff alleges a material omission, however, positive proof of reliance is not necessary if plaintiff can show that (1) the withheld facts were material, and (2) defendant had a duty to disclose the information omitted. *See, e.g., Pollack v. Laidlaw Holdings, Inc.*, 1995 WL 261518 at \*10 (citing *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54, 92 S.Ct. 1456, 1472 (1972); *In re Time Warner*, 9 F.3d at 267).

**\*19** With respect to Squadron Ellenoff's alleged omissions, plaintiffs cannot show reliance because it cannot satisfy the second prong, *i.e.*, that Squadron Ellenoff had a duty to disclose the allegedly omitted information. (*See* Point IV, above.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

With respect to Squadron Ellenoff's alleged misrepresentations, to satisfy Fed.R.Civ.P. 9(b), a securities fraud complaint must contain particularized allegations identifying the statements relied on. _Hayden v. Feldman, 753 F.Supp. 116, 118 (S.D.N.Y.1990)._ Although the complaint details a number of alleged misrepresentations by Squadron Ellenoff to the SEC (_see_ Cplt. ¶¶ 377-91 and discussion at pages 24-27, above), the complaint fails to allege that any plaintiff class member even heard of Squadron Ellenoff's statements to the SEC during the class period. Instead, plaintiffs only allege in the most general way that "[p]laintiffs relied upon the integrity of the regulatory process and truth of the representations made to the SEC by Squadron Ellenoff in purchasing their Notes." (Cplt.¶ 402.)

Indeed, plaintiffs implicitly admit that they did not have knowledge of or rely on Squadron Ellenoff's statements to the SEC:

Plaintiffs know that Squadron, Ellenoff made these false statements to the SEC because the June 11, 1992 letter was attached to an affidavit (Exhibit D to Heyl Decl. dated April 22, 1993) filed in this Court [in the _SEC v. Towers_ action] along with excerpts of "Wells Submissions" in which other false statements were made.

("Plaintiffs' Memorandum of Law in Opposition to Defendant Squadron Ellenoff's Motion to Dismiss The Consolidated Amended Class Action Complaint" ["Pltfs' Br."] at 11.) Thus, by plaintiffs' own admission, plaintiffs could not have relied on Squadron Ellenoff's statements to the SEC, since plaintiffs did not learn of them until April 22, 1993, the date of the Heyl affidavit, which is more than two months after the February 9, 1993 close of the class period. (_See_ Cplt. ¶ 1.)

Plaintiffs argue, however, that they need not allege specific reliance because reliance is presumed pursuant to the Supreme Court's holding in _Affiliated Ute_ or the "fraud created the market" and/or "fraud on the regulatory process" theories. Since none of those substitute reliance theories apply in this case, however, plaintiffs' complaint fails as to Squadron

Ellenoff for lack of reliance.

### B. _Affiliated Ute is Inapplicable_

Plaintiffs contend that they need not allege reliance upon any of Squadron Ellenoff's specific misrepresentations (or omissions), because Squadron Ellenoff participated in a larger scheme to defraud investors, relying on _Affiliated Ute Citizens v. United States, 406 U.S. 128, 152-53, 92 S.Ct. 1456, 1471-72 (1972)._ (Pltfs' Supp. Br. at 5.)

In _Affiliated Ute,_ mixed-blood Indians of the Ute Indian Tribe sued a bank and two of its employees. The bank had served as the transfer agent for stock of a corporation formed for the purpose of distributing tribal assets. Although the bank had been requested to discourage resale of the stock, its employees had actively encouraged a secondary market among non-Indians. 406 U.S. at 145-46, 92 S.Ct. at 1468. The plaintiffs alleged that the bank had "devised a plan and induced the mixed-blood holders of [the] stock to dispose of their shares without disclosing to them material facts that reasonably could have been expected to influence their decision to sell." _Id._ at 153, 92 S.Ct. at 1472.

*20 The Supreme Court held that defendants had violated § 10(b), despite the fact that they made no positive representations. The Court distinguished Rule 10b-5(a) and (c) from Rule 10b-5(b). The Court noted that while Rule 10b-5(b) requires a material misstatement, Rule 10b-5(a) and (c) are broader, encompassing " 'a course of business' or a 'device, scheme or artifice' that operated as a fraud." _Id._ at 153, 92 S.Ct. at 1472. Thus, the Court held that "under the circumstances of this case involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." _Id._ Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." _Id._ at 153-54, 92 S.Ct. at 1472.

_Affiliated Ute,_ however, is distinguishable since the Supreme Court found that the bank employees had a duty of disclosure to the plaintiffs stemming from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905
**(Cite as: Not Reported in F.Supp.)**

the relationship between the parties. The Court found that the role of the bank employees was comparable to that of a fiduciary in that they were "market makers" who were actively involved in encouraging the market for the stock through personal solicitations and receipt of commissions. *Id.* at 152-53, 92 S.Ct. at 1471-72. The Supreme Court noted "that if the two men and the employer bank had functioned merely as a transfer agent, there would have been no duty of disclosure here." *Id.* at 151, 92 S.Ct. at 1471; *see, e.g., Basic Inc. v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978, 989 (1988) ( *Ute* "dispensed with a requirement of positive proof of reliance, where a duty to disclose material information had been breached."). Thus, the Supreme Court implicitly held that the presumption of reliance would not apply where, as here, there is no fiduciary relationship and thus no duty of disclosure.

Moreover, even if *Affiliated Ute* operated to excuse reliance on a material omission, it has not been extended to misrepresentations. *E.g., Caleb & Co. v. E.I. Du Pont de Nemours & Co.,* 599 F.Supp. 1468, 1474-75 (S.D.N.Y.1984); *Cutner v. Fried,* 373 F.Supp. 4, 12 (S.D.N.Y.1974). Thus, plaintiffs still would have to plead reliance on Squadron Ellenof f Is alleged misrepresentations, and plaintiffs have not done so.

### C. Both the "Fraud on the Market" and the "Fraud Created the Market" Theories Are Inapplicable

Plaintiffs further argue that reliance on Squadron Ellenoff's misrepresentations and omissions can be found under a "fraud created the market" theory, first set forth in *Shores v. Sklar,* 647 F.2d 462 (5th Cir.1981) (en banc), *cert. denied,* 459 U.S. 1102, 103 S.Ct. 722 (1983).

In *Shores,* a purchaser of revenue bonds issued by an industrial development board brought a class action suit after default of the bonds against, *inter alia,* the attorney who had written the offering circular. While admitting that he had never read or even seen the offering circular, the plaintiff alleged that the issuance of the bonds was part of a fraudulent marketing scheme that "was so pervasive that

without it the issuer would not have issued, the dealer could not have dealt in, and the buyer could not have bought these Bonds, because they would not have been offered on the market at any price." 647 F.2d at 464 & n. 2. The Fifth Circuit agreed that dismissal of plaintiff's Rule 10b-5(b) omission and misrepresentation claim was warranted for lack of reliance. *Id.* at 468. The Fifth Circuit, however, held that even though plaintiff did not read or otherwise rely on the offering circular, he stated a cause of action under Rule 10b-5(a) and (c). *Id.* at 469. Because the offering circular allegedly was only one component of a broader fraudulent scheme, the Fifth Circuit held that the plaintiff was entitled to allege that he "relied on the integrity of the offerings of the securities market." *Id.* Put another way, he "relied on the Bonds, availability on the market as an indication of their apparent genuineness." *Id.* at 469-70.

**\*21** Subsequent decisions have credited *Shores* with the creation of the "fraud created the market" theory:

> When the fraud alleged is so pervasive that absent the fraud the bonds could not have been marketed, the reliance element is established by the buyer's reliance on the integrity of the market, *i.e.,* the action of the market to furnish only securities that are entitled to be marketed.

*Ross v. Bank South, N.A.,* 885 F.2d 723, 729 (11th Cir.1989), *cert. denied,* 495 U.S. 905, 110 S.Ct. 1924 (1990); *see also, e.g., In re MDC Holdings Sec. Litig.,* 754 F.Supp. 785 805 (S.D.Cal.1990). In order for this theory to apply, however, "the fraud must be so pervasive that it goes to the very existence of the bonds and the validity of their presence on the market," that is, but for the fraudulent scheme the securities would not have been marketable at any price. *Ross v. Bank South,* 885 F.2d at 729.

The fraud created the market theory is an extension of the "fraud on the market" theory, which was endorsed by the Supreme Court in *Basic Inc. v. Levinson:*

> "The fraud on the market theory is based on the hy-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905
**(Cite as: Not Reported in F.Supp.)**

pothesis that in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations."

485 U.S. 224, 241-42, 108 S.Ct. 978, 989 (1988) (quoting *Peil v. Speiser,* 806 F.2d 1154, 1160-61 (3d Cir.1986)). The fraud on the market theory has been applied in the Second Circuit to those cases where requiring proof of direct reliance would effectively preclude recovery under § 10(b). *See, e.g., Panzirer v. Wolf,* 663 F.2d 365, 368 (2d Cir.1981), *vacated as moot,* 459 U.S. 1027, 103 S.Ct. 434 (1982); *In re Laser Arms Corp. Sec. Litig.,* 794 F.Supp. 475, 489 (S.D.N.Y.1989), *aff'd,* 969 F.2d 15 (2d Cir.1992).

The underlying premise of the fraud on the market theory assumes that the market is a transmission belt which efficiently translates all information concerning a security into a price. In other words, it presumes the operation of an efficient market, a market in which "security prices reflect all available public information about the economy, about financial markets, and about the specific company involved."

*In re Laser Arms,* 794 F.Supp. at 490 (quoting *Reingold v. Deloitte Haskins & Sells,* 599 F.Supp. 1241, 1264 (S.D.N.Y.1984)). The rationale underlying this theory is the "understanding that even if the investor did not actually rely on the misrepresentation or omission, the investor reasonably relied on the *market* to set the accurate price for the stock and to be aware of all relevant information." *In re Fortune Systems Sec. Litig.,* 680 F.Supp. 1360, 1372 (N.D.Cal.1987). Thus, without an efficient and developed market, there is no reason to believe that the price of the security will reflect any misrepresentation or fraud the defendant may have perpetrated.

**\*22** The major difference between the fraud on the market and the fraud created the market theories is that the fraud on the market theory is limited to developed markets representing the "efficient market" model, while the fraud created the market theory has been applied to cases involving new securities in undeveloped markets. *See, e.g., Ross v. Bank South,* 885 F.2d at 728-29 n. 8; *Shores v. Sklar,* 647 F.2d at 471; *Panzirer,* 663 F.2d at 368; *Ross v. A.H. Robins Co.,* 607 F.2d 545, 553 (2d Cir.1979); *In re Laser Arms Sec. Litig.,* 794 F.Supp. at 490.

While the fraud on the market theory has been accepted by the Supreme Court and widely applied by many circuits, the fraud created the market theory has been criticized by courts and commentators. *See, e.g., Ockerman v. May Zima & Co.,* 27 F.3d 1151, 1159-60 (6th Cir.1994) (questioning validity of fraud created the market theory); *Peil v. Speiser,* 806 F.2d at 1160-61 n. 10 (questioning whether the fraud on the market presumption could be applied to offerings of newly issued stock); *In re MDC Holdings Sec. Litig.,* 754 F.Supp. at 805-06 (Court declines to adopt the fraud created the market theory, noting that it has been criticized by courts and commentators); Note, "Fraud-on-the-Market Theory After *Basic Inc. v. Levinson,*" 74 Cornell L.R. 964, 977, 982-91 (1989); Black, "Fraud on the Market: A Criticism of Dispensing with Reliance Requirements in Certain Open Market Transactions," 62 N.C.L.R. 435, 452-57, 472-73 (1984).

Moreover, the fraud created the market theory may have been implicitly rejected by the Supreme Court in *Basic, Inc. v. Levinson,* since the Court clearly stated that the presumption of reliance is based on the assumption of an open market. 485 U.S. at 241, 108 S.Ct. at 989; *see also, e.g.,* "Fraud on the Market Theory After *Basic Inc. v. Levinson,*" 74 Cornell L.R. at 977, 982-91 ("As Justice Blackmun's reasoning in Basic shows, the Supreme Court understood that the [fraud on the market theory] should apply only to an efficient market.").

Courts in the Second Circuit have implicitly rejec-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ted the fraud created the market theory by limiting the fraud on the market theory to publicly offered stock in "developed and efficient markets." *See, e.g., Sable v. Southmark,* 819 F.Supp. 324, 339 (S.D.N.Y.1993) (rejecting applicability of fraud on the market theory to privately offered stock that was "not traded actively in a large public market"); *In re Laser Arms,* 794 F.Supp. at 490 ("The Second Circuit has limited the application of the fraud on the market theory to developed markets, which represents the 'efficient market model.' ") (citing cases); *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.,* 709 F.Supp. 438, 445 n. 6 (S.D.N.Y.1989) ("In the instant action, Litton, the sole purchaser did not purchase Itek stock on the open market, but rather, personally negotiated the transaction. Thus, under the facts of this case, it is not logical to presume reliance."); *Reingold v. Deloitte Haskins & Sells,* 599 F.Supp. at 1264 (holding that the 'fraud-on-the-market' theory will only apply where the market concerned is an efficient one.").

*\*23* Applying Second Circuit law, the accepted fraud on the market theory is inapplicable here because the Notes were newly issued to a non-developed market. The offering Memoranda-entitled "Private Offering Document"-made explicit that the Towers Notes were being sold to a limited number of investors who were restricted as to resale, and that the Notes were neither registered with the SEC nor traded on any stock exchange.[FN16] The fraud on the market theory does not apply here, as plaintiffs conceded at oral argument. (See Transcript of Oral Argument before Judge Roberts 7/27/94 ["Oral Arg. Tr."] at 141-42.)

Plaintiffs have not cited, and the Court has not found, any decision of the Second Circuit or any district court within the Second Circuit accepting the fraud created the market theory. This Court declines to adopt that theory.

### D. *The "Fraud on the Regulatory Process" Theory is Inapplicable*

As another reliance alternative, plaintiffs argue that

Squadron Ellenoff's actions constituted a "fraud on the regulatory process." The basis of the fraud on the regulatory process theory, as articulated by the Ninth Circuit in *Arthur Young & Co. v. United States Dist. Court,* 549 F.2d 686 (9th Cir.) *cert. denied,* 434 U.S. 829, 98 S.Ct. 109 (1977), is that [j] ust as the open market purchaser relies on the integrity of the market and the price of the security traded on the open market to reflect the true value of securities in which he invests, so the purchaser of an original issue security relies, at least indirectly, on the integrity of the regulatory process and the truth of any representations made to the appropriate agencies and the investors at the time of the original issue.

*Id.* 549 F.2d at 695.

This Court refuses to apply the "fraud on the regulatory process" theory for two reasons. First, only the Ninth Circuit and a few isolated district courts have recognized this theory, and even then only in rare circumstances. Neither the Second Circuit nor even a single district court decision within the Second Circuit has recognized this theory. This Court declines to be the first to do so.

Second, even if the Court were to endorse the fraud on the regulatory process theory, it still would be inapplicable to the case at bar. Even in the Ninth Circuit, the fraud on the regulatory process theory is limited in application:
However, the "fraud-on-the-regulatory-process" exception is limited in application. Misrepresentations must be made directly to a regulatory agency and investors must prove that they relied upon either the pricing mechanisms of a securities exchange or the registration procedures of the Securities and Exchange Commission.

*Antonopulos v. North American Thoroughbreds, Inc.,* Civ. No. 87-0979-G(CM), 1991 WL 185147 at *2 (S.D.Cal.1991) (citing *Lubin v. Sybedon Corp.,* 688 F.Supp. 1425, 1446 (S.D.Cal.1988)).

The justification for the fraud on the regulatory process theory is that purchasers of securities are entitled to rely on the integrity of the regulatory pro-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905
**(Cite as: Not Reported in F.Supp.)**

cess and the truth of any representations made to the agencies "at the time of the original issue." _Arthur Young,_ 549 F.2d at 695. Thus, the theory has been applied to documents involved in the issuance of securities which have been reviewed by the SEC and thereby implicitly endorsed.

*24 The cases cited by plaintiffs illustrate that the theory has been applied only when documents concerning the issuance of the stock are filed with the SEC "at the time of the original issue." In _Arthur Young,_ the case which established the "fraud on the regulatory process" theory, the Ninth Circuit held that reliance could be presumed because the securities in question "were sold pursuant to registration statements and prospectuses filed with the S.E.C." and then "sent or shown to every investor" in the security. 549 F.2d at 695.

Furthermore, in _In re American Continental Corp./Lincoln Sav. & Loan Sec. Litig.,_ 140 F.R.D. 425 (D.Ariz.1992), a case heavily relied upon by plaintiffs, bond purchasers brought securities fraud actions against directors and officers of savings and loan associations for misrepresentations made before regulatory agencies in a prospectus and other documents. The court applied the fraud on the regulatory process presumption of reliance based on the premise that "an investor would have in all likelihood relied on the integrity of the regulatory process to ensure that _at a fundamental level the securities were entitled to be marketed._" _Id._ at 434 (emphasis added).

In _In re MDC Holdings Sec. Litig.,_ the court explained that "The Ninth Circuit has recognized an integrity of the regulatory process theory that is similar to the fraud created the market theory articulated in _Shores_ .... Thus, the Ninth Circuit has accepted a presumption of reliance on the integrity of the regulatory process as a substitute for proof of individual reliance in _initial ipublic offerings._" 754 F.Supp. 785, 806 (S.D.Cal.1990) (emphasis added).FN17

In the cases applying the fraud on the regulatory process theory, the SEC or other regulatory agen-

cies had the opportunity to assess the validity of the security through registration statements, prospectuses, or similar publicly-filed documents. Although plaintiffs here have alleged that Squadron Ellenoff made misrepresentations to the SEC during the course of an SEC investigation, plaintiffs have not alleged that they relied on the SEC's involvement in the Notes' pricing or registration. Indeed, plaintiffs could not so allege, since the Offering Memoranda explicitly informed investors, in large type, that the Notes were neither traded on any securities exchange nor approved by the SEC. (_See_ n. 16, above.) Thus, plaintiffs cannot invoke the Arthur Young "fraud on the regulatory process" reliance presumption. _See Lubin v. Sybedon Corp.,_ 688 F.Supp. at 1446 ("fraud on the regulatory process" theory inapplicable where plaintiff failed to allege SEC involvement in private placement offering).

In short, the Court declines to adopt the fraud on the regulatory process rebuttable presumption of reliance, but even if the Court were to adopt that theory, it would be applicable only to statements made in a registration statement or similar public filing with the SEC, not to Wells submissions and similar non-public submissions to the SEC in the course of an SEC investigation.

## VI. _PLAINTIFFS RAVE FAILED TO SUFFICIENTLY ALLEGE CAUSATION_

*25 The causation element of § 10(b) liability, also known as "loss causation," is closely related to reliance or "transaction causation." _Burke v. Jacoby,_ 981 F.2d 1372, 1378 (2d Cir.1992), _cert. denied,_ 113 S.Ct. 2338 (1993). Indeed, the Second Circuit has noted that "there generally is no causation without reliance." _Id._

In order to show "loss causation," plaintiff must establish a "direct or proximate relationship between the loss and the misrepresentation" which may not be supplied by "but for" allegations. _E.g., Bennett v. United States Trust Co.,_ 770 F.2d 308, 314 (2d Cir.1985), _cert. denied,_ 474 U.S. 1058, 106 S.Ct. 800 (1986); _Bloor v. Carro, Spanbock, Londin, Rodman & Fass,_ 754 F.2d 57, 61 (2d Cir.1985).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905
**(Cite as: Not Reported in F.Supp.)**

Loss causation "turns upon a question of proximate cause: was the damage complained of a foreseeable result of plaintiff's reliance on the fraudulent misrepresentation?" *Aquino v. Trupin*, 833 F.Supp. 336, 342 (S.D.N.Y.1993). In other words, plaintiffs must prove that the damage suffered was a "foreseeable consequence of the misrepresentation." *Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.*, 801 F.2d 13, 20-21 (2d Cir.1986), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 952 (1987). Although it is not necessary to plead causation in any detail, "plaintiffs must prove that but for the circumstances that fraud concealed, the investment would not have lost its value." *In re Gas Reclamation, Inc. Sec. Litig.*, 733 F.Supp. 713, 721 (S.D.N.Y.1990).

Further, even where a § 10(b) claim is based not on a specific misrepresentation or omission, but on a "comprehensive scheme to defraud," the plaintiff must still demonstrate causation in fact by showing that defendants, allegedly fraudulent activities were actually responsible for plaintiff's injuries. *Bloor v. Carro*, 754 F.2d at 61.

The complaint's only allegations of causation are that (1) "[h]ad Towers or Squadron Ellenoff disclosed the adverse facts revealed in the Spicer & Oppenheim Memo and known to Squadron Ellenoff, Notes investors would have rescinded their purchases and Towers' fraudulent scheme would have ended in 1988," and (2) "[b]y the false statements made to the SEC and others, Squadron Ellenoff intended to prevent or delay, and did delay, the SEC from stopping Towers and the Individual Defendants from selling Notes and encouraging the sale of the Notes." (Cplt.¶¶ 367, 401).

The former, however, establishes only "but for" causation, which is not sufficient. Essentially, plaintiffs argue that if holders of the 1986 Notes (which are not the Notes at issue in this case) rescinded their purchases, Towers would not have been financially able to offer the Notes at issue. Any misstatements relating to the offer of rescission of the 1986 Notes is not causally related to the sale of the Notes in issue between February 1989

and February 1993 in anything except a "but for" sense.[FN18]

**\*26** Plaintiffs' argument is similar to that of the plaintiff in *First Interstate Bank, N.A. v. Chapman & Cutler*, 837 F.2d 775 (7th Cir.1988). In *First Interstate*, the defendant law firm had allegedly made misstatements in connection with an initial bond offering to finance a nursing home. *Id.* at 777. In a "classic Ponzi scheme," the proceeds of subsequent bond offerings were used to repay the initial offering. *Id.* Plaintiff, representing a class of purchasers in the subsequent offerings, argued that "the subsequent bond issues were the inevitable result of the defendants, need to acquire funds to avoid defaulting on the [initial] issue." *Id.* at 778-79. The Seventh Circuit dismissed, adopting Second Circuit precedent, and held that "something more than but-for causation is required." *Id.* at 779 (*citing Bloor v. Carro*, 754 F.2d at 61-62). The Court concluded that while the issuance of the second round of bonds might have been foreseeable, the misuse of the bond proceeds "constitute[d] a superseding event" and, therefore, the attorneys were not liable. *Id.* at 779-80.

Plaintiffs' allegations as to Squadron Ellenoff's alleged misrepresentations in Wells submissions and other submissions to the SEC in late 1992 and early 1993 also cannot establish loss causation. The documents filed with the SEC could not have caused investors to buy the Notes since the complaint fails to allege that purchasers of the Notes were aware of Squadron Ellenoff's statements to the SEC.

Plaintiffs have conceded that they were not aware of Squadron Ellenoff's statements to the SEC until after the class period ended. For the reasons discussed in Point V(C) & (D) above, the Court declines to adopt (and necessarily also extend) the "fraud on the regulatory process" or "fraud created the market" theories as substitutes for proof of reliance and causation.

## VII. *PLAINTIFFS HAVE NOT SUFFICIENTLY ALLEGED THAT SQUADRON ELLENOFF'S MISREPRESENTATIONS WERE MADE "IN CON-*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*NECTION WITH" THE PURCHASE OR SALE OF THE NOTES*

A further reason to dismiss the complaint is that plaintiffs have not sufficiently alleged that Squadron Ellenoff's misrepresentations were made "in connection with" the purchase or sale of the Notes.

In *Superintendent of Ins. v. Bankers Life & Casualty Co., 404 U.S. 6, 12-13, 92 S.Ct. 165, 169 (1971),* the Supreme Court stated that in order for a party to state a claim under § 10(b) and Rule 10b-5, it must have been defrauded "as a result of deceptive practices touching its sale of securities." In the Second Circuit, however, "something more than a 'de minimis' relationship between the fraudulent scheme and the purchase or sale of securities is required." *Manufacturers Hanover Trust Co. v. Smith Barney, Harris Upham & Co., 770 F.Supp. 176, 181 (S.D.N.Y.1991).*

It is clear that "[m]isrepresentations or omissions involved in a securities transaction but not pertaining to the securities themselves cannot form the basis of a violation of Section 10(b) or Rule 10b-5." *Manufacturers Hanover v. Smith Barney, 770 F.Supp. at 181* (citing *Chemical Bank v. Arthur Andersen, 726 F.2d 930, 943 (2d Cir.1984),* cert. denied, *469 U.S. 884, 105 S.Ct. 253 (1984)).* Rather, the "in connection with" requirement mandates that the alleged fraud concern the "fundamental nature of the [securities]: namely, the characteristics and attributes that would induce an investor to buy or sell" the securities. *Kearney v. Prudential-Bache Sec., Inc., 701 F.Supp. 416, 424 (S.D.N.Y.1988).*

**\*27** As with causation, the Court must examine the complaint's allegations as to Squadron Ellenoff's actions with respect to (1) the offer of rescission for the 1986 Notes and (2) its statements to the SEC in 1992-93.

First, as to the offer of rescission of the 1986 Notes, Squadron Ellenoff's actions may be "in connection with" the purchase and sale of the 1986 Notes, which are not at issue in this suit, but are not "in connection with" the sale of the Notes at issue.

Second, Squadron Ellenoff's representation of Towers before the SEC in 1992-93 likewise does not satisfy the "in connection with" prong of § 10(b). Although plaintiffs have alleged that Squadron Ellenoff made statements to the SEC, plaintiffs do not allege that these statements were made to investors. In order to satisfy the "in connection with" prong, the alleged fraud must concern "characteristics and attributes that would induce an investor to buy or sell." *Kearney v. Prudential, 701 F. Supp at 424.* Clearly, if the purchaser were not aware of the statements made by Squadron Ellenoff to the SEC, which they admittedly were not, they could not have been induced to purchase the Notes based on the statements. Thus, since the allegedly fraudulent statements were not made to or known by the investors, plaintiffs have not satisfied the "in connection with" prong. *See Zoelsch v. Arthur Andersen & Co., 824 F.2d 27, 34 (D.C.Cir.1987)* (statements made by local accountants to worldwide auditors could not lead to liability, since "the accountant's statements were not publicly disseminated or made in any way to influence investors ... Thus they were not made at the time 'in connection with' any later sale."). Since Squadron Ellenoff's statements were not disclosed to any investor who purchased Notes, nor publicly filed with the SEC so as to trigger the "fraud on the market theory," the statements do not satisfy the "in connection with" prong of § 10(b). *See In re Leslie Fay Cos. Sec. Litig., 871 F.Supp. 686, 694-96 (S.D.N.Y.1995)* (misstatements made in SEC 10-K filing that were also contained in annual report satisfied "in connection with" requirement when fraud on market theory also applied).

## VIII. *PLAINTIFFS' PENDENT STATE LAW CLAIMS SHOULD BE DISMISSED*

Squadron Ellenoff also moves for dismissal of plaintiffs' pendent state law claims of negligent misrepresentation (Count IX, Cplt. ¶¶ 554-57), negligence (Count X, Cplt. ¶¶ 558-60), breach of fiduciary duty (Count XI, Cplt. ¶¶ 561-65), and common law fraud (Count XII, Cplt. ¶¶ 566-69).

A district court may exercise pendent jurisdiction

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. 07-cv-06305-HB     Document 10-12     Filed 08/31/2007     Page 24 of 28 Page 23
Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905
(Cite as: Not Reported in F.Supp.)

over state law claims "whenever the federal-law claims and state-law claims in the case 'derive from a common nucleus of operative fact' and are such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." ' *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 349, 108 S.Ct. 614, 618 (1988) (*quoting United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138 (1966)). The decision whether to exercise pendent jurisdiction, however, is within the discretion of the district court, which should consider such factors as "judicial economy, convenience, fairness and comity." *Carnegie-Mellon v. Cohill,* 484 U.S. at 349-50, 108 S.Ct. at 618-19; *Block v. First Blood Assocs.,* 988 F.2d 344, 351 (2d Cir.1993).

*28 When the federal claims are dismissed before trial, the Supreme Court has stated that the district court ordinarily should decline the exercise of jurisdiction by dismissing the state claims without prejudice. *Carnegie-Mellon,* 484 U.S. at 350 n. 7, 108 S.Ct. at 619 n. 7 ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139 ("if the federal claims are dismissed before trial ... the state claims should be dismissed as well.").

Thus, I recommend that in the exercise of its discretion, the Court dismiss plaintiffs' pendent state law claims against Squadron Ellenoff without prejudice.

## IX. *SQUADRON ELLENOFF'S REQUEST FOR RULE 11 SANCTIONS SHOULD BE DENIED*

Squadron Ellenoff also included in their briefs a request that the Court sanction plaintiffs for filing this law suit. Squadron Ellenoff maintains that, in light of the "abundant case law" in this and other circuits, plaintiffs' counsel "could not have concluded in good faith that a viable claim against the firm-under Rule 10b-5 or the common law-could properly be maintained." (Squadron Br. at 19.)

Plaintiffs respond that their claim against Squadron Ellenoff is "well supported by existing caselaw." (Pltfs' Br. at 32.)

Whether conduct should be sanctioned is measured by the Rule 11 standard in effect at the time of the conduct. *Knipe v. Skinner,* 19 F.3d 72, 78 (2d Cir.), *cert. denied,* 118 S.Ct. 424 (1994); *Corporate Printing Co. v. New York Twographical Union No. 6,* 886 F.Supp. 340, 343 (S.D.N.Y.1995). Because the conduct in question here occurred prior to the December 1, 1993 amendment of Rule 11, old Rule 11 applies. Old Rule 11 "mandates sanctions where: (1) a reasonable inquiry into the basis for a pleading has not been made; (2) under existing precedents there is no chance of success; and (3) no reasonable argument has been advanced to extend, modify or reverse the law as it stands." *International Shipping Co., S.A. v. Hydra Offshore, Inc.,* 875 F.2d 388, 390 (2d Cir.), *cert. denied,* 493 U.S. 1003, 110 S.Ct. 563 (1989). The mandatory application of sanctions under old Rule 11 is no longer required, however, because the Second Circuit has recognized the right of district courts to exercise the discretion permitted under the 1993 amendment of Rule 11. *Knilpe v. Skinner,* 19 F.3d at 78.

I recommend that the Court deny Squadron Ellenoff's motion for sanctions. While I do not agree with plaintiffs' assertion that their case is "well supported by existing case law," plaintiffs' claims against Squadron Ellenoff were a reasonable and good faith attempt to extend the boundaries of law firm liability. Particularly in light of the recent changes in securities law following *Central Bank,* and the absence of a Second Circuit decision unequivocally rejecting the "fraud on the regulatory process" theory of reliance, plaintiffs were justified in testing the limits of primary liability under § 10(b). While Rule 11 was enacted to eliminate frivolous claims, sanctions should not be imposed so as to chill creativity or stifle enthusiasm or advocacy. *See Securities Indus. Ass'n v. Clarke,* 898 F.2d 318, 322 (2d Cir.1990). Thus, in the exercise of its discretion, I recommend that the Court deny Squadron Ellenoff's motion for sanctions.

Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905
(Cite as: Not Reported in F.Supp.)

## CONCLUSION

**\*29** For the reasons set forth above, I recommend that the Court dismiss the complaint's federal claims with prejudice and state law claims without prejudice as to Squadron Ellenoff, but not impose Rule 11 sanctions on plaintiffs.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Whitman Knapp, 40 Centre Street, Room 1201, and to the chambers of the undersigned, 40 Centre Street, Room 540. Any requests for an extension of time for filing objections must be directed to Judge Knapp. Failure to file objections may result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 115 S.Ct. 86 (1994); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 113 S.Ct. 825 (1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988) *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983).

## SERVICE OF THIS REPORT & RECOMMENDATION

A copy of this Report & Recommendation is being mailed to plaintiffs' liaison counsel, defendants' liaison counsel and counsel for defendant Squadron Ellenoff. Counsel for Squadron Ellenoff is to serve a copy of this Report & Recommendation on all other counsel of record.
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

FN1. The class of investors includes United States residents who purchased the Notes between February 15, 1989 and February 9, 1993 and non-United States residents who purchased the Notes between February 1, 1991 and February 9, 1993. (Cplt.¶ 1.)

FN2. The term "Ponzi scheme" is derived from a case involving Charles Ponzi, a defendant in a pyramid scheme case. *See Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424 (1924). A Ponzi scheme involves "utiliz[ing] a portion of the fees or profits earned" from a note offering or limited partnership "to 'prop up' earlier [offerings or] partnerships so that the illusion of successful past performance would allow the promoters to continue in the [sale of new notes or] syndication of new partnerships." *Adler v. Berg Harmon Assoc.,* 790 F.Supp. 1222, 1226 (S.D.N.Y.1992).

FN3. The additional Towers Defendants are: Arthur Ferro, Charles Chugerman, Michael Rosoff, Thomas B. Evans, Jr., Ben Barnes, Raymond Lewis, Xavier Eboli, Gregory Pattakos, Richard Levine, Anthony DiNicolas, David Franklin, Nicholas Pattakos and Marvin Basson. (Cplt.¶¶ 35-47, 49.)

FN4. The complaint also includes defendant American Credit Indemnity Co. ("ACI") in the Professional Defendants. (Cplt.¶¶ 50, 54.) ACI has entered into a settlement agreement with plaintiffs and Magistrate Judge Roberts has recommended that the Court grant preliminary approval to the ACI settlement. *See* Report and Recommendation dated February 8, 1995.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905
(Cite as: Not Reported in F.Supp.)

FN5. Towers' Annual Reports for 1988-90 stated that Towers recognized its fees as 30% of the amount expected to be collected and that it expected to collect 30% of all collection receivables. (*Id.* ¶ 311.) In no year, however, had Towers collected even close to 30% of its collection receivables. (*Id.* ¶ 312.)

FN6. The "Section 12(1) Subclass" are those plaintiff class members who purchased Notes from the Selling Defendants on or after February 9, 1992 for purposes of the claim under section 12(1) of the Securities Act. (Cplt.¶ 229(a).)

FN7. The "Section 12(2) Subclass" are those plaintiff class members who purchased Notes from the Selling Defendants on or after February 9, 1990 for purposes of the claim under section 12(2) of the Securities Act. (Cplt.¶ 229(b).)

FN8. The "Individual Defendants" are defendants Steven Hoffenberg, Mitchell Brater, Charles Chugerman, Michael Rosoff, Thomas B. Evans, Jr., Ben Barnes, Raymond Lewis, Xavier Eboli, Gregory Pattakos, Richard Levine, Anthony DiNicolas, David Franklin, Marvin Basson, and Nicholas Pattakos. (Cplt.¶ 255.)

FN9. The "Blue Sky Subclass" is defined as "[c]lass members who may assert claims against defendants under applicable 'Blue Sky' statutes." (Cplt.¶ 229(c).)

FN10. A Wells submission is a "memorand[um] to the SEC presenting arguments why an enforcement proceeding should not be brought against a potential defendant." *SEC v. Forma,* 117 F.R.D. 516, 519 (S.D.N.Y.1987).

FN11. Section 10(b) makes it unlawful:
To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any

security not so registered, any manipulative or deceptive device or contrivance in contravention or such rule and regulations as the Commission may prescribe....
15 U.S.C. § 78j(b). Further, Rule 10b-5 makes it unlawful:
17 C.F.R. § 240.10b-5.

FN12. The requirements for establishing aiding and abetting liability in the Second Circuit were that a plaintiff show: "(1) a securities law violation by the primary wrongdoer, (2) knowledge of the violation by the person sought to be charged, and (3) proof that the person sought to be charged substantially assisted in the primary wrongdoing." *Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983).

FN13. *See, e.g., Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 62-63 (2d Cir.1985) (§ 10(b) primary liability and aiding and abetting claims against law firm dismissed for lack of causation); *Sable v. Southmark/Envicon Capital Corp.,* 819 F.Supp. 324, 333-41 (S.D.N.Y.1993) (§ 10(b) claim against tax counsel dismissed since no misrepresentations, no evidence that attorney had knowledge of falsity, and no investor reliance); *Ahmed v. Trupin,* 809 F.Supp. 1100, 1109-11 (S.D.N.Y.1993) (§ 10(b) fraud claim against law firm dismissed for failure to plead scienter with sufficient particularity and for lack of causation); *Abrash v. Fox,* 805 F.Supp. 206, 208 (S.D.N.Y.1992) (no § 10(b) liability where attorney's alleged misrepresentations were not "in connection with" the sale of security); *Hayden v. Feldman,* 753 F.Supp. 116, 119-20 (S.D.N.Y.1990) (§ 10(b) aiding and abetting charge dismissed against law firm since no evidence that law firm was on notice of fraud, no fiduciary duty, and no reliance); *CL-Alexanders Laing & Cruickshank v. Goldfeld,* 739 F.Supp. 158, 163-65 (S.D.N.Y.1990) (summary judg-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905
(Cite as: Not Reported in F.Supp.)

ment for law firm on § 10(b) claim for failure to prove scienter); *Sellin v. Rx Plus, Inc.,* 730 F.Supp. 1289, 1292-93 (S.D.N.Y.1990) (summary judgment on Securities Act § 12 claim for law firm that prepared a private placement memo used in fraudulent sale of securities absent evidence firm had role in solicitation of securities sales); *Friedman v. Arizona World Nurseries Ltd.,* 730 F.Supp. 521, 531, 533-34 (S.D.N.Y.1990) (§ 10(b) claims dismissed since counsel who drafted offering memo are not ordinarily liable for general statements therein, no specific misrepresentations were attributed to counsel, and allegations of scienter not sufficient); *In re Citisource, Inc. Sec. Litig.,* 694 F.Supp. 1069, 1082-83 (S.D.N.Y.1988) (law firm's status as special counsel insufficient in itself to show recklessness sufficient to impose § 10(b) liability to third persons).

FN14. The Second Circuit noted in *In re Time Warner,* however, that there may be a duty of disclosure, even absent a fiduciary relationship, "where the disclosure duty arises from the combination of a prior statement and a subsequent event, which, if not disclosed, renders the prior statement false or misleading." 9 F.3d at 267. We need not address such an exception here, however, as that is not this case.

FN15. But see *Breard v. Sachnoff & Weaver, Ltd.,* 941 F.2d 142 (2d Cir.1991); Siegler, "Attorney's Liability for Nondisclosure or Misrepresentation to Third-party Nonclients in Private Civil Actions under Federal Securities Law," 112 A.L.R.Fed. 141 at 10 (citing conflicting Second Circuit district court cases) Having reviewed *Breard* and the cases cited in the ALR article, I note that none of those cases explicitly addressed the issue of whether an attorney may be *primarily* liable to a nonclient for omissions. Most of the cases cited involved secondary (*i.e.,* aiding and abet-

ting) liability and several cases involved both misrepresentations and omissions or turned on the issue of scienter. The language in *Central Bank,* that there can be no fraud in a nondisclosure case "absent a duty to speak," 114 S.Ct. at 1447, calls these holdings into question, and the Court believes that the cases cited in the text state the correct principle of law.

FN16. Each offering Memoranda stated: THE UNITS HAVE NOT BEEN REGISTERED WITH, OR APPROVED OR DISAPPROVED BY, THE SECURITIES AND EXCHANGE COMMISSION OR BY THE SECURITIES REGULATORY AUTHORITY OF ANY STATE. NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.
(Offering Memorandum, Ruffino Aff.Ex. 4 at ii.)

FN17. Similarly, in the other cases cited by plaintiffs, the SEC (or other regulatory agency) was involved at the initial public offering phase of the stock issuance. *See, e.g., In re Software Toolworks Inc.,* 50 F.3d 615, 628-29 (9th Cir.1995) (court denied summary judgment in case where accounting firm had improperly computed financial statements made in the prospectus and assisted in drafting letters to SEC about financial information SEC wanted disclosed in prospectus); *T.J. Raney & Sons, Inc. v. Fort Cobb, Oklahoma Irrigation Fuel Auth.,* 717 F.2d 1330, 1333 (10th Cir.1983) ("[f]ederal and state regulation of new securities at a minimum should permit a purchaser to assume that the securities were lawfully issued."), *cert. denied,*

Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905
**(Cite as: Not Reported in F.Supp.)**

465 U.S. 1026, 104 S.Ct. 1285 (1984); *In re ZZZZ Best Sec. Litig.*, 864 F.Supp. 960 (C.D.Cal.1994) (summary judgment denied as to accounting firm which prepared review report included in offering prospectus); *In re Fortune Systems Sec. Liticg.*, 680 F.Supp. 1360, 1372 (N.D.Cal.1987) (fraud on regulatory process applied to case involving misrepresentations in company prospectus).

FN18. Plaintiffs were disingenuous in their description of the rescission offer, which was drafted by Squadron Ellenoff in connection with the 1986 Notes. Plaintiffs attempt to disguise that fact by using the generic term "Notes" to describe both the 1986 Notes and the 1988 Notes at issue in this litigation. (*See* Cplt. ¶¶ 362-66.)

The first paragraph of the amended complaint defines the "Notes" in question here as comprising "promissory notes and Series 1991-A Asset Backed and Guaranteed Bonds ... sold to United States residents between February 15, 1989 and February 9, 1993 and to non-United States residents between February 1, 1991 and February 9, 1993." (Cplt.¶ 1.) Despite this definition, plaintiffs proceed to use "Notes" to describe both the Notes issued in 1986 as well as those issued from 1989-1993.

Plaintiffs acknowledge that the rescission offer falls outside the three-year statute of limitations. Plaintiffs argue that such activities are still relevant to this action because "[h]ere, however, where Noteholders who declined the rescission offer necessarily renewed their investments within the three-year statutory period, Squadron Ellenoff is liable for its failure to disclose the information it knew to those investors at the time they 'rolled over' their Notes." (Pltfs' Supp.Br. at 22, n. 29.) However, as Squadron Ellenoff noted at oral argument before Magistrate Judge Roberts, plaintiffs have not alleged that a single plaintiff was in fact a 1986 investor who "rolled over" his

or her Notes. (Oral Arg.Tr. at 148.)

S.D.N.Y.,1995.

In re Towers Financial Corp. Noteholders Litigation

Not Reported in F.Supp., 1995 WL 571888 (S.D.N.Y.), Fed. Sec. L. Rep. P 98,905

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.