# APPENDIX

SCANNED ON 3/19/2007

```
JL RDYMSG DISPLAY = "WordPerfect Job"
@PJL SET RESUME
@PJL ENTER LANGUAGE = PCL
```

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

Charles Edward Ramos                                        53

PRESENT: _____                    PART _____

_____
                    *Justice*

Index Number : 600704/2006                INDEX NO.        _____

EURYCLEIA PARTNERS, LP,                    MOTION DATE     _____

vs

AMERICAN EXPRESS TAX                       MOTION SEQ. NO. _____

Sequence Number : 005                      MOTION CAL. NO. _____

DISMISS

                                           is motion to/for _____

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |

Cross-Motion:  |_| Yes   |_| No

Upon the foregoing papers, it is ordered that this motion

Motion denied as reflected in the Court's transcript. A party to this matter may request that this Court "So Order" the transcript by submitting a copy of the Court Stenographer's record, together with an errata sheet correcting all errors in the record, to the Clerk of Part 53. If all parties consent to the proposed corrections or agree that no corrections are required, a stipulation to that effect shall accompany said errata sheet or transcript. In the absence of consent, the requesting party shall notice the record for settlement puruant to CPLR Rule 5525(c).

If an order is required to effectuate this Court's ruling, any party may submit a proposed order*p17P6Xto53 (not to the Commercial Division's Clerk's office) together with a copy of the transcript. In the event the ruling requires the entry of a judgment or other action by the clerks, the submission of a proposed order or judgment is mandatory and shall be in form acceptable to the Judgment Clerk or other appropriate clerk.

FILED

COUNTY CLERK'S OFFICE NEW YORK

MAR 15 2007

Dated: _3/5/07_                          _____
                                         HON. CHARLES E. RAMOS
                                                        J.S.C.

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

Check one:  |_| FINAL DISPOSITION  |_| NON-FINAL DISPOSITION

Check if appropriate:  |_| DO NOT POST  |_| REFERENCE

1

```
 1

 2    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NEW YORK:    TRIAL TERM PART 53
 3    - - - - - - - - - - - - - - - - - - - - X

 4    EURYCLEIA PARTNERS, L.P., ET AL,

 5                          Plaintiffs,
                                   INDEX NUMBER:
 6            - against -         600704/06

 7    AMERICAN EXPRESS TAX & BUSINESS
      SERVICES, INC., N/K/A RSM McGLADREY,
 8    SEWARD, & KISSEL, LLP, and TRIDENT
      FINANCIAL SERVICES, LLC,
 9
                          Defendants.
10
      - - - - - - - - - - - - - - - - - - - X
11                        60 Centre Street
                          New York, New York
12                        January 31, 2007

13

14    BEFORE:
              HONORABLE CHARLES E. RAMOS, Justice.
15

16    APPEARANCES:

17            REED SMITH, LLP
              Attorney for the Plaintiffs
18            599 Lexington Avenue - 29th Floor
              New York, New York  10022
19            BY:  LANCE GOTTHOFFER, ESQ.
                   GIL FEDER, ESQ.
20                 ELENA P. LAZAROU, ESQ.

21
              SADIS & GOLDBERG, LLP
22            Attorneys for Defendant
              Trident Financial Services
23            551 Fifth Avenue
              New York, New York 10176
24            BY:   DOUGLAS R. HIRSCH, ESQ.
                    JARRET A. KAHN, ESQ.
25

26
                  (Continued on next page.)
```

Page 2 APPENDIX TO PLAINTIFF'S MEMO IN OPPOSITION TO MOTION TO DISMISS

mb

2

1

2   APPEARANCES:    (Continued)

3

        PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
4       Attorneys for Defendant Seward & Kissel, LLP
        1285 Avenue of the Americas
5       New York, New York 10019-6064
        BY:   GERARD E. HARPER, ESQ.
6             JACQUELINE RUBIN, ESQ.

7

8                                    Margaret Baumann
                                 Official Court Reporter
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 3 APPENDIX TO PLAINTIFF'S MEMO IN OPPOSITION TO MOTION TO DISMISS
                                   mb

3

| | |
|---|---|
| 1 | Proceedings |
| 2 | THE COURT: Defendant's motion. |
| 3 | MR. HARPER: Thank you, your Honor. |
| 4 | Would it cause a disservice in the gallery if |
| 5 | I use the podium? |
| 6 | THE COURT: No, no. Of course not. Just |
| 7 | bring it over there close to stenographer. |
| 8 | MR. HARPER: I have a pretty good voice. |
| 9 | THE COURT: If we do not hear you, we will |
| 10 | bring it over. |
| 11 | MR. HARPER: May it please the Court: |
| 12 | My name is Gerard Harper. I am from Paul, |
| 13 | Weiss, Rifkind, Wharton & Garrison, LLP, and I |
| 14 | represent the distinguished law firm of Seward & |
| 15 | Kissel, which has been accused in this lawsuit of not |
| 16 | malpractice, but of the most egregious kinds of |
| 17 | allegations and the most grave kinds of allegations |
| 18 | that could be made against a lawyer or law firm for |
| 19 | fraud, breach of fiduciary duty, aiding and abetting |
| 20 | knowingly a fraud and a breach of fiduciary duty. |
| 21 | The basic background is that my client Seward |
| 22 | & Kissel organized, prepared the offering memoranda and |
| 23 | subscription agreements for a hedge fund and a |
| 24 | management company that was to run the hedge fund which |
| 25 | I will collectively refer to as Wood River (phonetic). |
| 26 | The Wood River Hedge Fund went out and raised |

**Page 4 APPENDIX TO PLAINTIFF'S MEMO IN OPPOSITION TO MOTION TO DISMISS**

mb

4

1          Proceedings

2     money from limited partners who invested in hedge funds

3     beginning in 2003.

4          In the offering memorandum, which is very,

5     very extensive and designed for highly sophisticated

6     investors, under the securities laws it has to be, it

7     said, Look, we have the flexibility to invest in

8     anything you want and at any given point in time.  You

9     know, we are not bound by anything in terms of where we

10    are going to put the money.  But, typically, typically

11    our plan going forward is to put no more than

12    10 percent of the total fund assets into any one

13    company.

14         In September of 2005, going forward, now

15    two years after, well over two years after the money

16    had started to be raised, the SEC comes in and

17    discovers that the fund owns over 35 percent of a

18    company called End Wave (phonetic) in California, and

19    the SEC's interest in that is because there is no

20    filings by Wood River that it owns 35 percent of the

21    company.

22         THE COURT:  It would have to file upon

23    ownership of 5 percent.

24         MR. HARPER:  Five percent.  Then you file a

25    10, 15, and they all have different consequences

26    depending on, even at five, your motive.

5

1          Proceedings

2          THE COURT:  The hedge fund does not do that.

3          MR. HARPER:  The hedge fund does not do that.

4     It has not made any filings, and it turns out that the

5     35 percent that it owns of End Wave comprises something

6     in excess of 60 percent of the total assets of the

7     fund.

8          THE COURT:  And I take it, the stock fails?

9          MR. HARPER:  Pardon me?

10         THE COURT:  I take it the stock fails.  It

11    tanks.  Otherwise, we would not be here.

12         MR. HARPER:  And guess what happens?  Then

13    margin calls, and so everything collapses at the end of

14    September.

15         The SEC commences an action.  A couple of

16    weeks later, a receiver is appointed.  My client

17    resigns within two days of the discovery of this from

18    the representation of both the management company and

19    the fund.

20         And then, as night follows day, not from the

21    receiver, no lawsuit from the receiver, nor claim by

22    the SEC, a group of hedge funds from the Cayman Islands

23    bring an action against my client alleging fraud, the

24    firm committed fraud, a breach of fiduciary duty,

25    aiding and abetting and so forth.

26         So, Seward & Kissel not only prepared the

6

1          Proceedings

2     initial memo, but also continued to represent the fund.

3          Seward & Kissel continued to perform discreet

4     tasks for the fund overtime.

5          THE COURT:  Okay.

6          MR. HARPER:  But, and it is going to be

7     important, that you -- it is just like a corporation,

8     when I represent a corporation, I am not necessarily --

9     I am not their mother.  I do not know what they are

10    doing.  I do not know whether they are filing.  I do

11    not.  That is not my responsibility.  My responsibility

12    is to do what they ask me to do.

13         THE COURT:  I am assuming that the plaintiffs

14    have alleged in this case Seward & Kissel did know and

15    participated.

16         MR. HARPER:  We are going to analyze that,

17    Judge.  We do not think we do.  That is what I am here

18    to talk about, and I am here to talk about the law,

19    what the complaint says, and I am going to focus

20    primarily on one main issue.

21         THE COURT:  I take it no answer has been filed

22    yet.

23         MR. HARPER:  Correct.

24         MR.  GOTTHOFFER:  That is correct, your Honor.

25         MR. HARPER:  One main issue, which is a breach

26    of duty, because this complaint is a dagger at the

7

1                           Proceedings

2      heart of what a lawyer is and what a lawyer's duty is,

3      so that is going to be the dominant theme, but I am

4      going to talk a little bit about lies and a little bit

5      about standing if I may.

6             Now, with respect to, you know, your Honor,

7      more than I do than when a company collapses, including

8      when a hedge fund collapses, all right, the investors

9      look around, and anybody who is at the scene of the

10     accident is immediately finding themselves on the south

11     side of a caption.  So, this is not the first time that

12     investors in a hedge fund have tried to sue the hedge

13     fund lawyers.  And none of them, not one, has gotten

14     past the pleading stage.

15            And happily, within the last two weeks, the

16     Southern District issued a brand new decision directing

17     that point involving the Bayou Hedge Fund, In Re:

18     Bayou Hedge Funds, which dwarfs the collapse of Wood

19     River in the terms of the volume of dollars and the

20     like, and people went to jail and so forth.

21            And, I would like, if I could, of course,

22     permission to hand up a copy because it just a new,

23     brand new decision.

24            THE COURT:  Before we get there, let's get a

25     little more specific here.  What kind of allegations

.26    are we talking about?

mb

1                        Proceedings

2            I am looking at a complaint.  You are saying

3    it does not state a cause of action or you have

4    documentary action?

5            MR. HARPER:  I am saying it fails to state a

6    claim of action.

7            THE COURT:  Okay.

8            MR. HARPER:  And as a matter of law, I think I

9    could sum up in one sentence, why it does not.  My

10   client owed these plaintiffs no duty whatsoever of any

11   kind or character, except two duties that every human

12   being owes every other human being, lawyers and

13   non-lawyers alike:

14           Number one, I cannot make a false

15   representation of fact.  I cannot lie.

16           And, number two, I cannot provide substantial

17   assistance to somebody else who I know is lying.

18           So, let me repeat that.  This whole case turns

19   on that one sentence.  My client owed these plaintiffs

20   no duty except the duty not to make an affirmative lie,

21   or to substantially assist somebody else in making an

22   affirmative lie.

23           So, that really boils down to two questions

24   for you, am I right?  What does a lawyer owe to a third

25   person?  Is a lawyer a whistle blower for a client when

26   the lawyer comes in to, comes in to possession of

1                        Proceedings

2        information, is he obligated to?  That has been debated

3        all over the country.

4                New York has answered that question.  We will

5        go into a second --

6                THE COURT:  I am telling you, this is not a

7        Sarbanes case.

8                MR. HARPER:  No, your Honor, Sarbanes governs

9        only public companies, and the SEC has limited

10       regulatory authority over hedge funds.  In fact, it may

11       change as a result of some recent headlines, but that

12       is the way the law was at the time.  So, it is not, it

13       is not a Sarbanes issue.

14               So, who do we owe a duty to?  We owe a duty to

15       these investors which were only some of the investors

16       in these?  If I rewrite the code of professional

17       responsibility and the law of bar in the case of

18       New York.  Now, in Bayou the case, have we handed it

19       up?  May I?  It is a brand new case.

20               THE COURT:  Of course, you will not continue

21       unless I let you hand up the case.

22               (Handing.)

23               THE COURT: You handed the case up, now

24       continue please.

25               MR. HARPER:  I read directly on point, it

26       says:

10

1          Proceedings

2          The complaint in this case fails to allege any

3    facts from which could fairly infer that the RNO -- in

4    that case the hedge fund -- lawyer had any duty to

5    plaintiffs, the investors, their status as investors or

6    limited partners or shareholders in the Bayou entities,

7    does not create the necessary attorney/client

8    relationship.

9          Briarcliff (phonetic), a case also involving

10   the law firm of -- Frankfurt Garber (phonetic) law

11   firm, this is from the First Department:

12         Even if the defendants' investors, limited

13   partners had represented the partnership -- I'm sorry,

14   defendants were the lawyers -- had represented the

15   partnership or the general partner, they would not have

16   owed a fiduciary duty to plaintiff who was a limited

17   partner.

18         Now, our brief goes, and I am leaving it to

19   the brief, holding, after holding, after holding, that

20   if I represented an LP, my duty is to the LP.  My duty

21   is to the entity, not to the constituency of the

22   entity.

23         And then I saw, I turn to their brief, and I

24   see in their brief a statement that says, on page 13:

25         New York courts have squarely, not roundly,

26   squarely held that a lawyer for a limited partnership

11

1          Proceedings

2    owes the limited partnership fiduciary duties, and I

3    stopped there.

4          I said, wait a minute.  I have been doing this

5    stuff for a long time.  I have never heard that.  What

6    is the case?  I pull out the case.  It is a Southern

7    District case called Steinfeld vs. Marks (phonetic).

8    Here is what Steinfeld vs. Marks says:

9          It says, an attorney retained by an entity

10   generally owes his allegience to the entity rather than

11   the individual constituency of the entity.

12         Cites a very well known case called Quintella

13   (phonetic).  The law firm did not owe any duty to the

14   limited partners, and that goes onto say:

15         An attorney, under some circumstances an

16   attorney may also be an attorney for the individual

17   constitutents, and it goes through a couple of cases,

18   Judge.

19         And what it says in those couple, what those

20   couple of cases say is if you have got -- when you got

21   a closely held family corporation or something of that

22   ilk, you may well be found to be a lawyer for the

23   entity.

24         And in the Steinfeld case, in the Steinfeld

25   case, there were two equal co-ventures, only two, and

26   plaintiffs were the lawyers.  The guy who hired the law

12

1                          Proceedings

2     firm and alleged that he had a individual, personal

3     attorney/client relationship with, so I was relieved.

4              This case is meaningless.  It says nothing.

5     It does not contradict the long-standing law of this

6     State that if you represent an LP you do not represent

7     and you do not owe a duty to the individual

8     constituents, including the limited partners.

9              We have nothing like that here.  We have

10    hordes of investors and a law firm which prepares

11    forms, the organization prepares the basic documents

12    and then leaves it, the hedge fund, to go off on its

13    own.

14             Now, I might add that at least four of these

15    plaintiffs, I will get to that later, were not even

16    LPs.  They are never LPs, and so they could not claim

17    that fiduciary obligation at all.  But, my main point,

18    your Honor is surely familiar with 5019 of the Code of

19    Professional Responsibility, organization clients that

20    you owe a duty, it is just basic to the organization,

21    not to the constituents.

22             What does it mean?  What does that mean for

23    their claims here?  And I will just do it claim by

24    claim because it is too important not to.

25             They have a fraudulent omission claim that I

26    failed to disclose to the world the facts I knew about

Proceedings

1

2    Wood River.  There is no such thing as a fraudulent

3    omission claim, and we heard it well expressed in the

4    argument, the lengthy argument just before this one.

5    There is no such thing as a fraudulent omission claim

6    without a fiduciary duty dispute.

7            The second claim is a breach of fiduciary duty

8    claim.  There is no breach of fiduciary duty unless

9    there is a fiduciary duty, and there is no fiduciary

10   duty to constituents.

11           The other tort claims are aiding and abetting.

12   Aiding and abetting has two components:  Actual

13   knowledge and substantial assistance.

14           Substantial assistance for lawyers, there is

15   case after case uncontradicted by my adversaries that a

16   lawyer cannot be liable for aiding and abetting a

17   client simply by not saying anything.  Silence does not

18   equal substantial assistance.  Gross, rather neglect

19   misrepresentation.  There must be a duty to speak.  It

20   is in contrast to the case we just heard about where

21   you had a director talking to people to whom he owed a

22   fiduciary duty.  Here, there is no duty to speak.  And

23   he actually spoke in the case ahead as I understand the

24   argument.  So, no court, no court has ever adopted the

25   theory of liability, lawyer liability that they are

26   attempting to impose on my client.  My client owed no

14

1              Proceedings

2   duty to these plaintiffs, except the ones I am about

3   mention again, and, in the absence of that duty, all

4   their claims go, except one.

5              THE COURT:  Is there any allegation in the

6   complaint that the Seward firm knew of the

7   misrepresentations, the alleged misrepresentations in

8   the offering memo?

9              MR.  GOTTHOFFER:  Yes.

10             MR. HARPER:  In fact, there is no allegation

11  in the claim, your Honor.  Let me take it in parts.

12  There is no allegation in the complaint it is Seward.

13             THE COURT:  I did not find it.

14             Plaintiff, what paragraph?

15             MR. HARPER:  May I?

16             MR.  GOTTHOFFER:  I am sorry, I did not hear

17  you.

18             THE COURT:  I was looking at it.  I did not

19  find a specific allegation.

20             MR.  GOTTHOFFER:  Yes, your Honor, let me

21  suggest your Honor turn to Paragraph 88 of the

22  complaint.

23             THE COURT:  I thought I read that already.

24             MR.  GOTTHOFFER:  And, if I may just take you

25  down to the portion that I think will answer your

26  question.

**Page 15 APPENDIX TO PLAINTIFF'S MEMO IN OPPOSITION TO MOTION TO DISMISS**
mb

15

| | |
|---|---|
| 1 | Proceedings |
| 2 | THE COURT:  Well, it is not in 88. |
| 3 | MR.  GOTTHOFFER:  88 is the starting of the |
| 4 | portion, but there are two particular |
| 5 | misrepresentations that we say Seward knew were false. |
| 6 | If you go to 99, you will see that with |
| 7 | respect to whether there was an auditor, in fact, |
| 8 | appointed -- remember, this is the case where AMEX was |
| 9 | supposed to be the auditor, but it never audited -- you |
| 10 | will see the allegation, but it follows, it follows |
| 11 | from specific statements that read to that conclusion, |
| 12 | and that is one part of it. |
| 13 | THE COURT:  All right.  Let me turn to |
| 14 | defendant's counsel. |
| 15 | I am looking now, I did not see it before, |
| 16 | Paragraph 99. |
| 17 | MR. HARPER:  Pardon? |
| 18 | THE COURT:  Quote: |
| 19 | "Seward thus knew the statements in the Wood |
| 20 | River offering memorandum were false." |
| 21 | MR. HARPER:  Which paragraph?  I'm sorry. |
| 22 | THE COURT:  99.  99, page 127 of the |
| 23 | complaint. |
| 24 | MR. HARPER:  Yes, I see that allegation in |
| 25 | itself is wholly inadequate.  I mean that does not need |
| 26 | any particular later requirement.  It does not give me |

16

1                          Proceedings

2    any facts.  It is just a conclusion.

3              THE COURT:  That is true.

4              MR.  GOTTHOFFER:  Your Honor.

5              MR. HARPER:  So, let me answer the question in

6    this way, in pieces, if I can, because time has its

7    importance here too.

8              The offering memorandum is done in February or

9    so of 2003.  All right.  And in fact, eight of these

10   plaintiffs buy in 2003 or 2004.  There is no allegation

11   anywhere in this complaint that I knew that any

12   statement, if there was any statement in the offering

13   memorandum, and some of it was very promissory, that

14   any statement was false when made in 2003.

15             There is no allegation, factual allegation in

16   this complaint by which they could point to that says I

17   knew in 2003 that that AMEX was not the auditor, and,

18   in fact, they are really of two minds because they

19   stand up, Judge --

20             THE COURT:  Show me.

21             MR. HARPER:  They stand up, Judge, in front of

22   you before and they say, You know, what AMEX was the

23   auditor.

24             They got to make up their mind.

25             MR. GOTTHOFFER:  I am trying, Judge.  I did

26   not want to cut off Mr. Harper.

17

Proceedings

1

2      THE COURT:  Okay.

3          MR.  GOTTHOFFER:  Okay.  Let me take you to

4      Paragraph 99, is the conclusion to be drawn from the

5      paragraph that preceded it, just like you will see in

6      Paragraph 105, we say they knew that Wood River was

7      violating the provisions of the offering memorandum

8      about a 10 percent cap, they knew of the End Wave

9      investment.  So, you have got to read the paragraphs

10     that lead up to this.  So, if I may take you through.

11         THE COURT:  So, you are saying Seward & Kissel

12     knew while this was ongoing --

13         MR.  GOTTHOFFER:  That is correct.

14         THE COURT:  (Continuing) -- that a fraud was

15     being perpetrated on the investors of the hedge fund.

16         MR.  GOTTHOFFER:  And, your Honor, absolutely.

17     And the important part, there is not in this case --

18         THE COURT:  Now, wait a minute.  It is pretty

19     clear under the code that a client, when a client

20     starts to defraud a third-party, it puts the attorney

21     in an ethical dilemma.

22         MR.  HARPER:  Absolutely, your Honor.

23         THE COURT:  It is usual to resign the

24     representation.

25         MR.  HARPER:  It is not required, but it does

26     put a lawyer, put a lawyer in an ethical dilemma.

18

1                        Proceedings

2              THE COURT:  You counsel the client to cut it

3    out, and, if you do not, you have to make a decision as

4    to whether or not resign the representation or not.

5              MR. HARPER:  Correct.  Under DO710B -- 10A2, I

6    think it is, a lawyer who learns that a client is

7    engaged or perpetrating a fraud --

8              THE COURT:  An ongoing fraud.

9              MR. HARPER:  (Continuing) -- an ongoing one

10   shall promptly reveal it, unless it is protected as a

11   confidence or secret.

12             So, if I am a lawyer --

13             THE COURT:  In which case you take a hike.

14             MR. GOTTHOFFER:  Exactly.

15             MR. HARPER:  Your Honor, with all due respect,

16   if I am advising my law firm what to do, if I have that

17   knowledge, and we will get into what they allege is the

18   knowledge because I think that is a very important part

19   of it, but if I am advising my law firm, as I do on

20   these issues, I am taking a hike, but sitting on ethics

21   committees in considering this issue, plenty of ethics

22   committees and plenty of law that say I do not

23   necessarily have to abandon that client.  What I cannot

24   do is participate in the commission of the fraud.  So

25   that if I am representing a client, for example, in

26   something that is completely unrelated to the fraud, I

19

Proceedings

1
2  could continue to represent the client.

3          THE COURT:  Yes, you are right.

4          MR. HARPER:  I do not have that ethical

5  dilemma.  So, it is not as in New Jersey.  On the other

6  hand, if we were across the river, under the rules of

7  professional conduct in New Jersey, I would have an

8  obligation today to blow the whistle on my client.

9          If I were operating under the model rules of

10  present conduct of ABA, I would have an obligation to

11  notify my client.  But under the Kosack (phonetic)

12  provisions, if you, if you get the commission on the

13  standards for attorney conduct that is under work in

14  New York in the revision of the code, I would not.  And

15  certainly under the code of professional responsibility

16  as it exists today in New York and existed at the time

17  of these transactions and occurrences I do not.

18          THE COURT:  But, the attorney was

19  participating in the ongoing fraud.

20          MR. HARPER:  If the attorney is knowingly

21  participating and facilitating the fraud, no question

22  about it.

23          But what the cases all say, Judge, and they

24  are cited in our brief, our opening brief, our reply

25  brief is that simply being quiet and going on and doing

26  the other work, the fact that I do not make a noisy

**Page 20 APPENDIX TO PLAINTIFF'S MEMO IN OPPOSITION TO MOTION TO DISMISS**

mb

20

1                        Proceedings

2      withdrawal or send a press release, God forbid, I would

3      be in ethics jail.  I would be a press release out.

4                  THE COURT:  I understand that, but, obviously,

5      my concern, it seems this is going to be very fact

6      specific.

7                  MR. HARPER:  Your Honor, I really think this

8      is.

9                  THE COURT:  It is one thing to say -- Seward &

10     Kissel, I assume, were not representing the hedge fund

11     in landlord and tenant court?

12                 MR. HARPER:  Correct.

13                 THE COURT:  And but, on the other hand they

14     probably were not making the decisions that ended up in

15     the collapse of the hedge fund?

16                 MR. HARPER:  Absolutely.

17                 THE COURT:  Somewhere in between they fall.

18     The question is what side of the line do they fall on.

19                 MR. HARPER:  Right.

20                 THE COURT:  Is that something I could

21     determine on the motion to dismiss?

22                 MR. HARPER:  Yes.  What you do on a motion to

23     dismiss, what has been done in countless cases

24     involving lawyer liability, again we have to talk

25     about whether I owe a duty.  If I do not owe a duty,

26     all the claims go, and they do not have a case, and

21

1                        Proceedings

2    there is no case under the New York law where my duty

3    runs to them.

4              THE COURT:  But, wait a minute.  But the

5    duty --

6              MR. HARPER:  If the receiver wants to sue me.

7              THE COURT:  Now, we are treading on dangerous

8    ground.  I know this is an evolving area of ethics law.

9    But the duty, the duty really depends on the

10   consequences of the act.  If, if you are aware of the

11   -- if the attorney is aware the client is engaging in

12   an ongoing fraud and the attorney is doing, and I do

13   not want to be too theoretical here, is doing anything

14   to aid and abet that fraud, and some people say we are

15   just representing the corporation is enough.  I do not

16   know if that is in this case, this particular case, but

17   you have to look at what the impact is going to be to

18   third parties.

19             MR. HARPER:  Well, your Honor.

20             THE COURT:  And that's why I say this seems to

21   be fact driven.

22             MR. HARPER:  I do not owe a duty to third

23   parties, period.

24             THE COURT:  Let's take the extreme example.

25   You are counsel for Seward & Kissel who is counsel for

26   the hedge fund.  The hedge fund is actively

22

1                              Proceedings

2      participating in a fraud of investors, and you are

3      clearly aiding and abetting in that fraud.  That is

4      what they are alleging.

5                    MR. HARPER:  They are not alleging, they are

6      not alleging facts, they are alleging conclusions to

7      that.  But let me take that example, Judge.

8                    THE COURT:  I want to.

9                    MR. HARPER:  Suppose I know, suppose I know,

10     as they allege I know, I knew that this fella had or

11     the fund had gone over 5 percent or 10 percent and not

12     filed.

13                   Now, one very important preliminary point, my

14     knowledge that they own 5 or 10 percent of a particular

15     company may mean that I know something about securities

16     laws obligations.  It tells me nothing about whether

17     that is 10 percent of the fund's assets, unless I know

18     what the fund's assets are.  And show me anywhere in

19     this complaint, anywhere where these people allege that

20     I had actual knowledge of how much money, how much

21     money -- let me finish my point.

22                   MR.  GOTTHOFFER:  I have not said a word.

23                   THE COURT:  You made your point.

24                   Tell me.

25                   MR.  GOTTHOFFER:  Paragraph 91.

26                   MR.  HARPER:  Paragraph?

23

1               Proceedings

2          MR. GOTTHOFFER: 91.

3          THE COURT: 91 of the complaint.

4          I love specific answers.

5          MR. GOTTHOFFER: I know. I want to give you

6     some so badly.

7          THE COURT: All right. 91, based upon the

8     receiver documents, I take it those are the documents

9     that you obtain from the SEC receiver?

10         MR. GOTTHOFFER: That is correct, your Honor.

11         THE COURT: Seward knew the importance to

12    investors of accurate liquidity asset level, and like

13    disclosures in the Wood River offering memorandum and

14    John Cleary, a partner wrote, and I will read this to

15    myself.

16         (Pause).

17         THE COURT: Oh, I see, so a Seward partner

18    writes to Whittier (phonetic).

19         MR. GOTTHOFFER: Where as the principal of

20    Wood River.

21         THE COURT: You indicated to me some liquidity

22    issues. We should have discussion regarding the

23    issues, the performance of the fund, the asset level,

24    and whether there needs to be disclosure. Okay.

25         MR. GOTTHOFFER: And, your Honor, may I make

26    one other point?

24

1          Proceedings

2          THE COURT:  Hang on.

3          MR. HARPER:  Could we put in a date?

4          THE COURT:  So clearly, Mr. Cleary has some

5   knowledge.  We do not know how much, but he has -- you

6   have a basis to allege that Cleary has knowledge as to

7   what is going on in the fund.

8          MR. HARPER:  That is wrong, Judge.

9          MR.  GOTTHOFFER:  Your Honor, may I have one

10  point?

11         THE COURT:  Yes.

12         MR. HARPER:  The date, Judge, look at the date

13  of the letter.

14         THE COURT:  April 2002.

15         MR. HARPER:  April 2002 there is no Wood River

16  fund.

17         MR.  GOTTHOFFER:  They are --

18         MR. HARPER:  It does not go to market until

19  2003.  Even they plead that.

20         What that is referring to, Judge, and we are

21  way off record, outside the record, way outside the

22  pleading, is that John Whittier had a previous fund

23  where he managed purely family money, all right, and

24  the letter is referring to that fund, not the Wood

25  River fund which did not come into existence -- no

26  money, not a nickel was raised --

25

| 1 | Proceedings |
|---|---|

1   Proceedings

2        MR. GOTTHOFFER: That is not correct.

3        MR. HARPER: (Continuing) -- until 2003.

4        MR. GOTTHOFFER: You read the last line of the

5   e-mail; he is talking about the new fund. This was the

6   new River Fund startup that we are talking about.

7   Mr. Harper does not want me to get to that. There was

8   not one offering memorandum for the Wood River fund,

9   there was a series offered all by Seward, preparing as

10  counsel, starting in 2003. There were about a dozen

11  between 2003 and June of 2005, and each of them Seward

12  wrote, "AETB is the auditor," not will be, not we are

13  looking toward them. "(B) The fund will be diversified

14  and investment will be capped," not typically, "will be

15  capped at 10 percent of the fund's assets."

16        They wrote that, your Honor, even after they

17  knew there was no auditor, not AMEX, not anybody. They

18  wrote that, your Honor, after they knew that Wood River

19  had at some point an investment, and they knew this

20  because Whittier told them of 12 million shares in End

21  Wave, a stock that had 10 million shares outstanding.

22  So, over 20 percent at a dollar value that Seward,

23  which formed the fund, was aware of asset values, was

24  concerned about asset values, knew or had to know,

25  unless they were willfully blind, not doing what they

26  say in Paragraph 91 they were doing, but that this was

26

1                     Proceedings

2      about 20 percent of the fund's assets.  They knew that

3      there was no SEC filing because Seward was the only --

4                THE COURT:  What is the timing overall of

5      this?

6                MR.  GOTTHOFFER:  I would be happy to give you

7      the timing, if I may please.

8                MR. HARPER:  This is --

9                MR.  GOTTHOFFER:  Which one would you like us

10     to answer?

11               THE COURT:  Yes, please answer the question.

12               MR.  GOTTHOFFER:  The timing on when Wood

13     River acquired that knowledge starts, I do not have it

14     down pat because I have not had discovery, but what we

15     have seen, in October of 2004.

16               THE COURT:  You mean Seward, not Wood River.

17               MR.  GOTTHOFFER:  Yes, we have not had

18     discovery.  In October of 2004, Seward learns that Wood

19     River has a large investment in End Wave, and they, in

20     this context, learn this because they are doing a

21     termination agreement with an employee who brought End

22     Wave to Wood River, and the parties Wood River, and

23     Mr. Foster, the employee have reached an agreement that

24     if End Wave hit a particular price on a particular day,

25     he would get a big bonus.  The stock almost hit the

26     price, but did not.

Proceedings

1
2      Mr. Foster, in December of '04 writes
3  complaining that the reason it did not hit that price
4  was because Whittier dumped a large amount of End Wave
5  shares on the market to drive the price down.
6      Seward's response on behalf of Wood River says
7  that is totally false, absolutely ridiculous, Mr.
8  Whittier never had any such power, never had any such
9  sovereignty.
10      May I ask you to look at Exhibit A to the
11  complaint.  I believe it dated January 27th, 2004.
12      THE COURT:  2005.
13      MR.  GOTTHOFFER:  2005, forgive me.
14      THE COURT:  Yes.
15      MR.  GOTTHOFFER:  And if you look at the
16  second page, you will see that the lawyer for
17  Mr. Foster is telling Seward all about the End Wave
18  holdings and the facts.
19      THE COURT:  Where this is?
20      MR.  GOTTHOFFER:  This is the first paragraph,
21  your Honor.
22      THE COURT:  What, line 1?
23      MR.  GOTTHOFFER:  One, two, three, four, five,
24  six lines down beginning with, "For example."
25      THE COURT:  Yes.
26      MR.  GOTTHOFFER:  You have that?

28

1                          Proceedings

2          I am let you read it, if you would.

3          (Pause).

4          THE COURT:  Yes.

5          MR.  GOTTHOFFER:  Now, so they are aware or

6    that there is a charge that they own, Wood River owns

7    more than 15 percent of the stock, which, as you know

8    you mentioned consequences before, a consequence of

9    owning more than 10 percent of the shares of the public

10   company like End Wave is that you lose any profit you

11   make on sales or by buy sells within 6 months, the

12   short swing profit rule, anyone reading this, and

13   Seward lawyers are very sophisticated people, know that

14   the End Wave holdings in the Wood River fund mean it is

15   a death pack for the investors.  If End Wave goes down,

16   they take the hit.  If End Wave goes up, they do not

17   get the benefit.  There is no SEC filing because Seward

18   has been the sole lawyer for Wood River at least, and

19   there is a different percent provision in the offering

20   memorandum, so investors do not know how their money is

21   being invested.

22          What happens is you could take a look at

23   Exhibit 9 to compendium, which I think you have.

24   Seward talks to Mr. Whittier.  Whittier apparently

25   gives Seward some documents with some disputes with

26   Mr. Foster.

29

1        Proceedings

2            If you go to the Exhibit 9.

3            THE COURT:  Is that the instant messaging?

4            MR.  GOTTHOFFER:  I refer you, your Honor, to,

5    it is Page 3, and I believe the underlying, the salient

6    portion that Mr. Whittier is saying I owned over

7    2 million shares of End Wave, and this is a document

8    you could see from the Bates number, down on the box

9    Seward & Kissel document.

10            MR. HARPER:  Your Honor, may I go back to the

11    original question you asked counsel to answer?

12            MR.  GOTTHOFFER:  Your Honor, may I finish?  I

13    think it may be enlightening for the Court.

14            THE COURT:  Go ahead.

15            MR.  GOTTHOFFER:  Thank you.

16            If you look at Exhibit 13, which also has a

17    Seward number on it, you will see that it is research

18    Seward was doing in respect of -- I'm sorry, in respect

19    of End Wave, and, if you do the arithmetic at the time,

20    you take the market cap, you divide it by the price,

21    you are going to wind up with the number of shares

22    outstanding, and that would be about 10 million shares.

23            THE COURT:  20 percent.

24            MR.  GOTTHOFFER:  It is a heck of a lot.

25            Now, with all of that, and this is all set out

26    in the complaint, what does Seward do?

30

| | |
|---|---|
| 1 | Proceedings |
| 2 | It structures an agreement with Mr. Foster |
| 3 | where Mr. Foster gets payment, gives up his claim and |
| 4 | agrees never to talk with anyone about Wood River's |
| 5 | holdings again. |
| 6 | Almost immediately thereafter, that is, you |
| 7 | asked when that was, I believe that was April or May of |
| 8 | 2005, from May of 2005, your Honor, you got to read |
| 9 | this in the complaint because if I tell you, you would |
| 10 | not believe me, Paragraph 107, okay. |
| 11 | MR. HARPER: Believe it or not. |
| 12 | MR. GOTTHOFFER: Would you like to see a |
| 13 | document or two, Mr. Harper, that would support it? |
| 14 | Your Honor, may I continue? |
| 15 | THE COURT: Yes, please. |
| 16 | MR. GOTTHOFFER: And then I will, I will ask |
| 17 | you to read 107 through 111. |
| 18 | THE COURT: Now, I turn to the defense. |
| 19 | MR. GOTTHOFFER: Thank you. |
| 20 | MR. HARPER: Let me go back, if I could, |
| 21 | Judge, to the question you actually asked plaintiffs' |
| 22 | counsel, which, because I had made a statement to the |
| 23 | effect there was not a single line in the complaint in |
| 24 | which they alleged Seward & Kissel knew how, what the |
| 25 | total assets of the fund were at any point. |
| 26 | And what he did was point you to Paragraph 91, |

31

Proceedings

1

2    a letter written almost a year before the fund had even

3    raised ten cents, let alone, any paragraph that says,

4    at this point in time, Seward & Kissel knew that the

5    hedge fund had only $300 million or $500 million,

6    Judge, when American felt it had 9 billion.

7            Seward & Kissel had -- there is not an

8    allegation in this complaint, there is not an

9    allegation in this complaint that Seward & Kissel at

10   any time knew whether this fund had 300 million, 500

11   million, 3 billion, 10 million.

12           And all of these numbers, that he is throwing

13   around to you, let me use the number in the instant

14   messages that you know mean absolutely nothing unless

15   you know what the amount of the fund assets are.

16           THE COURT:  Well, it would mean, it would mean

17   something in light of the percentage that that the fund

18   owned in End Wave.

19           MR. HARPER:  No, sir.

20           THE COURT:  It would not?

21           MR. HARPER:  No.

22           THE COURT:  Excuse me.

23           MR. HARPER:  Your Honor, let me explain.  Let

24   me explain.  He just pointed you to an instant message

25   and said, Oye, 2 million shares.  And, he says also

26   where in his brief they were trading at $15.  Actually,

32

Proceedings

1

2    it never hit 15.  It was below.  Let's use 15 because

3    it is easier to do the math.  Two million times 15 is

4    30 million.

5            THE COURT:  I do not care.  It is the

6    percentage of the ownership of End Wave which is

7    important.

8            MR. HARPER:  He is not enforcing the

9    anti-trust laws, Judge.  He is not suing me for aiding

10   and abetting security law.  He is not suing for aiding

11   and abetting a violation of the security law, neither

12   is the SEC.  Either of these hedge funds file their own

13   forms for the 5 percent or 10 percent, 15 percent.

14   Just because I know that he owns 10 percent does not

15   mean he asked me to do the filing for him, and it does

16   not mean that I have an obligation to say, Oh, I am

17   going to file it for you.  That is not what the

18   allegation is, Judge.

19            And, what he is really trying to use it for is

20   to show you that somehow I knew that it comprised more

21   than 10 percent of the fund assets, and that is why I

22   challenged him to say where in his complaint does he

23   allege that I knew what the fund's assets were.

24            Number two, suppose I did know that, Judge.

25   Suppose, I did know that he did not file with the

26   5 percent or the 10 percent, Judge.  What, what is,

33

| | |
|---|---|
| 1 | Proceedings |

2       what is the consequence of that knowledge to him?

3               I cannot send out a press release to the

4       investors saying, Oh, by the way, I just learned in a

5       confidential communication covered by the Code of

6       Professional Responsibility covered as a confidence in

7       secret, which I am forbidden to divulge, that my client

8       had not filed under the 5 percent or 10 percent rule.

9               THE COURT:  Until --

10              MR. HARPER:  What is my consequence?  What is

11      my obligation.

12              THE COURT:  Until we -- I, the Court knows

13      what the relationship was between Seward & Kissel and

14      the fund, and what activities the firm was taking on

15      behalf of the hedge fund, it is difficult for me to

16      know what to do with, example Paragraph 106, of the

17      complaint.

18              MR. HARPER:  Well.

19              THE COURT:  You are asking me, you are asking

20      me to rule in essentially in a vacuum.

21              MR. HARPER:  I am asking you to rule on the

22      basis of the complaint.  Before you get to all --

23      before you get to put on your website --

24              THE COURT:  Excuse me.  Excuse me.  There are

25      limitations as to what the Court's reasonable

26      expectation is for a pleading.  There is only so much

mb

34

```
 1                    Proceedings
 2    information a plaintiff can allege.
 3              MR. HARPER:  May I address that point?
 4              THE COURT:  Excuse me.
 5              MR. HARPER:  I'm sorry.
 6              THE COURT:  There are allegations in this
 7    complaint that, obviously, need to be fleshed out.
 8    There are issues that I think probably would be, would
 9    be more -- certainly, I would be more comfortable
10    dealing with if it was in the form of summary judgment.
11    You are asking at the earlier stage in the proceeding
12    for me to essentially give Seward & Kissel a
13    get-out-of-jail-free card in light of some fairly
14    specific allegations considering the fact that there
15    has been no discovery.
16              MR. HARPER:  Well, your Honor, may I address
17    very briefly the discovery point, and then move onto
18    the main point because you do have, with the utmost
19    respect, an obligation to regulate the courthouse door
20    by making sure that these plaintiffs, before they put
21    on their website that they are suing my firm for
22    $200 million, before they go out and solicit other
23    investors to sue me, and before they put it on the
24    front page of the New York Law Journal, they have to do
25    certain things before they engage in millions of
26    dollars worth of discovery.  They have to satisfy
```

mb

35

1

2  certain pleading requirements.  And, what I am

3  suggesting to you is on Bayou and every case that

4  precedes Bayou's complaints like this have never gotten

5  past the pleading stage.

6          But let me talk about discovery because he, in

7  fact, has had the benefit of discovery in two ways.

8          THE COURT:  I really, I really, I really

9  reject the notion that just because other cases have

10  been dismissed against other law firms that Seward &

11  Kissel is entitled to an automatic dismissal.

12          MR. HARPER:  I know what you are saying.

13          THE COURT:  The argument is finished.

14          The motion is marked submitted.

15          Thank you very much.

16          MR.  GOTTHOFFER:  Thank you, your Honor.

17          MR. HARPER:  Thank you, your Honor.

18          (Whereupon, these proceedings are recessed.)

19

20

21

22                          - - -

23                      CERTIFIED TO BE A TRUE
                        AND CORRECT TRANSCRIPT
24

25          *Margaret Baumann*

26          MARGARET BAUMANN
            OFFICIAL COURT REPORTER

**Page 36 APPENDIX TO PLAINTIFF'S MEMO IN OPPOSITION TO MOTION TO DISMISS**